UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-                                   18-CR-609 (RJD)

BUSHAWN SHELTON,

　　　　　　Defendant.

# MEMORANDUM OF LAW IN SUPPORT OF
# MOTION TO SUPPRESS STATEMENTS

Susan K. Marcus
Elisa Y. Lee
Law Firm of Susan K. Marcus
29 Broadway, Suite 1412
New York, NY 10006
susan@skmarcuslaw.com

*Attorneys for Bushawn Shelton*

1

I.          **PRELIMINARY STATEMENT**

Defendant Bushawn Shelton respectfully submits this Memorandum of Law in support of his pre-trial motions for an Order: suppressing Mr. Shelton's statements elicited during custodial interrogation at his home, and at FBI field office, because they were obtained in violation of the Fifth and Sixth Amendments or, in the alternative, holding an evidentiary hearing; and for such other and further relief as this Court may deem just and proper.

II.          **STATEMENT OF FACTS**

On October 11, 2018, Bushawn Shelton was arrested at approximately 5:00am. An arrest report dated October 16, 2018, indicates that twenty law enforcement officers, from both state and federal agencies, were involved in the arrest of Mr. Shelton and the search of Mr. Shelton's home and car, and that the search of his home began at 5:15am and lasted until 11:25am. Bates 1058.

Agents broke the door down. Mr. Shelton was upstairs; his wife had already left for work. His grandmother was asleep in the basement. Officers threw smoke bombs in the house, and then upon seeing Mr. Shelton upstairs, pointed their guns at him and threatened to shoot him if he did not come downstairs. He came down; officers continued to point their guns on him, and immediately placed Mr. Shelton, who was wearing nothing but his underwear, in handcuffs. Armed officers sat him by the back door, and had several armed officers standing over him while others officers continued to search his house.

While Mr. Shelton was handcuffed, and in custody, officers demanded to know where Mr. Shelton's vehicle was. They threatened him with destruction of his property, and told him that they would violate his grandmother and wife if he did not tell them where it was located. They had not read him his rights under *Miranda v. Arizaona*. Under duress, Mr. Shelton felt compelled to tell them.

At 7:20am, Special Agents Dayna Kendall, Sean Olsewski, and Intelligence Analyst Christopher Stantzos searched his vehicle in Hempstead, New York. Bates 1067.

At approximately 5:45am, FBI New York Swat turned custody of Mr. Shelton over to Special Agent Michael Zoufal with the FBI, and Detectives Shawn Ricker and Jose Ortiz of the New York Police Department. Bates Shelton 00001. They brought Mr. Mr. Shelton to an interrogation room in the New York Field Office of the FBI at 6:50am. *Id.* At 7:06am on 10/11/2018, Mr. Shelton was read his *Miranda* rights and presented with an Advice of Rights form to sign. *Id.* Mr. Shelton refused both to waive his constitutional rights and to sign the Advice of Rights form. Bates Shelton 147. As the form indicates, Mr. Shelton was read the following rights:

> Before we ask you any questions, you must understand your rights.
> You have the right to remain silent.
> Anything you say can be used against you in court.
> You have the right to talk to a lawyer for advice before we ask you any questions.
> You have the right to have a lawyer with you during questioning.
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

Mr. Shelton said he did not want to make any statements and wanted to speak with an attorney. Bates Shelton 00001.

### III.   ARGUMENT

#### A. The Court Should Suppress Statements Made by Bushawn Shelton in His Home on October 11, 2018

Law enforcement may only interrogate a defendant in custody if the defendant has been advised of his or her *Miranda* rights and has waived those rights. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966).  Statements obtained in violation of *Miranda* are subject to suppression. *See Dickerson v. United States*, 530 U.S. 428, 443-44 (2000). Once *Miranda* rights have been invoked, interrogation must stop and the invocation must be "scrupulously honored." *Michigan v. Mosley, 423*

2

*U.S. 96, 104,* (1975). Interrogation in this context does not consist only of explicit questioning. The Supreme Court has defined an interrogation as "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).

Mr. Shelton was in custody. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444 (footnote omitted). Mr. Shelton was handcuffed and placed under arrest upon the officers' entry in his home. *See* Bates Shelton 0001. There is no doubt he was in custody. *See New York v. Quarles*, 467 U.S. 649, 655 (1984); *Dunaway v. New York,* 442 U.S. 200, 215 (1979).

Demanding to know where Mr. Shelton's car were not questions related to public safety. *Cf.. Quarles*, 467 U.S. at 655-656. The public safety exception is limited in that pre-*Miranda* questions, while "framed spontaneously in dangerous situations," may not be investigatory in nature or "designed solely to elicit testimonial evidence from a suspect." *United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005) (*quoting United States v. Newton*, 369 F.3d 659, 678 (2d Cir. 2004), and *Quarles*, 467 U.S. at 658-59).

Mr. Shelton's statement about the location of his car should be suppressed. The subsequent search of his car, which was conducted in Hempstead, New York, nowhere near his home, should be suppressed as fruits of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963); *Nix v. Williams*, 467 U.S. 431, 441-444 (1984); *United States v. Guarino*, 629 F. Supp. 320, 326 (D. Conn. 1986) ("since the defendant's act of pointing to the black bag and identifying its contents as cocaine was unlawfully obtained and has therefore been suppressed, the cocaine seized as a direct result of this act must likewise be suppressed" (quoting *United States v. Lee*, 699 F.2d 466, 468 (9th Cir. 1982) (lead pipe suppressed because its seizure was the direct result of an unlawfully obtained

confession)). In *Nix,* the Supreme Court held that "[w]e need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light *but for the illegal actions* of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Nix,* 467 U.S. at 442.

  The car was not located in Brooklyn, where Mr. Shelton was arrested. It would not have been searched pursuant to an inventory search or inevitable discovery. Even though law enforcement had a search warrant for the vehicle, the agents would not have located the car without the incriminating statement elicited from Mr. Shelton. *Cf. United States v. Mendez*, 315 F.3d 132, 137-139 (2d Cir. 2002) (holding that even if police officers' initial search of defendant's automobile at time of his arrest was not a valid inventory search, handgun found in glove compartment would have been inevitably discovered during valid inventory search); *United States v. Garcia*, 279 F. Supp. 2d 294, 303 (S.D.N.Y. 2003) ("Since the pills in Garcia's groin area would inevitably have been discovered pursuant to a routine search of Garcia's person, either at the scene of the arrest or at the Precinct, the pills would not be suppressed under the inevitable discovery rule"). Evidence is admissible under this exception to the exclusionary rule "only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006).

  In this case, the government cannot say that each of the contingencies necessary to the legal discovery of Mr. Shelton's car, which was parked in Long Island, would be resolved in the government's favor. And, we will never know, because law enforcement used the coerced and

4

illegally obtained statements made by Mr. Shelton, while he was in handcuffs and under arrest, and not given any *Miranda* warnings, to effect the search.

### B. The Court Should Suppress Any Statements Mr. Shelton Made in the FBI Interrogation Room On October 11, 2018

Officers brought Mr. Shelton into an interrogation room in the New York Field Office for the FBI for questioning. The only evidence provided of this interrogation is a video. The video time stamp is at 7:14am. Mr. Shelton has his head down on the table, and within less than a minute there are three law enforcement officers present. The video starts with Agent Zoufal reading Mr. Shelton his *Miranda* rights. Mr. Shelton immediately says "No." Agent Zoufal says "No? So you don't wanna…?". Mr. Shelton says "it says are you willing to answer questions without a lawyer, and I'm not. I don't know what the hell you all got going on so I don't want to say nothing…" At 7:16am on the video time stamp Agent Zoufal states that he is writing that Mr. Shelton refused to sign on the waiver form.

This should have been the end of any questioning of Mr. Shelton. However, the officers continued to engage Mr. Shelton in conversation. Agent Zoufal stated "that's totally fine if you don't want to answer questions" or "talk to a lawyer first," that's a "smart move," but "I'll just tell you this man. This investigation has been going on a long time. We have a lot of information. We didn't pick you at random or out of a hat. We know what's going on. We know what this is about. You're in a position right now to help yourself. But the more you drag it out and withhold information, the worse it's going to get. Okay? The charges you're looking at are very serious. The Murder for Hire statute for example, is a death penalty eligible offense… and the gun charge is uh… using a firearm in a crime of violence, that carries a mandatory minimum charge as well." Mr. Shelton says "I used a firearm in a crime of violence?". Agent Zoufal says "it's a conspiracy charge. You may not have directly used a firearm but if you caused someone else to use the firearm you can be charged with

5

it… it's different from the state system." Mr. Shelton reiterates "Nah, nah, definitely, um-um. No. I'm good." Agent Zoufal says "Just remember what I said." Shelton said, "all the more reason I need to talk to someone, … conspiracy, you can just be thrown into with it, I need to know what … is going on. My mind is racing right now. I'm not in a position to talk to anyone."

Despite this, the law enforcement officers continued to try to engage Mr. Shelton in conversation. They appeared to be "on his side" by reassuring him that the quality of appointed lawyers in the federal system was "top tier." They offer to let him make a call to his wife. They tell him he can go over "financial information" with her. Mr. Shelton makes statements about his work obligations. Then officers asked about the car he rented for their anniversary, and at one point, asked him whether he liked "Honda Accords."

Mr. Shelton's statements were obtained in violation of his *Miranda* rights, because, as indicated on the Advice of Rights form, he refused to waive his *Miranda* rights to remain silent or to be questioned without a lawyer present, and refused to execute the form. Once Mr. Shelton refused to waive his rights, all questioning should have ceased. *See Miranda*, 384 U.S. at 475 (holding that once the right to counsel in invoked, "the interrogation must cease until an attorney is present"). Once an arrestee has invoked his Fifth Amendment right to counsel, there is an absolute bar on police interrogation "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *see also United United States v. Oehne*, 698 F.3d 119, 122 (2d Cir. 2012).

Rather than "scrupulously honor" Mr. Shelton's decision, however, law enforcement agents continued to try to find ways to elicit potentially incriminating statements from Mr. Shelton. After Mr. Shelton refused to waive his right to remain silent, the officers nonetheless continued to try to elicit incriminating information from him. There was, of course, no reasonable explanation for their continued communications with him *other* than to try to elicit a statement from Mr. Shelton. This

6

constituted custodial interrogation in violation of the Fifth and Sixth Amendments, and his statements should be suppressed.

Continuing to talk to Mr. Shelton was "precisely the sort of conduct the prophylactic rule seeks to prevent." *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989) (noting that the ADA's "remark that 'If you want to talk to us, now is the time to do it' was not aimed at resolving any ambiguity in Campaneria's statement, but rather at changing his mind."). Indeed, the only reason to keep Mr. Shelton in the room with officers was to elicit a statement from him. The only next step in his process was for him to have an attorney appointed (which could have happened earlier in the day – there was no reason to wait "until the afternoon"), and to appear before the Magistrate Judge. But rather than "scrupulously honor[]" Mr. Shelton's refusal to waive his rights, the detective took his last chance to try to elicit incriminating information from Mr. Shelton.

Doing so violated Mr. Shelton's rights. He had recently explicitly refused to waive those rights, he was in custody, his rights were not re-administered, and he did not at any point agree to waive his rights. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (noting that the Supreme Court has held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."). Indeed, the law enforcement officers' repeated efforts to talk to Mr. Shelton, both before and after he explicitly refused to waive his rights, amounted to a multiple step-process designed to break down Mr. Shelton's will over a period of time and to elicit incriminating statements from him. *See Missouri v. Seibert*, 542 U.S. 600, 609 (2004) "'[I]nterrogation practices' such as the one at issue in this case may 'disable an individual from making a free and rational choice about speaking,' negating the constitutional force of subsequent Miranda warnings…." *Id.* (internal citations omitted).

7

Because Mr. Shelton's statements at his home and in the FBI Field Office Interrogation Room were obtained in violation of Mr. Shelton's Fifth and Sixth Amendment rights, his statements should be suppressed.

### IV.    CONCLUSION

For all the foregoing reasons, Bushawn Shelton respectfully requests that the Court grant the relief he seeks herein, or any relief the Court deems just and proper.

Dated: April 29, 2022

> Respectfully submitted,
>
> /s/ Susan K. Marcus
>
> Susan K. Marcus, Esq,
> Elisa Y. Lee, Esq.
> Law Firm of Susan K. Marcus LLC
> 29 Broadway, Suite 1412
> New York, NY 10006
> susan@skmarcuslaw.com
>
> *Attorneys for Bushawn Shelton*