NS:KCB/DEL/EJD
F. #2018R01984

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        Docket No. <u>18-609–CR-(S-3) (RJD)</u>

ARTHUR CODNER,
ALFRED LOPEZ,
HIMEN ROSS,
BUSHAWN SHELTON and
ANTHONY ZOTTOLA, SR.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S MEMORANDUM OF LAW IN
<u>RESPONSE TO DEFENDANT'S PRETRIAL MOTIONS</u>

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Kayla Bensing
Devon Lash
Emily Dean
Assistant U.S. Attorneys
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ vii

PRELIMINARY STATEMENT ........................................................................... 1

RELEVANT BACKGROUND ............................................................................. 2

    I.    Facts ........................................................................................................... 2

        A.    The Offense Conduct, Charges and Arrests ................................. 2

        B.    The Challenged Search Warrants ................................................ 3

              1.    The September and October Instagram Warrants ........................... 3

              2.    The September and October Historical Cell Site Warrants ................................................................................ 5

              3.    The October Premises Warrant and the October and July SIM Card Warrants .................................................... 6

              4.    The October Verizon Warrant ......................................... 9

              5.    The December Premises Warrant .................................... 10

               6.    The June Premises and Devices Warrants ..................... 11

ARGUMENT ...................................................................................................... 14

    I.    The Motions to Dismiss Should Be Denied ........................................ 14

        A.    Applicable Law ........................................................................ 14

        B.    Discussion ................................................................................ 15

    II.    The Motions for a Bill of Particulars Should Be Denied ..................... 18

        A.    Applicable Law ........................................................................ 18

        B.    Discussion ................................................................................ 21

    III.    The Motions to Sever Should Be Denied ............................................ 26

        A.    Legal Standard ......................................................................... 26

        B.    Zottola and Shelton's Claims of Antagonistic Defenses Do Not Require Severance ........................................................... 30

i

|   |   | 1. | Mutually Antagonistic Defenses | 31 |
|   |   | 2. | Discussion | 33 |
|   |   |   | a. The Proffered Defenses Face Evidentiary Hurdles | 34 |
|   |   |   | i. Zottola | 34 |
|   |   |   | ii. Shelton | 36 |
|   |   |   | b. The Proffered Defenses Are Not Mutually Antagonistic | 38 |
|   |   |   | c. Zottola and Shelton's "Second Prosecutor" Argument is a Red Herring | 45 |
|   | C. | Zottola, Shelton, Codner and Lopez Have Articulated No Spillover Prejudice Requiring Severance | 47 |
|   | D. | Judicial Efficiency Weighs Against Severance | 53 |
|   | E. | Severance of Counts Five and Six is Unwarranted | 56 |
|   |   | 1. | Applicable Law | 57 |
|   |   | 2. | Discussion | 58 |
| IV. | The Motions for Brady/Giglio Disclosures Should Be Denied | 59 |
|   | A. | Applicable Law | 60 |
|   | B. | Discussion | 60 |
|   |   | 1. | Brady Material | 60 |
|   |   | 2. | Giglio Material | 62 |
|   |   | 3. | Shelton's Other Requests | 64 |
| V. | The Motion to Produce All Statements by Sylvester Zottola Should Be Denied | 66 |
| VI. | The Motion to Preclude Evidence Produced in April 2022 Should Be Denied | 68 |
|   |   | 1. | The April 2022 Rule 16 Discovery Production | 68 |
|   |   | 2. | The April 2022 Pretrial Disclosure | 70 |

VII.   The Motions to Suppress Shelton's and Zottola's Statements Should Be Denied ............................................................................................. 75

    A.   Additional Facts ................................................................................. 76

        1.   Zottola's Post-Arrest Statements ................................. 76

        2.   Shelton's Post-Arrest Statements................................. 78

    B.   Applicable Law ................................................................................. 79

        1.   Spontaneous Utterances ................................................ 79

        2.   Routine Booking Exception........................................... 80

        3.   Inevitable Discovery ..................................................... 82

    C.   Discussion ........................................................................................ 82

        1.   Zottola's Motion to Suppress His Statements Should Be Denied ....................................................................... 82

            a.   The Routine Booking Exception Applies ......................... 83

            b.   Zottola's Statements as to the Timing of His Arrest Were Spontaneous and Voluntary Statements ............................................................ 85

        2.   Shelton's Motion to Suppress His Statements Should Be Denied ....................................................................... 86

        3.   No Hearing as to Either Motion is Necessary............................... 88

VIII.  The Motions to Suppress Evidence Seized from Premises, Electronics Devices, Cell Phones and Social Media Accounts Should Be Denied ................. 89

    A.   Applicable Law ................................................................................. 91

        1.   Standing ......................................................................... 91

        2.   Probable Cause............................................................... 91

        3.   Particularity / Overbreadth............................................ 93

        4.   Good Faith Exception .................................................... 94

        5.   *Franks* Doctrine ............................................................ 96

            a.   Intentionality or Recklessness........................... 97

|   |   |   | b. | Materiality | 98 |
|---|---|---|---|---|---|
| B. |   | The MMBCERTIFIED Instagram Warrant, the KINGSHELZ Instagram Warrant and the Joint Instagram Warrant Were Sufficiently Particularized and Issued Upon Probable Cause | | | 99 |
|   | 1. | The Instagram Warrants Were Sufficiently Particularized and Not Overbroad | | | 99 |
|   | 2. | The Instagram Warrants Were Issued Upon Probable Cause | | | 107 |
|   | 3. | The Instagram Affidavits Did Not Omit Material Information | | | 111 |
| C. |   | The Warrants for Shelton's Historical Cell Site Information and Zottola's Verizon Information Were Sufficiently Particularized and Issued Upon Probable Cause | | | 113 |
|   | 1. | The 4515 Historical Cell-Site Warrant as to Shelton | | | 114 |
|   |   | a. | The 4515 Historical Cell-Site Warrant Did Not Lack Probable Cause | | 114 |
|   |   | b. | The 4515 Historical Cell-Site Warrant Was Sufficiently Particularized | | 115 |
|   | 2. | The 3484 Historical Cell-Site Warrant As to Shelton | | | 116 |
|   | 3. | The October Verizon Warrant As to Zottola | | | 118 |
|   |   | a. | The October Verizon Warrant was Particularized | | 118 |
|   |   | b. | The Seizure Did Not Exceed the October Verizon Warrant's Scope | | 120 |
| D. |   | The October Premises Warrant | | | 121 |
|   | 1. | Zottola Has Failed to Demonstrate Standing to Move to Suppress the October Premises Warrant | | | 122 |
|   | 2. | Shelton Failed to Demonstrate Standing to Move to Suppress the Search of the Laptop Identified as FBI Evidence Number 1B45 | | | 128 |
|   | 3. | The October Premises Warrant Was Not Overbroad | | | 129 |
|   |   | a. | The October Premises Warrant Was Not Overbroad in Its Authorization to Search the | | |

iv

Entire Premises .............................................. 129

b.   The October Premises Warrant Was Not
Overbroad in Its Authorization to Seize
Electronic Devices ......................................... 132

c.   The October Premises Warrant Was Not
Overbroad in The Scope of Its Authorization to
Search Electronic Devices ............................... 135

d.   The Remedy for an Overbroad Search Warrant is
Not Wholesale Suppression ........................... 141

4.   The October Premises Warrant Was Sufficiently
Particular and Issued on Probable Cause .................................... 144

a.   Particularity of Categories of Items to Be Seized .......... 144

b.   There was Probable Cause for the Warrant's
Seizure of Non-Cell Phone Electronic Devices ............. 153

5.   The October Premises Warrant Did Not Omit Material
Information Nor Was it Misleading ........................... 156

E.   The October Vehicle Warrant .............................................. 159

F.   The December Premises Warrant ........................................ 160

G.   The July SIM Card Search Was Not Rendered Unreasonable by
the Passage of Time .............................................. 162

H.   The Zottola Premises and Device Warrants............................. 163

1.   The Zottola Premises and Devices Warrants Were
Supported by Probable Cause ....................................... 164

2.   The Zottola Premises and Devices Warrants Were
Sufficiently Tailored ..................................... 168

3.   The Zottola Premises and Devices Warrants Are
Sufficiently Tailored ..................................... 172

I.   Law Enforcement Relied Upon Each of the Shelton and Zottola
Warrants in Good Faith.............................................. 174

J.   The Execution of the Shelton and Zottola Premises Warrants Was
Reasonable .............................................. 177

1.   Legal Standard ......................................... 177

2.      Analysis.........................................................................................179

CONCLUSION...........................................................................................................186

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

Alderman v. United States,
    394 U.S. 165 (1969)................................................................................... 124

Andresen v. Maryland,
    427 U.S. 463 (1976)..................................................................................... 92

Brown v. United States,
    411 U.S. 223 (1973)..................................................................................... 89

Bruton v. United States,
    391 U.S. 123 (1968)........................................................................... 28, 47, 53

Carpenter v. United States,
    138 S. Ct. 2206 (2018)....................................................... 123, 124, 153

Chimel v. California,
    395 U.S. 752 (1969)................................................................................... 123

Coolidge v. New Hampshire,
    403 U.S. 443 (1971)..................................................................................... 91

Cruz v. New York,
    481 U.S. 186 (1987)..................................................................................... 47

Davis v. United States,
    564 U.S. 229 (2009)............................................................................. 93, 172

Edwards v. Arizona,
    451 U.S. 477 (1981)..................................................................................... 78

Fenje v. Feld,
    301 F. Supp. 2d 781 (N.D. Ill. 2003)............................................................ 35

Franks v. Delaware,
    438 U.S. 154 (1978)............................................................................. 96, 97

Giglio v. United States,
    405 U.S. 150 (1972)............................................................................. 59, 60

Herring v. United States,
    555 U.S. 135 (2009)................................................................... 95, 96, 176

Hudson v. Michigan,
   547 U.S. 586 (2006).............................................................................. 82, 95, 175

Illinois v. Gates,
   462 U.S. 213 (1983).............................................................................. 92, 93, 115

Illinois v. Krull,
   480 U.S. 340 (1987)........................................................................................ 176

Jones v. United States,
   362 U.S. 257 (1960)........................................................................................ 125

Kaley v. United States,
   571 U.S. 320 (2014).......................................................................................... 16

Katz v. United States,
   389 U.S. 347 (1967)................................................................................ 123, 127

Krimstock v. Kelly,
   464 F.3d 246 (2d Cir. 2006) ........................................................................ 121

Lavin v. United States,
   299 F.3d 123 (2d Cir. 2002) ........................................................................ 121

Marron v. United States,
   275 U.S. 192 (1927).......................................................................................... 91

United States v. Mendlowitz,
   No. 17-CR-248 (VSB), 2019 WL 1017533 (S.D.N.Y. Mar. 2, 2019)................... 178, 179, 185

Miranda v. Arizona,
   384 U.S. 436 (1966)................................................................................ 75, 80, 82

Nix v. Williams,
   467 U.S. 431 (1984)................................................................................... 83, 88

Old Chief v. United States,
   519 U.S. 172 (1997)........................................................................................ 108

Pennsylvania v. Muniz,
   496 U.S. 582 (1990)................................................................................... 75, 84

Rakas v. Illinois,
   439 U.S. 128 (1978)........................................................................................ 128

Richardson v. Marsh,
   481 U.S. 200 (1987)................................................................................... 28, 53

Riley v. California,
    134 S. Ct. 2473 (2014) ................................................................. 123

Rosa v. McCray,
    396 F.3d 210 (2d Cir. 2005) ................................................ 81, 82, 84, 85

Steagald v. United States,
    451 U.S. 204 (1981) ..................................................................... 133

Taylor v. Evans,
    No. 94-CV-8425, 1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) ......................... 35, 41

Texas v. Brown,
    460 U.S. 730 (1983) ....................................................................... 93

United State v. Mahaffy,
    446 F. Supp. 2d 115 (E.D.N.Y. 2006) ..................................................... 24

United States v. Abakporo,
    No. 12-CR-340 (SAS), 2013 WL 6188260 (S.D.N.Y. Nov. 25, 2013) .................... 32

United States v. Abboud,
    438 F.3d 554 (6th Cir. 2006) ................................................ 103, 104, 116

United States v. Abrams,
    539 F. Supp. 378 (S.D.N.Y. 1982) ......................................................... 14

United States v. Abu-Jihaad,
    630 F.3d 102 (2d Cir. 2010) .............................................................. 108

United States v. Adelekan,
    No. 19-CR-291 (LAP), 2021 WL 4839065 (S.D.N.Y. Oct. 15, 2021) ................. 43, 45

United States v. Akparanta,
    No. 19-CR-363 (LGS), 2019 WL 5616875 (S.D.N.Y. Oct. 30, 2019) ................... 137

United States v. Albunio,
    No. 91-CR-0403, 1992 WL 281037 (E.D.N.Y. Sept. 9, 1992) ....................... 20, 23

United States v. Alegria,
    761 F. Supp. 308 (S.D.N.Y. 1991) ......................................................... 48

United States v. Alexander,
    92-CR-220 (SWK), 1993 WL 97407 (S.D.N.Y. Apr. 1, 1993) ......................... 149

United States v. Alleyne,
    No. 20-CR-266 (AMD), 2021 WL 5496044 (E.D.N.Y. Nov. 23, 2021) ................... 87

United States v. Almaleh,
   No. 17-CR-25 (ER), 2022 WL 602069 (S.D.N.Y. Feb. 28, 2022) ................ 138, 147, 179, 183

United States v. Alston,
   No. 15 CR. 435 (CM), 2016 WL 2609521 (S.D.N.Y. Apr. 29, 2016) .......................... 179, 186

United States v. Amato,
   15 F.3d 230 (2d. Cir. 1994) ...................................................................................... 29

United States v. Anderson,
   929 F.2d 96 (2d Cir. 1991) ...................................................................................... 81

United States v. Annucci,
   No. 06-CR-982 (BSJ), 2007 WL 1310156 (S.D.N.Y. May 3, 2007) ................................. 80, 81

United States v. Attanasio,
   870 F.2d 809 (2d Cir. 1989) ................................................................................ 27, 29

United States v. Awadallah,
   349 F.3d 42 (2d Cir. 2003) ......................................................................... 97, 98, 112

United States v. Ayers,
   924 F.2d 1468 (9th Cir. 1991) ............................................................................... 131

United States v. Babilonia,
   854 F.3d 163 (2d Cir. 2017) .................................................................................. 162

United States v. Baez,
   62 F. Supp. 2d 557 (D. Conn. 1999) .......................................................................... 21

United States v. Barnes,
   158 F.3d 662 (2d Cir. 1998) ..................................................................................... 19

United States v. Barret,
   824 F. Supp. 2d 419 (E.D.N.Y. 2011) .................................................................... passim

United States v. Beaudion,
   979 F.3d 1092 (5th Cir. 2020) ................................................................................ 125

United States v. Bellomo,
   954 F. Supp. 630 (S.D.N.Y. 1997) ............................................................................. 48

United States v. Bernstein,
   533 F.2d 775 (2d Cir. 1976) ..................................................................................... 27

United States v. Binday,
   No. 12-CR-152 (CM), 2012 WL 6135013 (S.D.N.Y. Dec. 10, 2012) ............................... 21, 22

United States v. Blake,
   868 F.3d 960 (11th Cir. 2017) ................................................................ 103, 104

United States v. Bortnovsky,
   820 F.2d 572 (2d Cir. 1987) ....................................................................... 21, 22

United States v. Brown,
   No. 07-CR-1341, 2008 WL 4585325 (2d. Cir. Oct. 14, 2008) ................................. 84

United States v. Burke,
   517 F.2d 377 (2d Cir. 1975) ............................................................................ 186

United States v. Canestri,
   518 F.2d 269 (2d Cir. 1975) ............................................................................ 131

United States v. Canfield,
   212 F.3d 713 (2d Cir. 2000) ............................................................... 98, 99, 157

United States v. Cantoni,
   No. 18-CR-562 (ENV), 2019 WL 1264899 (E.D.N.Y. Mar. 19, 2019) .................... 72

United States v. Canty,
   971 F. Supp. 687 (N.D.N.Y. 1997) ..................................................................... 16

United States v. Cardascia,
   951 F.2d 474 (2d Cir. 1991) ................................................................. 28, 31, 49

United States v. Carroll,
   510 F.2d 507 (2d Cir. 1975) .............................................................................. 19

United States v. Casamento,
   887 F.2d 1141 (2d Cir. 1989) ............................................................. 29, 31, 48, 49

United States v. Cephas,
   937 F.2d 816 (2d Cir. 1991) .............................................................................. 19

United States v. Cerna,
   No. 08-CR-0730 (WHA), 2010 U.S. Dist. LEXIS 145991 (N.D. Cal. Sept. 22, 2010) ......... 116

United States v. Cervone,
   907 F.2d 332 (2d Cir. 1990) .............................................................................. 27

United States v. Chen,
   378 F.3d 151 (2d Cir. 2004) ......................................................................... 19, 21

United States v. Chierchio, et al,
   20-CR-306 (NGG), 2022 WL 523603 (E.D.N.Y. Feb. 22, 2022) ...................... passim

United States v. Choudhry,
    24 F. Supp. 3d 273 (E.D.N.Y. 2014) ................................................ 80, 81, 85, 87

United States v. Chow,
    No. 01-CR-291 (FB), 2001 WL 1347236 (E.D.N.Y. Nov. 2, 2001) ...................................... 178

United States v. Cioffi,
    668 F. Supp. 2d 385 (E.D.N.Y. 2009) ................................................ 169

United States v. Clark,
    638 F.3d 89 (2d Cir. 2011) ................................................ 96, 111, 176

United States v. Clarke,
    No. 05-CR-017 (DAB), 2006 WL 3615111 (S.D.N.Y. Dec. 7, 2006) ................................... 16

United States v. Cohen,
    372 F. Supp. 2d 340 (E.D.N.Y. 2005) ................................................ 80

United States v. Colkley,
    899 F.2d 297 (4th Cir. 1990) ................................................ 112

United States v. Colon,
    835 F.2d 27 (2d Cir. 1987) ................................................ 80, 86, 87

United States v. Conyers,
    No. 15-CR-537 (VEC), 2016 WL 7189850 (S.D.N.Y. Dec. 9, 2016) ................................... 62

United States v. Coppa,
    267 F.3d 132 (2d Cir. 2001) ................................................ 60, 62

United States v. Crews,
    445 U.S. 463 (1980) ................................................ 82

United States v. Cuti,
    720 F.3d 453 (2d Cir. 2013) ................................................ 36

United States v. D'Amico,
    734 F. Supp. 2d 321 (S.D.N.Y. 2010) ................................................ 152

United States v. Davidoff,
    845 F.2d 1151 (2d Cir. 1988) ................................................ 25

United States v. Dawkins,
    No. 17-CR-684 (ER), 2019 WL 2464924 (S.D.N.Y. May 23, 2019) ................................... 102

United States v. De La Pava,
    165 F.3d 157 (2d Cir. 2001) ................................................ 16

United States v. DeVillio,
  983 F.2d 1185 (2d Cir. 1993) ................................................... 53

United States v. DiTomasso,
  56 F. Supp. 3d 584 (S.D.N.Y. 2014) ......................................... 127

United States v. Dore,
  582 F. App'x 42 (2d Cir. 2014) ................................................ 125

United States v. Dupigny,
  No. S1 18 Cr. 528 (JMF), 2019 WL 2327697 (S.D.N.Y. May 20, 2019) ....................... 92, 129

United States v. Dupree,
  781 F. Supp. 2d 115 (E.D.N.Y. 2011) ....................................... 124

United States v. Durand,
  767 F. App'x 83 (2d Cir. 2019) .......................................... 81, 83

United States v. Elkorany,
  No. 20-CR-437 (NRB), 2021 WL 3668086 (S.D.N.Y. Aug. 17, 2021) ................................. 174

United States v. Elliott,
  893 F.2d 220 (9th Cir. 1990) ................................................ 115

United States v. Eng,
  997 F.2d 987 (2d Cir.1993) .................................................. 80

United States v. Falso,
  544 F.3d 110 (2d Cir. 2008) ................................................ 106

United States v. Feola,
  651 F. Supp. 1068 (S.D.N.Y. 1987) ........................................... 20

United States v. Ferguson,
  758 F.2d 843 (2d Cir. 1985) ................................................. 99

United States v. Ferrarini,
  9 F. Supp. 2d 284 (S.D.N.Y. 1998) ........................................... 49

United States v. Feyrer,
  333 F.3d 110 (2d Cir. 2003) ................................................. 28

United States v. Folks,
  No. 20-3267-CR, 2021 WL 5987009 (2d Cir. Dec. 17, 2021) ....................... 145, 148, 155, 178

United States v. Friedman,
  854 F.2d 535 (2d Cir. 1988) .............................................. 27, 29

United States v. Galpin,
    720 F.3d 436 (2d Cir. 2013) ...................................................................... passim

United States v. Gammarano,
    No. 06-CR-72 (CPS), 2007 WL 2077735 (E.D.N.Y. July 18, 2007) ....................................... 24

United States v. Ganias,
    824 F.3d 199 (2d Cir. 2016) ................................................................... 120, 179

United States v. Gatto,
    313 F. Supp. 3d 551 (S.D.N.Y. 2018) ................................................................ 137

United States v. George,
    975 F.2d 72 (2d Cir. 1992) ....................................................................... passim

United States v. Gillette,
    383 F.2d 843 (2d Cir. 1967) ..................................................................... 89, 90

United States v. Gotchis,
    803 F.2d 74 (2d Cir.1986) ....................................................................... 81, 82

United States v. Gotti,
    784 F. Supp. 1017 (E.D.N.Y. 1992) .................................................................. 19

United States v. Graziano,
    558 F. Supp. 2d 304 (E.D.N.Y. 2008) ............................................................... 132

United States v. Griffith,
    867 F.3d 1265 (D.C. Cir. 2017) ............................................................... 131, 135

United States v. Hadden,
    No. 20 CR. 468 (RMB), 2022 WL 1409600 (S.D.N.Y. May 4, 2022) ................................... 174

United States v. Hameedi,
    No. 17-CR-137 (JGK), 2017 WL 5152991 (S.D.N.Y. Nov. 3, 2017) ................................. 43, 45

United States v. Haqq,
    278 F.3d 44 (2d Cir. 2002) ....................................................................... 123

United States v. Heath,
    455 F.3d 52 (2d Cir. 2006) ..................................................................... 83, 88

United States v. Hernandez,
    No. 09-CR-625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) ................................... 146, 174

United States v. Hill,
    No. 12-CR-214 (KAM), 2013 WL 3243657 (E.D.N.Y. June 26, 2013) ................................... 81

United States v. Ianniello,
  621 F. Supp. 1455 (S.D.N.Y. 1985) ...................................................................... 20

United States v. Jacobson,
  4 F. Supp. 3d 515 (E.D.N.Y. 2014) ............................................................... passim

United States v. James,
  712 F. 3d 79 (2d Cir. 2013) ................................................................................. 50

United States v. Jarman,
  847 F.3d 259 (5th Cir. 2017) ...................................................................... 179, 185

United States v. Jimenez,
  824 F. Supp. 351 (S.D.N.Y. 1993) .............................................................. 21, 29

United States v. Jones,
  85-CR-1075 (CSH), 1986 WL 275 (S.D.N.Y. May 28, 1986) ............................... 20

United States v. Kahaner,
  203 F. Supp. 78 (S.D.N.Y. 1962) ........................................................................ 20

United States v. Kahaner,
  317 F.2d 459 (2d Cir. 1963) ................................................................................ 20

United States v. Knights,
  534 U.S. 112 (2001) ......................................................................................... 179

United States v. Knoll,
  16 F.3d 1313 (2d Cir. 1994) ...................................................................... 124, 127

United States v. LaChance,
  788 F.2d 856 (2d Cir. 1986) .............................................................................. 120

United States v. Larranga Lopez,
  No. 05-CR-655 (SLT), 2006 WL 1307963 (E.D.N.Y. May 11, 2006) .................... 44

United States v. Lee,
  549 F.3d 84 (2d Cir. 2008) ........................................................................... 57, 58

United States v. Lee,
  834 F.3d 145 (2d Cir. 2016) .......................................................................... 68, 72

United States v. Leon,
  468 U.S. 897 (1984) ....................................................................................... passim

United States v. Levy,
  No. 11-CR-62 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) ............. 101, 138, 148, 174

United States v. Liburd,
   No. 17-CR-296 (PKC), 2018 WL 2709199 (E.D.N.Y. June 5, 2018)................................... 137

United States v. Lifshitz,
   369 F.3d 173 (2d Cir. 2004) ........................................................................ 124, 127

United States v. Lloyd,
   No. 98-CR-529 (ILG), 1998 WL 846822 (E.D.N.Y. Oct. 5, 1998) ..................................... 178

United States v. Lofstead,
   No. 3:20-CR-53 (MMD), 2021 U.S. Dist. LEXIS 224735 (D. Nev. Nov. 22, 2021) ........... 141

United States v. Lucas,
   382 F. Supp. 3d 280 (W.D.N.Y. May 13, 2019) .................................................... 124

United States v. Lustyik,
   57 F. Supp. 3d 213 (S.D.N.Y. 2014) ........................................................... passim

United States v. Lyles,
   593 F.2d 182 (2d Cir. 1979) ..................................................................... 28, 54

United States v. Mandell,
   710 F. Supp. 2d 368 (S.D.N.Y. 2010) ............................................................ 22, 23

United States v. Marcus,
   807 F. Supp. 934 (E.D.N.Y. 1992) ................................................................. 117

United States v. Martin,
   157 F.3d 46 (2d Cir. 1998) ......................................................................... 93

United States v. Martin,
   426 F.3d 68 (2d Cir. 2005) ......................................................................... 97

United States v. Mejias,
   No. 11-CR-506 (CBA), 2011 WL 5156440 (E.D.N.Y. Oct. 28, 2011)................................... 58

United States v. Meregildo,
   883 F. Supp. 2d 523 (S.D.N.Y. 2012) .............................................................. 124

United States v. Messalas,
   No. 17-CR-339 (RRM), 2020 WL 4003604 (E.D.N.Y. July 14, 2020) ................ 101, 121, 145

United States v. Metter,
   860 F. Supp. 2d 205 (E.D.N.Y. 2012) ......................................................... 179, 184

United States v. Middendorf,
   No. 18-CR-36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) ..................................... 62

United States v. Miller,
  116 F.3d 641 (2d Cir. 1997) ............................................................. 52

United States v. Montana,
  958 F.2d 516 (2d Cir. 1992) ............................................................. 78

United States v. Morales,
  77 M.J. 567 (A. Ct. Crim. App. 2017) ............................................ 142

United States v. Nejad,
  436 F. Supp. 3d 707 (S.D.N.Y. 2020) ...................................... 179, 185

United States v. Nerlinger,
  862 F.2d 967 (2d Cir. 1988) ............................................................. 27

United States v. Nixon,
  418 U.S. 683 (1974) ......................................................................... 63

United States v. Nordlicht,
  No. 16-CR-640 (BMC), 2018 U.S. Dist. LEXIS 63890 (E.D.N.Y. Apr. 16, 2018) ........... 40, 41

United States v. Oehne,
  698 F.3d 119 (2d Cir. 2012) ............................................................. 80

United States v. Orsini,
  406 F. Supp. 1264 (E.D.N.Y. 1976) ............................................ 24, 25

United States v. Osario,
  949 F.2d 38 (2d Cir. 1991) ............................................................. 123

United States v. Pabon,
  871 F.3d 164 (2d Cir. 2017) ............................................................. 82

United States v. Page,
  657 F.3d 126 (2d Cir. 2011) ....................................................... 57, 59

United States v. Palmer,
  No. 14-CR-788 (NSR), 2015 WL 6459271 (S.D.N.Y. Oct. 23, 2015) ................... 90

United States v. Pangburn,
  983 F.2d 449 (2d Cir. 1993) ........................................................... 186

United States v. Paulino,
  850 F.2d 93 (2d Cir. 1988) ...................................................... 123, 124

United States v. Payner,
  447 U.S. 727 (1980) ....................................................................... 125

United States v. Pena,
   961 F.2d 333 (2d Cir. 1992) ............................................................. 89

United States v. Persico,
   621 F. Supp. 842 (S.D.N.Y. 1985) ............................................. 14, 21

United States v. Pirro,
   76 F. Supp. 2d 478 (S.D.N.Y. 1999) ............................................... 29

United States v. Pugh,
   No. 15-CR-00116 (NGG), 2015 WL 9450598 (E.D.N.Y. Dec. 21, 2015).............. 23, 136, 138

United States v. Purcell,
   967 F.3d 159 (2d Cir. 2020) ..................................................... passim

United States v. Rajaratnam,
   719 F.3d 139 (2d Cir. 2013) ............................................. 98, 99, 113

United States v. Ralston,
   No. 19-CR-774 (JSR), 2022 WL 769257 (S.D.N.Y. Mar. 14, 2022) .......................... 15, 16, 17

United States v. Ray,
   541 F. Supp. 3d 355 (S.D.N.Y. 2021) .......................................... passim

United States v. Raymonda,
   780 F.3d 105 (2d Cir. 2015) ................................................. 95, 175

United States v. Riley,
   906 F.2d 841 (2d Cir. 1990) ..................................................... passim

United States v. Rittweger,
   524 F.3d 171 (2d Cir. 2008) .................................................. 27, 29

United States v. Rivera,
   750 F. Supp. 614 (S.D.N.Y. 1990) ............................................... 98

United States v. Rivera,
   No. 09-CR-619 (SJF), 2011 WL 1429125 (E.D.N.Y. Apr. 13, 2011) .................... 52

United States v. Robinson
   No. 16-CR-545 (S-3) (ADS), 2018 WL 5928120 (E.D.N.Y. Nov. 13, 2018) ...................... 121

United States v. Rodriguez,
   356 F.3d 254 (2d Cir. 2004) ..................................................... 82

United States v. Rodriguez,
   496 F.3d 221 (2d Cir. 2007) ..................................................... 60

United States v. Rodriguez-Adorno,
  695 F.3d 32 (1st Cir. 2012) ...................................................................... 37

United States v. Rosa,
  11 F.3d 315 (2d Cir.1993) ......................................................... 48, 93, 134

United States v. Rosa,
  626 F.3d 56 (2d Cir. 2010) ............................................................. 96, 103

United States v. Rosario,
  No. 19-CR-807 (LAP), 2021 WL 5647879 (S.D.N.Y. Dec. 1, 2021) .................................. 174

United States v. Rucker,
  32 F. Supp. 2d 545 (E.D.N.Y. 1999) ................................................... 28

United States v. Ruggiero,
  824 F. Supp. 379 (S.D.N.Y. 1993) .............................................. 123, 129

United States v. Salameh,
  152 F.3d 88 (2d Cir. 1998) ............................................................ 97, 99

United States v. Saliba,
  No. 08-CR-792 (DLI) (RLM), 2010 WL 680986 (E.D.N.Y. Feb. 24, 2010) .............. 63, 64, 65

United States v. Samsonov,
  No. 07-CR-1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ..................... 23

United States v. Scarfo,
  180 F. Supp. 2d 572 (D.N.J. 2001) ................................................... 102

United States v. Scott,
  637 F. App'x 10 (2d Cir. 2015) ......................................... 32, 35, 42, 54

United States v. Scully,
  108 F. Supp. 3d 59 (E.D.N.Y. 2015) ................................................ 102

United States v. Sedlak,
  720 F.2d 715 (1st Cir. 1983) ............................................................. 14

United States v. Serpoosh,
  919 F.2d 835 (2d Cir. 1990) ........................................................ 31, 40

United States v. Shellef,
  507 F.3d 82 (2d Cir. 2007) ............................................................... 29

United States v. Shi Yan Liu,
  239 F.3d 138 (2d Cir. 2000) ........................................ 145, 146, 173, 186

xix

United States v. Shkreli,
   260 F. Supp. 3d 247 (E.D.N.Y. 2017) ............................................................... passim

United States v. Shkreli,
   15-CR-637 (KAM), 2016 WL 8711065 (E.D.N.Y. 2016) ................................. passim

United States v. Siddiqi,
   No. 06-CR-377 (SWK), 2007 WL 549420 (S.D.N.Y. Feb. 21, 2007) ..................... 25

United States v. Sindone,
   No. 01-CR-517 (MBM), 2002 WL 48604 (S.D.N.Y.2002) .................................... 24

United States v. Singh,
   390 F.3d 168 (2d Cir. 2004) ........................................................................... 93, 108

United States v. Singletary,
   685 F. App'x 33 (2d Cir. 2017) ............................................................................. 60

United States v. Smith,
   9 F.3d 1007 (2d Cir. 1993) ................................................................................. 115

United States v. Smith,
   967 F.3d 198 (2d Cir. 2020) ........................................................................ 162, 163

United States v. Snape,
   116 Fed. App'x 317 (2d Cir. 2004) ...................................................................... 115

United States v. Sosa,
   379 F. Supp. 3d 217 (S.D.N.Y. 2019) ........................................................... 179, 185

United States v. Spicer,
   2013 WL 871952 (E.D.N.Y. Mar. 7, 2013) ............................................................ 48

United States v. Spinelli,
   352 F.3d 48 (2d Cir. 2003) ................................................................................... 52

United States v. Stavroulakis,
   952 F.2d 686 (2d Cir. 1992) ................................................................................. 14

United States v. Stein,
   428 F. Supp. 2d 138 (S.D.N.Y. 2006) .................................................................... 27

United States v. Sterling,
   No. 16-CR-488 (LAK), 2017 WL 2304024, at *5 (S.D.N.Y. May 24, 2017)........................ 58

United States v. Stewart,
   513 F.2d 957 (2d Cir. 1975) ................................................................................. 62

United States v. Stewart,
    590 F.3d 93 (2d Cir. 2009) ........................................................ 51

United States v. Stewart,
    770 F. Supp. 872 (S.D.N.Y. 1991) ............................................ 79

United States v. Stringer,
    730 F.3d 120 (2d Cir. 2013) ...................................................... 25

United States v. Tamura,
    694 F.3d 591 (9th Cir. 1982) .................................................. 139

United States v. Taylor,
    17 F. Supp. 3d 162 (E.D.N.Y. 2014) ........................................ 60

United States v. Torres,
    901 F.2d 205 (2d Cir. 1990) ........................................ 19, 24, 49

United States v. Tramunti,
    513 F.2d 1087 (2d Cir. 1975) .................................................... 19

United States v. Triumph Capital Grp.,
    211 F.R.D. 31 (D. Conn. 2002) .............................................. 180

United States v. Turner,
    558 F.2d 46 (2d Cir. 1977) ...................................................... 186

United States v. Uccio,
    917 F.2d 80 (2d Cir. 1990) ........................................................ 27

United States v. Ulbricht,
    14-CR-68 (KBF), 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014) .................................... passim

United States v. Urso,
    369 F. Supp. 2d 254 (E.D.N.Y. 2005) ...................................... 20

United States v. Vanwort,
    887 F.2d 375 (2d Cir. 1989) ...................................................... 17

United States v. Ventura,
    724 F.2d 305 (2d Cir. 1983) ...................................................... 28

United States v. Vilar,
    No. 05-CR-621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) .................................. 98

United States v. Villegas,
    899 F.2d 1324 (2d Cir. 1990) .................................................... 43

United States v. Viscioso,
 711 F. Supp. 740 (S.D.N.Y. 1989) ...................................................... 89

United States v. Vondette,
 248 F.Supp.2d 149 (E.D.N.Y. 2001) ................................................... 63

United States v. Wagner,
 989 F.2d 69 (2d Cir. 1993) ............................................... 92, 107, 160

United States v. Walker,
 142 F.3d 103 (2d Cir. 1998) ............................................................... 29

United States v. Walsh,
 194 F.3d 37 (2d Cir. 1999) ............................................................ 14, 19

United States v. Watson,
 404 F.3d 163 (2d Cir. 2005) ........................................ 89, 92, 122, 129

United States v. Wey,
 256 F. Supp. 3d 355 (S.D.N.Y. 2017) ........................... 120, 141, 174, 179

United States v. White,
 No. 17-CR-611 (RWS), 2018 WL 4103490 (S.D.N.Y. Aug. 28, 2018) ............................. 123

United States v. White,
 489 F. Supp. 3d 274 (S.D.N.Y. 2020) ............................................... 110

United States v. Whitley,
 249 F.3d 614 (7th Cir. 2001) .............................................................. 98

United States v. Williams,
 592 F.3d 511 (4th Cir. 2010) ............................................................ 138

United States v. Young,
 745 F.2d 733 (2d Cir. 1984) .............................................................. 95

United States v. Yousef,
 327 F.3d 56 (2d Cir. 2003) ........................................................ 31, 32, 38

United States v. Yu,
 No. 97-CR-102 (SJ), 1998 WL 57079 (E.D.N.Y. Feb. 5, 1998) .................... 63

United States v. Zemlyansky,
 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ........................................ 100, 120

Walczyk v. Rio,
 496 F.3d 139 (2d Cir. 2007) ........................................ 92, 134, 160

Zafiro v. United States,
   506 U.S. 534 (1993).............................................................................. passim

## FEDERAL STATUTES

18 U.S.C. § 924(c) ................................................................................... passim

18 U.S.C. § 924(j) .................................................................................... passim

18 U.S.C. § 1959 ...................................................................................... passim

18 U.S.C. § 3500 ...................................................................................... passim

18 U.S.C. §§ 1958 .................................................................................... passim

U.S. Const. amend. IV ............................................................................. passim

## FEDERAL RULES

Federal Rule of Evidence 404(b) ..................................................................... 18

Federal Rule of Evidence 602 ........................................................................ 35

Federal Rule of Evidence 801 .................................................................... 34, 37

Federal Rule of Criminal Procedure 7(f) ........................................................... 18

Federal Rule of Criminal Procedure 8(b)....................................................... 26, 27

Federal Rule of Criminal Procedure 14(a)........................................................... 28

Federal Rule of Criminal Procedure 41 ......................................................... passim

## OTHER AUTHORITIES

1 McCormick on Evid. § 10............................................................................ 36

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in opposition to the following defense motions:

- Defendant Arthur Codner's and Alfred Lopez's motions to dismiss the indictment, <u>see</u> ECF Nos. 318 and 338;
- Defendant Anthony Zottola's motion for a bill of particulars, <u>see</u> ECF No. 334-335;
- Defendants Bushawn Shelton's, Lopez's, Codner's and Zottola's motions to sever, <u>see</u> ECF Nos. 318, 332, 336 and 338;
- Defendants Shelton's and Zottola's motions to suppress statements, <u>see</u> ECF Nos. 319 and 334-35;
- Defendants Shelton's and Zottola's motions to suppress materials seized from premises, electronic devices, cell phone and Instagram records, <u>see</u> ECF Nos. 324, 325, 327, 329 and 334-35;
- Defendant Zottola's motion to preclude the government from use of evidence produced to the defendants months in advance of trial, and defendants Zottola's and Lopez's motions compelling the government to make certain immediate disclosures, joined by Shelton, <u>see</u> ECF Nos. 318, 334-35 and 337; and
- Defendant Zottola's request for a written juror questionnaire, joined by Shelton and Lopez, <u>see</u> ECF Nos. 318, 334-35 and 337.

As set forth below, the defendants' motions for a bill of particulars, dismissal of the indictment, severance, suppression and preclusion of evidence made available to them months in advance of trial should be denied in their entirety without a hearing.  The Court should also deny the defendants' requests for immediate disclosure of certain material, except insofar as the government has agreed to provide certain additional information responsive to those requests. Finally, the government does not oppose the defendants' request for a written juror questionnaire.

<u>RELEVANT BACKGROUND</u>

I.      <u>Facts</u>

      A.      <u>The Offense Conduct, Charges and Arrests</u>

           This case arises out of the defendants' conspiracy and violent attempts to murder Sylvester Zottola and his son, Salvatore Zottola, beginning in 2017, ultimately resulting in the October 4, 2018 murder of Sylvester Zottola.

           Specifically, on October 4, 2018, defendant Anthony Zottola's 71-year-old father, Sylvester Zottola, was shot and killed while waiting in his car at a McDonald's drive-thru in the Bronx.  His death was the culminating event in a series of violent episodes targeting Sylvester Zottola and the defendant Anthony Zottola's brother, Salvatore Zottola, which included (1) a September 2017 beating of Sylvester Zottola; (2) a November 2017 attempted kidnapping of Sylvester Zottola; (3) a December 2017 home invasion and attempted murder of Sylvester Zottola, during which his throat was slashed; (4) a May 2018 break-in at the office of Sylvester Zottola; (5) a July 2018 shooting of Salvatore Zottola, who suffered gunshot wounds in his head, chest and hand, but survived; and, finally, (6) the October 2018 murder of Sylvester Zottola.  The investigation revealed that defendant Anthony Zottola orchestrated the attacks on his father and his brother by hiring, and planning with, defendant Bushawn Shelton, a member of the Bloods street gang, who in turn enlisted the help of other Bloods gang members to fulfill the contract, including Himen Ross, who acted as a shooter in the homicide; Alfred Lopez, who acted as a driver in the homicide; and Arthur Codner, who acted as a driver in the attempted murder of Salvatore Zottola.

           On October 10, 2018, Shelton was charged by complaint with murder-for-hire conspiracy, in violation of 18 U.S.C. § 1958(a), and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).  <u>See</u> ECF No. 1.  He was arrested on October 11, 2018

2

and given <u>Miranda</u> warnings.  He declined to waive his <u>Miranda</u> rights and did not speak with law enforcement.  On November 8, 2018, a grand jury sitting in this district returned an indictment against Shelton charging the same two crimes initially charged by complaint, along with causing death through use of a firearm, related to the murder-for-hire scheme, being a felon in possession of a firearm, related to the recovery of a firearm from Shelton's residence on the date of his arrest, and perjury, based on Shelton's false statements in an affidavit regarding his finances on the date of his arrest.  <u>See</u> ECF No. 10.  On December 13, 2018, a grand jury returned a superseding indictment (the "S-1 Indictment"), charging several other individuals, including Codner and Ross, with murder-for-hire conspiracy and the related § 924(c) and § 924(j) firearms offenses.  <u>See</u> ECF No. 14.  On June 13, 2019, a second superseding indictment was returned adding Lopez and Zottola to the existing charges in the indictment, and additionally charging Shelton with possessing contraband in prison, based on his possession of a contraband cell phone while incarcerated (the "S-2 Indictment").  <u>See</u> ECF No. 84.  Zottola was arrested on June 17, 2019, given <u>Miranda</u> warnings and declined to speak with law enforcement agents.  Finally, on January 14, 2021, a third superseding indictment was returned, adding, as relevant here, an additional charge as to each of the defendants of substantive murder-for-hire, in violation of 18 U.S.C. § 1958(a) (the "Superseding Indictment").  <u>See</u> ECF No. 229.

The government currently anticipates that defendants Anthony Zottola, Bushawn Shelton, Himen Ross, Alfred Lopez and Arthur Codner will proceed to trial.

      B.    <u>The Challenged Search Warrants</u>

          1.    <u>The September and October Instagram Warrants</u>

On September 11, 2018, the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge, issued a search and seizure warrant authorizing law enforcement officers to search an Instagram account with username MMBCERTIFIED (the "MMBCertified Instagram

Account"), belonging to defendant Shelton, stored at Instagram (the "MMBCERTIFIED Instagram Warrant"), for evidence, fruits and instrumentalities of violations of 18 U.S.C. §§ 1958 (conspiracy to commit murder-for-hire), 1959 (conspiracy to commit murder in-aid-of racketeering) and 924(c) (unlawful use and possession of firearms). See Shelton's Instagram Mot., ECF No. 329, Ex. A. On September 19, 2018, the Honorable Robert M. Levy, United States Magistrate Judge for the Eastern District of New York, issued a search and seizure warrant authorizing law enforcement officers to search an Instagram account with username KINGSHELZ (the "KINGSHELZ Instagram Account"), belonging to defendant Shelton, stored at Instagram (the "KINGSHELZ Instagram Warrant"), for evidence, fruits and instrumentalities of the same offenses. See Shelton's Instagram Mot., ECF No. 329, Ex. B. On October 9, 2018, Judge Reyes issued a search and seizure warrant authorizing law enforcement officers to search both the MMBCERTIFIED and the KINGSHELZ Instagram Accounts (the "Joint Instagram Warrant," and collectively with the MMBCertified and KINGSHELZ Instagram Warrants, the "Instagram Warrants") for an enlarged date range and for evidence, fruits and instrumentalities of violations of 18 U.S.C. §§ 1958 (conspiracy to commit murder-for-hire), 1959 (conspiracy to commit murder in-aid-of racketeering), 924(c) (unlawful use and possession of firearms) and, because the Joint Instagram Warrant post-dated Zottola's murder, 924(j) (causing death through use of a firearm) (collectively, the "Subject Offenses"). See Shelton's Instagram Mot., ECF No. 329, Ex. C.

In support of the issuance of the Instagram Warrants, a Special Agent with the Federal Bureau of Investigation submitted affidavits setting forth, among other things, probable cause that Shelton was the owner and user of the MMBCERTIFIED and KINGSHELZ Instagram Accounts and that Shelton used those accounts in furtherance of the murder-for-hire conspiracy, including to communicate with a co-conspirator. In executing the Instagram Warrants, law

enforcement officers seized a subset of pages of the Instagram Accounts, which contain communications, photographs, contacts and user attribution information related to the murder-for-hire conspiracy.  The government produced a full set of the Instagram Warrant returns to Shelton on January 16, 2019.

        2.      The September and October Historical Cell Site Warrants

On September 11, 2018, Magistrate Judge Reyes issued a search and seizure warrant authorizing law enforcement officers to search historical location data of the cell phone assigned call number 917-562-4515, belonging to Bushawn Shelton, stored at AT&T (the "4515 Historical Cell-Site Warrant"), for evidence, fruits and instrumentalities of the Subject Offenses. See Shelton's Cell Phone Records Mot., ECF No. 327, Ex. A.  On October 16, 2018, the Honorable Cheryl L. Pollak, Chief United States Magistrate Judge, issued a search and seizure warrant authorizing law enforcement officers to search historical location data of the cell phone assigned call number 646-258-3484, belonging to Bushawn Shelton, stored at T-Mobile (the "3484 Historical Cell-Site Warrant"), for evidence, fruits and instrumentalities of the Subject Offenses. See Shelton's Cell Phone Records Mot., ECF No. 327, Ex. C.  In support of the issuance of these historical cell-site warrants, a Special Agent with the Federal Bureau of Investigation submitted affidavits setting forth, among other things, probable cause to believe that Shelton was the user of both phone numbers, that Shelton had used both phone numbers to communicate with co-conspirators during the charged time period, and that Shelton participated in the murder for hire plot against Sylvester and Salvatore Zottola.

In executing the 4515 Historical Cell-Site Warrant, law enforcement officers seized Shelton's historical cell site location data between approximately November 8, 2017 and July 21, 2018.  In executing the 3484 Historical Cell-Site Warrant, law enforcement officers seized Shelton's historical cell site location data between approximately November 1, 2017 and October

11, 2018.  The government produced a full set of the 4515 Historical Cell-Site Warrant returns and a full set of the 3484 Historical Cell-Site Warrant returns to Shelton on May 8, 2019.

       3.    The October Premises Warrant and the October and July SIM Card Warrants

On October 10, 2018, Judge Reyes issued a search and seizure warrant authorizing law enforcement officers to search the residence located at 561 Belmont Avenue, Brooklyn, New York 11207 ("Shelton's Residence"), and any closed compartments and containers, cellular telephones and internet capable devices contained therein (the "October Premises Warrant"), for evidence, fruits, and instrumentalities of the Subject Offenses.  See Shelton's Premises Mot., ECF No. 325, Ex. A.  The October Premises Warrant contained a detailed description and a photograph of the subject residence.  Id. at Attachment A-1.  It also stated the offenses for which evidence may be sought—the Subject Offenses—and enumerated an illustrative list of 13 specific categories of evidence, fruits and instrumentalities.  Id. at Attachment B-1.  The warrant also set forth guidance for law enforcement agents to follow when searching, reviewing and seizing electronic devices and any electronically stored information contained therein.  Id. at Attachment B-1(L).

On the same date, Magistrate Judge Reyes issued a search and seizure warrant authorizing law enforcement officers to search a red and black Dodge Charger belong to Shelton (the "Dodge Charger") and any closed compartments and containers, cellular telephones and internet capable devices contained therein (the "October Vehicle Warrant") for evidence, fruits and instrumentalities of the Subject Offenses.  See Shelton's Premises Mot., ECF No. 325, Ex. A.  The October Vehicle Warrant contained a detailed description and a photograph of the Dodge Charger.  Id. at Attachment A-2.  Like the October Premises Warrant, it stated the offenses for which evidence may be sought—the Subject Offenses—and provided an illustrative list of specific categories of items to be seized.  Id. at Attachment B-2.

In support of the issuance of the October Premises and Vehicle Warrants, a Special Agent with the Federal Bureau of Investigation submitted an affidavit (the "October Affidavit") setting forth, among other things, probable cause to believe that Shelton had committed the Subject Offenses and probable cause justifying the search of the subject residence. See Shelton's Premises Mot., ECF No. 325, Ex. A. To demonstrate probable cause justifying the search of the subject residence, the October Affidavit set forth numerous facts that established that the defendant resided at the residence, that the defendant travelled to and from the residence in furtherance of the Subject Offenses and that the residence was likely to contain specific categories of evidence, fruits and instrumentalities (including electronic devices and data stored therein). Id. ¶¶ 5-9; 21-54. The October Affidavit also stated, among other things, that New York State Department of Motor Vehicles ("DMV") records in October 2018 indicated that the Dodge Charger was registered to Shelton. Id. ¶ 8. The affidavit further stated that Shelton was observed driving the Dodge Charger as recently as October 9, 2018, the day before Magistrate Judge Reyes issued the warrant. Id. ¶ 9.

As discussed above, Shelton was also charged by complaint on October 10, 2018 with murder for hire conspiracy, in violation of 18 U.S.C. § 1958(a), and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c), two of the Subject Offenses, and Judge Reyes issued an arrest warrant commanding Shelton's arrest on that date. See ECF Nos. 1, 2.

Law enforcement officers executed Shelton's arrest warrant, the October Premises Warrant and the October Vehicle Warrant concurrently on October 11, 2018. During the execution of the October Premises Warrant, law enforcement officers recovered, among other things, 19 devices that appeared to contain electronically stored information. These devices included one SIM card, three thumb/flash drives, 11 cell phones, one computer and three tablets. See Shelton's Electronic Devices Mot., ECF 324, Ex. E (Collected Items Log indicating room from which each

7

item was collected).  Thirteen of the devices were submitted for forensic extraction, only 11 of which were able to be imaged by law enforcement.

Law enforcement completed the forensic imaging of all 11 devices by approximately November 20, 2018—less than two months after the execution of the October Premises Warrant—with three exceptions.  First, for two of the devices, cellular telephones assigned FBI evidence numbers 1B51 and 1B55, initial extractions were completed by on or about October 15, 2018 (four days after the execution of the October Premises Warrant); however, full forensic images of those phones were not completed for technical reasons until approximately early May 2019 (for 1B51) and approximately March 2020 (for 1B55).  Second, law enforcement obtained a separate search warrant, dated October 11, 2018, for a SIM card recovered from Shelton's wallet on the kitchen counter of the residence on the same date (the "October SIM Card Warrant").  See Shelton's Electronic Devices Mot., ECF 324, Ex. B.  Due to an oversight, the search of the SIM card was not executed within the time frame authorized by the October SIM Card Warrant and, accordingly, on July 24, 2020, law enforcement sought a second search warrant for the SIM card, assigned FBI evidence number 1B32 (the "July SIM Card Warrant").  See Shelton's Electronic Devices Mot., ECF 324, Ex. C.  Forensic imaging of that SIM card was complete by late July 2020.

The government produced a log of evidence obtained from the subject premises to Shelton on January 16, 2019, and copies of all forensic images were provided to Shelton on a rolling basis.  As the government has already informed counsel, the government expects to use at trial data from six of the 11 devices imaged by law enforcement, bearing FBI evidence numbers 1B32, 1B36, 1B45, 1B46, 1B51 and 1B55.  The government produced images of these devices to

Shelton on a rolling basis beginning in January 2019 and ending in October 2020.  In addition, the devices have been and remain available for review by Shelton upon request.

During the execution of the October Vehicle Warrant, law enforcement officers recovered, among other things, several devices that appeared to contain electronically stored information.  As the government has already informed defense counsel, the government does not intend to offer into evidence data from any of these devices at trial.  The government reserves the right to admit other papers recovered pursuant to the October Vehicle Warrant containing, among other things, identification information and deposit slips, at trial.

### 4.   The October Verizon Warrant

On October 16, 2018, Magistrate Judge Pollak issued a search and seizure warrant authorizing law enforcement officers to search content and location data of the cell phone assigned call number 347-392-0804, belonging to Anthony Zottola, stored at Verizon Wireless (the "October Verizon Warrant"), for evidence, fruits and instrumentalities of the Subject Offenses. See Zottola's Omnibus Mot., ECF No. 334, Ex. O.  In support of the issuance of the October Verizon Warrant, a Special Agent with the Federal Bureau of Investigation submitted an affidavit (the "October Verizon Affidavit") setting forth, among other things, probable cause that Zottola had used his phone to communicate with Shelton frequently during the charged time period— including the dates of various attacks on his father and brother, and even after his father's murder— as well as facts supporting that Shelton had received information from Zottola to carry out the attacks.  See Zottola's Omnibus Mot., ECF No. 334, Ex. N.

In executing the warrant, law enforcement officers seized approximately four days' worth of communications between Shelton and Zottola, including coded text messages in which the two discuss the exchange of money, from October 7, 2018 through October 10, 2018—the day

before Shelton's arrest.  Law enforcement officers also seized Zottola's historical cell site location data between approximately November 1, 2017 and Oct 12, 2018.

The government produced text message content obtained pursuant to the October Verizon Warrant to Shelton on January 16, 2019 (which was also produced to Zottola following his arrest) and a full set of the October Verizon Warrant returns to Zottola on October 7, 2019.

### 5.   The December Premises Warrant

On December 13, 2018, Judge Reyes issued a search and seizure warrant authorizing law enforcement officers to conduct a second search of Shelton's Residence (the "December Premises Warrant") for evidence, fruits and instrumentalities of the Subject Offenses and, specifically, (1) Adidas sandals; and (2) boxes of water or boxes consistent in appearance with a box depicted in a photograph identified on one of Shelton's devices following the execution of the October Premises Warrant.  See Shelton's Premises Mot., ECF No. 325, Ex. B.  As explained in an affidavit sworn to by a Special Agent with the FBI supporting the issuance of the December Premises Warrant (the "December Affidavit"), law enforcement recovered a photograph on one of Shelton's phones depicting a large sum of cash in a box of bottled waters, with Adidas sandals visible in the photograph, which appeared to have been taken inside the kitchen of Shelton's Residence, based on similarity of the flooring, iron of the chair and the print of the table cloth depicted in the photograph.  See Shelton's Premises Mot., ECF No. 325, Ex. B, ¶¶ 6-7.  Based on metadata associated with the photograph, law enforcement believed the photograph had been taken on October 5, 2018, the day after Sylvester Zottola's murder.  Id.

Law enforcement officers executed the December Premises Warrant on December 14, 2018, took photographs inside Shelton's Residence and recovered water bottles but did not recover sandals.

10

6.    The June Premises and Devices Warrants

On June 17, 2019, the Honorable Sarah Netburn, United States Magistrate Judge for the Southern District of New York, issued a search and seizure warrant authorizing law enforcement officers to search the residence located at 15 S. Ridge Road, Larchmont, New York ("Zottola's Residence"), including a backyard shed and playhouse, and any closed compartments and containers, cellular telephones and internet-capable devices contained therein (the "June Premises Warrant"), for evidence, fruits, and instrumentalities of the Subject Offenses.  See Zottola's Omnibus Mot., ECF No. 334, Ex. I.  The June Premises Warrant contained a detailed description and photograph of Zottola's Residence.  Id. at Attachment A-1.  It also stated the offenses for which evidence could be sought—the Subject Offenses—and enumerated a list of specific categories of evidence, fruits and instrumentalities.  Id. at Attachment B-1.  Furthermore, the warrant set forth a protocol for law enforcement agents to follow when searching, reviewing and seizing electronic devices and any electronically stored information contained therein.  Id. at Attachment B-1(J).

In support of the June Premises Warrant, a Special Agent with the Federal Bureau of Investigation submitted an affidavit (the "June Affidavit") setting forth, among other things, probable cause that Zottola had committed the Subject Offenses (including the fact that a grand jury had returned an indictment against Zottola charging him with the Subject Offenses) and probable cause justifying the search of the residence.  See Zottola's Omnibus Mot., ECF No. 334, Ex. H.  To demonstrate probable cause justifying the search of Zottola's Residence, the June Affidavit set forth numerous facts that established that Zottola resided at the residence, that Zottola used the residence in furtherance of the Subject Offenses and that the residence was likely to contain specific categories of evidence, fruits and instrumentalities (including electronic devices and data stored therein).  Id. ¶¶ 5-7, 14-15, 30.  The June Affidavit included numerous examples

11

of text message conversations between Zottola and co-defendant Shelton, including on November 26, 2017 (the day Sylvester Zottola escaped a masked gunman who exited a dark van), on March 11, 2018 (when Zottola gave Shelton the authority to target Salvatore Zottola in addition to Sylvester Zottola), on October 4, 2018 (six hours before Sylvester Zottola's murder and six minutes after Sylvester Zottola's murder), and on October 5, 7 and 9, 2018 (the days after Sylvester Zottola was killed). Id. ¶¶ 30-39. The June Affidavit also included numerous facts about the plots to kill Sylvester Zottola and Salvatore Zottola, the attacks and incidents on November 26, 2017, December 27, 2017, April 16, 2018 and June 12, 2018, the vehicles and weapons used in them, a tracking device recovered from Sylvester Zottola's vehicle in the days after his death, and the monitoring of Sylvester Zottola through his security system. Id. ¶¶ 16-29, 39, 82-83. The June Affidavit also included numerous facts connecting the Subject Offenses to the family's real estate business. Id. ¶¶ 77-81.

Law enforcement officers executed the June Premises Warrant on June 17, 2019. During its execution, law enforcement officers recovered, among other things, 17 devices that appeared to contain electronically stored information. These devices included five phones, three computers, three iPads, an iPod, a camera and a hard drive. See Gov't Ex. 1 (Aug. 7, 2019 Collected Item Log).[1]

---

[1]     The government respectfully requests that its exhibits to this opposition be filed under seal. As an initial matter, the government is sensitive to the need to minimize the amount of information in a criminal case that is filed under seal. See, e.g., United States v. Aref, 533 F.3d 72, 83 (2d Cir. 2008) (noting "the requirement that district courts avoid sealing judicial documents in their entirety unless necessary"); Lugosch v. Pyramid Co., 435 F.3d 110, 119–20 (2d Cir. 2006) (noting that sealing orders should be "narrowly tailored"). However, the exhibits describe the items seized and provide layouts of residences, as well as personal information obtained in the searches and arrests of Zottola and Shelton, thus, sealing is warranted here. United States v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (privacy interests may be compelling reason justifying sealing).

In addition, two cell phones were recovered pursuant to Zottola's arrest on June 17, 2019.  On June 18, 2019, the Honorable Roanne L. Mann, United States Magistrate Judge for the Eastern District of New York, issued a search and seizure warrant authorizing law enforcement officers to search the two devices (a white Apple iPhone and a black Apple iPhone).  See Zottola's Omnibus Mot., ECF No. 334, Ex. K.  The Affidavit attached and incorporated the Zottola Premises Affidavit, discussed above.  See id.

Of the 19 electronic devices seized, 15 were submitted for forensic extraction, and law enforcement agents were able to image 14 devices.  The government produced a log of evidence obtained from the June search of Zottola's Residence in a discovery production dated October 5, 2020 and copies of all forensic images to Zottola in a discovery production dated November 4, 2019.[2]  As the government has already informed counsel, the government intends to admit information at trial from seven of Zottola's devices, and specifically, those bearing FBI evidence numbers 1B116, 1B117, 1B120, 1B123, 1B125, 1B148 and 1B150, images of each of which were produced to Zottola.  In addition, Zottola's counsel inspected the physical evidence, including the devices seized from Zottola's Residence, on March 7, 2022 and they remain available for review upon request.

---

[2]      In addition, the government returned two electronic devices to Zottola's counsel on October 17, 2019:  a white/pink iPhone in a black case (1B119) and a silver iPad in a black case (1B124), upon Zottola's request.

<u>ARGUMENT</u>

I.      <u>The Motions to Dismiss Should Be Denied</u>

Codner moves to dismiss the counts in the Superseding Indictment charging him (Counts One, Two, Three and Four) as duplicitous.  <u>See</u> ECF No. 338 at 8-9.  Lopez moves to dismiss Counts One and Two of the Superseding Indictment as lacking in probable cause and unconstitutionally vague and overbroad, or in the alternative, for a bill of particulars.  <u>See</u> ECF No. 318-1, at 8-9.

A.      <u>Applicable Law</u>

Under Rule 7(c) of the Federal Rules of Criminal Procedure, an indictment need only set forth a "plain, concise, and definite written statement of the essential facts constituting the offense."  It is firmly established that "an indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."  <u>United States v. Stavroulakis</u>, 952 F.2d 686, 693 (2d Cir. 1992).  There is no requirement that an indictment set forth with specificity any particular factual element of the crimes charged.  <u>See, e.g.</u>, <u>United States v. Persico</u>, 621 F. Supp. 842, 859 (S.D.N.Y. 1985); <u>United States v. Sedlak</u>, 720 F.2d 715, 719 (1st Cir. 1983).  The Second Circuit has further stated that the Indictment Clause of the Fifth Amendment "requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury."  <u>United States v. Walsh</u>, 194 F.3d 37, 45 (2d Cir. 1999) (quoting <u>United States v. Abrams</u>, 539 F. Supp. 378, 384 (S.D.N.Y. 1982)).

Under Rule 8(a) of the Federal Rules of Criminal Procedure, an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or

14

constitute parts of a common scheme or plan."  "An indictment is impermissibly duplicitous if (a) it combines two or more distinct crimes in one count in contravention of Rule 8(a) of the Federal Rules of Criminal Procedure and (b) the defendant is thereby prejudiced."  United States v. Ralston, No. 19-CR-774 (JSR), 2022 WL 769257, at *7 (S.D.N.Y. Mar. 14, 2022).  "Acts that could be characterized as part of a single continuing scheme may be charged in a single count without being duplicitous," and, for conspiracies, "an indictment is not duplicitous simply because it alleges that the conspiracy had multiple objects."  Id. (internal quotation marks omitted).  "A defendant may be prejudiced where a defendant potentially lacks notice of the crime charged and its maximum penalty, a second trial on the same offense would potentially not be barred by the Double Jeopardy Clause, or there is potential uncertainty with respect to the crime of which the jury convicted the defendant and the attendant sentencing implications."  Id.

B.    Discussion

The murder-for-hire counts in the Superseding Indictment are charged with sufficient specificity:   the defendants are charged with participating in a murder-for-hire conspiracy and murder-for-hire, taking place between November 1, 2017, and October 11, 2018, and resulting in the death of Sylvester Zottola and the personal injury of Salvatore Zottola, orchestrated through the use of one or more cell phones and in consideration for something of pecuniary value.  These facts plainly meet Rule 7(c)'s requirements, particularly when coupled with the defendants' having had the benefit of extensive discovery provided to them by the government.  The Superseding Indictment contains the elements of the offense, tracks the language of the charged statutes and informs the defendants of the nature of the charges against them—the law requires no more.  The government need not provide greater specificity on the face of an indictment in a case where the "[i]ndictment, coupled with the discovery information the government has thus far provided to defendants, sufficiently apprises [the defendants] of the crime

charged and the general outline of the government's case against them." See United States v. Canty, 971 F. Supp. 687, 690 (N.D.N.Y. 1997).

Although Lopez asserts that these counts should be dismissed as "unconstitutionally vague and overbroad," ECF No. 318-1, at 8, he fails to identify how they are so, and cites no case in which any court dismissed an indictment under similar circumstances—a remedy that would, in any event, be "extraordinary" and "reserved only for extremely limited circumstances implicating fundamental rights." United States v. De La Pava, 165 F.3d 157, 165 (2d Cir. 2001). The same is true of Lopez's one-sentence claim that he is entitled to dismissal of the murder-for-hire counts "since the prosecution lacks probable cause." ECF No. 318-1. "An indictment is generally not subject to dismissal on the ground that there was inadequate or incompetent evidence before the grand jury." United States v. Clarke, No. 05-CR-017 (DAB), 2006 WL 3615111, at *4 (S.D.N.Y. Dec. 7, 2006) (internal quotation marks omitted). Rather, "[t]he grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." Kaley v. United States, 571 U.S. 320, 328 (2014). Lopez provides no basis for challenging grand jurors' probable cause determination in returning the Superseding Indictment in this case, and his motion should be denied.

Finally, Codner asserts that the murder-for-hire counts (Counts One and Two) and the related § 924(c) and § 924(j) firearms counts (Counts Three and Four) are impermissibly duplicitous. See ECF No. 338, at 8-9. Codner's claim fails because he does not cite any deficiency in the charged counts' purported "combination of two or more distinct crimes in one count." Ralston, 2022 WL 769257, at *7. Nor could he. It is well-settled that "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting

emphasis in its locale of operations." United States v. Vanwort, 887 F.2d 375, 383 (2d Cir. 1989). Here, though the conspiracy expanded to encompass the deaths of both Sylvester and Salvatore Zottola, "the consistent means and methods of the scheme throughout render" it "a single, continuing scheme" such that the counts charged in the indictment are not impermissibly duplicitous. Ralston, 2022 WL 769257, at *8. The same is true for the substantive murder-for-hire charged in Count Two (and the related firearms charges in Counts Three and Four). Although Codner appears to take issue with the government's proof on these counts, he does not assert any argument that the scheme, though having two victims, was duplicitous. Rather, Codner asserts that because, in his view, his role in the crimes was limited in timeframe, and he was not actively furthering the goals of the conspiracy and plot for the entire charged time period, he was unfairly charged. See ECF No. 338, at 10-11. Codner is free to challenge his guilt before the trial jury and his role in the charged crimes before the Court at sentencing if convicted; his claims do not, however, form the basis of a proper motion to dismiss. That the counts in this case encompass conduct occurring over an approximately 11-month time period, as well as two victims, does not make them duplicitous under the law.

Although Codner asserts that he will suffer prejudice because of unspecified jury confusion and issues with the government's charging methods, these are simply repackaged complaints about his view of the government's proof in this case. Moreover, though Codner does not articulate any particular jury confusion, insofar as he is concerned with confusion as to whether the jury has convicted him of the enhanced penalties arising from the death of Sylvester Zottola on the murder-for-hire and murder-for-hire conspiracy counts, such confusion is easily remedied with a jury instruction or special verdict sheet, if appropriate. See Ralston, 2022 WL 769257, at *8 (denying motion to dismiss on duplicitous grounds where there is no "cognizable prejudice

17

because [defendant] is on notice of the crime with which he is charged and its maximum penalty"
and "[t]he jury can be instructed, if appropriate" of the defendant's role in one fraud scheme but
not another).

As such, the defendants' motions to dismiss the Superseding Indictment should be
denied.

## II.   The Motions for a Bill of Particulars Should Be Denied

Zottola seeks a bill of particulars describing the "time, place and occurrence of each
incident" encompassed in the murder-for-hire and conspiracy charges, as well as the related use
and possession of firearms charges.  See Zottola's Omnibus Mem., ECF No. 335, at 17.  Lopez
seeks a bill of particulars as an alternative to his motion to dismiss the indictment requesting the
precise date he joined the murder-for-hire conspiracy; his statements; actions he took in
furtherance of the conspiracy; all statements of others connecting him to the conspiracy; all phone
evidence the government identifies as relevant to the conspiracy; and all payment information
related to the conspiracy.  See ECF No. 318-1, at 8-9.  These requests, effectively a means of
impermissibly requesting a roadmap of the government's trial evidence and early disclosure of
material pursuant to Federal Rule of Evidence 404(b) and 18 U.S.C. § 3500, including at the
expense of the safety of the surviving victim and the government's witnesses, should be denied.[3]

### A.   Applicable Law

Although Federal Rule of Criminal Procedure 7(f) permits the Court to direct the
government to file a bill of particulars, it is well established that "[a] bill of particulars is required

---

[3]      As to those of Lopez's requests that fall within the government's Rule 16
obligations, such as Lopez's requests for his own statements and phone evidence the government
intends to rely on at trial, the government has already produced responsive discovery, which Lopez
does not address in his motion.

only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) (quotations marks and citation omitted). Specifically, a bill of particulars is appropriate only when the indictment is too vague to inform the defendant of the nature of the charges to allow the preparation of a defense, avoid unfair surprise, and preclude double jeopardy. See United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990). A defendant must establish why he needs each of the particulars demanded and explain how the denial of each will prevent him from identifying the specific crimes with which he is charged. Therefore, the question is not whether the information would be helpful to the defendant, but rather, whether the information is necessary. United States v. Gotti, 784 F. Supp. 1017, 1019 (E.D.N.Y. 1992) (bill of particulars is necessary only if "directed to curing defects in an indictment; that is [only if it] clarifies the charges against the defendant") (emphasis in original)).

It is well-established that a defendant is not entitled to discover, through a bill of particulars, the exact times and places at which the crime occurred or the identities of the witnesses and the evidence that will establish the crime charged. See United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975); United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975). Nor is a defendant entitled to a detailed recitation as to how, when, where or with whom an alleged conspiracy took place. See United States v. Barnes, 158 F.3d 662 (2d Cir. 1998) (trial court did not its abuse discretion by declining to order bill of particulars to amplify indictment count charging defendant with conspiracy with intent to distribute controlled substances, even though count only provided duration of alleged conspiracy, names of co-defendants and names of drugs allegedly possessed); United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991) (bill of particulars not required to identify the specific activities by which defendant furthered conspiracy). The

substance of the conversations or the details of agreements between or among co-conspirators may not be obtained through a bill of particulars, see United States v. Kahaner, 203 F. Supp. 78, 84 (S.D.N.Y. 1962), aff'd, 317 F.2d 459 (2d Cir. 1963), nor can the specific role played by a defendant in a conspiracy, or the particular acts the defendant is alleged to have participated in, had knowledge of, or for which he is being held responsible, see United States v. Jones, 85-CR-1075 (CSH), 1986 WL 275, at *2 (S.D.N.Y. May 28, 1986).  Indeed, it is well established that "the defendant does not 'need' detailed evidence about the conspiracy in order to prepare for trial properly."  United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989).

It is also not appropriate to use Rule 7(f) to limit the government's evidence or flush out its prosecutorial theories in advance of trial.  See  United States v. Urso, 369 F. Supp. 2d 254, 272 (E.D.N.Y. 2005) ("As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars."); see also United States v. Barret, 824 F. Supp. 2d 419, 439 (E.D.N.Y. 2011) ("[T]he court is mindful that it cannot compel the government to disclose, through a bill of particulars, the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories." (quotations and citations omitted)); United States v. Ianniello, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985) ("To require most of the further disclosure the defendants seek would do little more than restrict the government's proof at trial, which is not the purpose of a bill of particulars."); United States v. Albunio, No. 91-CR-0403, 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992) ("The defendant's right to know the crime with which he is charged must be distinguished from his right to know the evidentiary details by which proof of his culpability will be established.").  Consequently, a motion for a bill of particulars must be

denied where it would "unduly restrict the Government's ability to present its case." United States v. Baez, 62 F. Supp. 2d 557, 559 (D. Conn. 1999).

There are three basic reasons for these restrictions on the use of bills of particulars. First, their use "is not comparable to discovery in civil [cases] because of the nature of the issues, the danger of intimidation of witnesses, and the greater danger of perjury and subornation of perjury." United States v. Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985) (internal quotations and citations omitted). Second, the government must not be compelled "to give a preview of its evidence and legal theories lest the defendant tailor his testimony to explain away the Government's case." United States v. Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (citations omitted). Finally, the government should not be stopped from "using proof it may develop as the trial approaches." Id. (citation omitted).

Moreover, "[i]f the information the defendant seeks 'is provided in the indictment or in some acceptable alternate form,' such as discovery or other correspondence, no bill of particulars is required." United States v. Binday, No. 12-CR-152 (CM), 2012 WL 6135013, at *11 (S.D.N.Y. Dec. 10, 2012) (citing United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); see also Chen, 378 F.3d at 163 ("[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means.").

B.    Discussion

Here, not only does the third superseding indictment provide a sufficient overview of the scheme to allow the defendants to meet the charges against them, but the government has also provided extensive additional detail to the defendants through correspondence and discovery. For example, Zottola acknowledges that within the year timeframe charged in the indictment, "based on the discovery produced by the government pursuant to Rule 16," Zottola has been able

to identify "at least eight discrete incidents that occurred during that timeframe, in addition to the July 11, 2018 shooting of John Doe #1 and the October 4, 2018 death of Sylvester Zottola." See Zottola's Omnibus Mem., ECF No. 335, at 16-17.  Indeed, the government's discovery productions have provided specific, organized detail as to numerous incidents committed by certain defendants throughout the course of the conspiracy—organized into folders labeled with the date of the incident (e.g., "2017.09.08 Assault of Sylvester Zottola"; "2017.11.26 Menacing of Sylvester Zottola"; "2017.12.27 Home Invasion of Sylvester Zottola"; "2018.04.15 Burglary of Sylvester Zottola"; "2018.04.16 Menacing of Sylvester Zottola"; "2018.05.01 Burglary of Sylvester Zottola"; "2018.06.12 Menacing of Sylvester Zottola"; "2018.07.11 Shooting of John Doe #1"; "2018.10.04 Murder of Sylvester Zottola"), and containing information about the time and place of such incidents.  The descriptive organization of the government's discovery productions—plus the content of the discovery productions themselves, including search warrant affidavits spelling out government theories about the defendants' guilt—thus belies Zottola's disingenuous claim that because the government has provided such discovery, specifically identifying certain incidents relevant to and comprising the murder-for-hire plot, the volume of it somehow renders his attempt "to determine which specific incidents are included in the Indictment's charges" "all but futile." Id. at 18.

Moreover, the government has also detailed at length the nature of the conspiracy and Zottola's role in it in numerous detention letters filed in this case.  See, e.g., ECF Nos. 100; 189; 209.  These disclosures more than suffice and a bill of particulars is not warranted in these circumstances.  See Binday, 2012 WL 6135013, at *11 ("If the information the defendant seeks 'is provided in the indictment or in some acceptable alternate form,' such as discovery or other correspondence" no bill of particulars is required (citing Bortnovsky, 820 F.2d at 574)); United

States v. Mandell, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the government provided voluminous, organized discovery); United States v. Samsonov, No. 07-CR-1198 (CM), 2009 WL 176721, at *4 (S.D.N.Y. Jan. 23, 2009) (denying bill of particulars request where indictment, discovery letters and discovery materials gave defendant adequate information to prepare for trial).  Because the government has already provided extensive discovery and "outlined its theory and the facts upon which it is based in numerous filings with the court," and in its discovery productions, the motion should be denied. United States v. Pugh, No. 15-CR-00116 (NGG), 2015 WL 9450598, at *28 (E.D.N.Y. Dec. 21, 2015) (collecting cases).  Indeed, requests such as this—that is, requests for the government to identify all evidence that it may present of a conspiracy—are routinely denied as beyond the scope of a bill of particulars, as outlined above.

What Zottola (and Lopez, in more summary fashion) actually seek is the government's order of proof and early Section 3500 and Rule 404(b) disclosures; indeed, he acknowledges as much in his motion.  See Zottola's Omnibus Mem., ECF No. 335, at 19 & n.8 (requesting disclosure of every single incident and date that may come up through the course of trial and stating that the "bill of particulars . . . is also necessary to ensure compliance with" Rule 404(b)); see also ECF No. 318-1 (requesting all actions Lopez took in furtherance of the charged conspiracy and all statements made by others connecting him to it, among other things).  These requests are beyond the scope of a bill of particulars, and it is inappropriate under the law for a defendant to use Rule 7(f) as a mechanism to limit the government's evidence or flush out its prosecutorial theories in advance of trial, as Zottola and Lopez attempt to do here.  United States v. Albunio, No. 91-CR-403, 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992) ("The defendant's right to know the crime with which he is charged must be distinguished from his right to know the

23

evidentiary details by which proof of his culpability will be established."). The Second Circuit has been clear that "[a]cquisition of evidentiary detail is not the function of the bill of particulars." United State v. Mahaffy, 446 F. Supp. 2d 115, 119 (E.D.N.Y. 2006) (quoting United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990)). Moreover, as courts have recognized in cases involving clear and extreme violence by the defendants—particularly where, as here, Zottola's actions already led to the death of his father, and the attempted murder of one of the government's potential trial witnesses—the early disclosure of such information is particularly circumscribed. See United States v. Sindone, No. 01-CR-517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y.2002) ("The stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are ever present. The government is not required to turn over information that will permit a defendant to preview the government's case and tempt him . . . to see to it that the government's proof is not presented.").

The cases cited by Zottola warrant no different conclusion. See Zottola's Omnibus Mem., ECF No. 335, at 20. In United States v. Gammarano, No. 06-CR-72 (CPS), 2007 WL 2077735, at *9-13 (E.D.N.Y. July 18, 2007), the district court denied a bill of particulars request seeking "all locations where the crimes were allegedly committed" and "the exact nature of the fraudulent acts committed in furtherance of the securities fraud conspiracy, which took place over the course of eight years," in light of, among other things, the government's production of a "significant amount of evidence and information" to the defendants in discovery, which, as here, provided the defendant "with significant details about the nature of the conspiracy, the manner in which it proceeded, the participants . . . and the dates on which they were effected." In United States v. Orsini, 406 F. Supp. 1264, 1266 (E.D.N.Y. 1976), though the district court (without explanation) ordered the government to provide more information on one of the overt acts charged

24

in that indictment, the district court denied the defendant's request that the government "disclose with specificity all the overt acts which the government intends to prove at trial or which the defendant allegedly committed during the course and in furtherance of the conspiracy"—what Zottola is asking this Court to do—because "[t]here is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge." Id.[4]  And United States v. Siddiqi, No. 06-CR-377 (SWK), 2007 WL 549420, at *4 (S.D.N.Y. Feb. 21, 2007), in which the district court ruled that the government must disclose to the defendant the approximate dates and amounts of individual cash bribes charged in a bribery indictment, and United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988), in which the indictment alleged an extortion aimed at one company while the trial evidence showed an extortion aimed at different companies, are simply inapposite here, where the indictment and discovery specifically indicate the victims and dates of the attempted murder and murder underlying these murder-for-hire charges.

Taken together, the indictment, discovery and government filings in this case clearly put the defendants on notice of the nature of the charges against them and are more than sufficient to permit them to understand those charges and prepare for trial.  The requests for a bill of particulars should be denied.

---

[4]     Moreover, Zottola's citation to United States v. Stringer, 730 F.3d 120 (2d Cir. 2013), is misleading.  That case does not address a bill of particulars, and the portion cited by Zottola regarding the need for "fair notice to defendants and to ensure that any conviction would arise out of the theory of guilt presented to the grand jury" was specific to "the statute making it a crime for a witness summoned before a congressional committee to refuse to answer any question pertinent to the question under inquiry . . . .  As we explained at length . . . a valid indictment for such a refusal to testify must go beyond the words of [the statute] and allege the subject of the congressional hearing in order to determine whether the defendant's refusal was pertinent."  Id. at 126 (internal quotation marks omitted).  It has no bearing on this case, where the government has been clear that it has charged the attempts on the lives of Zottola's father and brother.

III.     The Motions to Sever Should Be Denied

Zottola, Shelton, Codner and Lopez move to sever their trials.  Zottola moves to sever his trial from Shelton only, while Shelton, Codner and Lopez move to sever their trials from each other and all other defendants.  Zottola argues that his motion to sever should be granted under Rule 14 of the Federal Rules of Criminal Procedure because Zottola and Shelton have antagonistic defenses and trying their cases together would lead to a "second prosecutor" in the courtroom.  Zottola Sev. Mot., ECF No. 332, at 1, 3.  Zottola further argues that severance from Shelton is appropriate because a joint trial would create evidentiary obstacles and spillover prejudice to both Zottola and Shelton.  Id.  Finally, Zottola suggests that there is no loss of judicial economy by severing the Zottola and Shelton trials.  Similarly, Shelton moves for a severance from all other defendants on similar bases.  See Shelton Sev. Mot., ECF No. 336, at 2-12. Specifically, Shelton argues that he and any defendant tried alongside him will have antagonistic defenses and all defendants tried with Shelton will act as "second prosecutors" in the case.  Id. at 3-6, 7-10.  Shelton further argues that severance is appropriate because a joint trial will create trial management issues and cause spillover prejudice to Shelton, as well as any co-defendant tried alongside him.  Id. at 6-7, 10-11.  Finally, Shelton argues that severance is appropriate because he needs additional time to prepare for trial.  Id. at 11-12.  Like Shelton, Codner and Lopez move for severance from all other defendants, echoing Shelton's arguments that the risk of spillover prejudice is too great for either Codner or Lopez to be tried alongside any of their co-defendants. As set forth below, none of these arguments have merit and the severance motions should be denied.

A.     Legal Standard

Federal Rule of Criminal Procedure 8(b) provides that an indictment may charge multiple defendants "if they are alleged to have participated in the same act or transaction or in the

same series of acts or transactions constituting an offense or offenses."  The "defendants may be charged in one or more counts together or separately."  Fed. R. Crim. P. 8(b).  Multiple defendants engage in the same "series of acts or transactions" when their "criminal acts are 'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme.'"  United States v. Cervone, 907 F.2d 332, 341 (2d Cir. 1990) (quoting United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989)); see also United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008) ("[J]oinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants or arise out of a common plan or scheme.").  Whether joinder is warranted "must be determined on a case-by-case basis."  Rittweger, 524 F.3d at 177 (2d Cir. 2008).  Courts must make a "commonsense" determination whether "joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice" to the defendants "in light of the factual overlap among charges."  Id.

"It is an 'established rule' that a 'non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b).'"  United States v. Uccio, 917 F.2d 80, 87 (2d Cir. 1990) (quoting United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988)); see United States v. Friedman, 854 F.2d 535, 561 (2d Cir. 1988) ("The mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an offense.").  Because a conspiracy charge "provides a common link [to substantive counts] and demonstrates the existence of a common plan," the joinder of conspiracy and substantive counts is also proper.  United States v. Bernstein, 533 F.2d 775, 789 (2d Cir. 1976); United States v. Stein, 428 F. Supp. 2d 138, 142 & n.16 (S.D.N.Y. 2006) ("The claim of an overall conspiracy said to link the substantive crimes charged in an indictment justifies joinder under Rule 8(b)." (citing cases)).

27

The Supreme Court has consistently reaffirmed "a preference in the federal system for joint trials of defendants who are indicted together" because such trials promote efficiency and prevent the injustice of inconsistent verdicts.  Zafiro v. United States, 506 U.S. 534, 537 (1993); see also United States v. Cardascia, 951 F.2d 474, 482–83 (2d Cir. 1991); United States v. Ventura, 724 F.2d 305, 312 (2d Cir. 1983) (where "defendants . . . are jointly indicted [they] should be jointly tried").  Furthermore, joint trials "limit inconveniences to witnesses, avoid delays in bringing defendants to trial and permit the entire story to be presented to a single jury."  United States v. Rucker, 32 F. Supp. 2d 545, 547 (E.D.N.Y. 1999); see also Barrett, 824 F. Supp. 2d at 432-33.

As the Supreme Court has stated:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.  Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit.  Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 209-10 (1987); see also Bruton v. United States, 391 U.S. 123, 134 (1968) (joint trials conserve state funds, diminish inconvenience to witnesses and avoid delays); United States v. Lyles, 593 F.2d 182, 191 (2d Cir. 1979) (joint trials conserve resources, lessen the burden on jurors and avoid repetitive testimony).

Although Federal Rule of Criminal Procedure 14(a) permits separate trials where the joinder "appears to prejudice a defendant," courts must balance the efficiency of a joint trial against the possibility of prejudice to a defendant.  See Bruton, 391 U.S. at 131-134; United States

28

v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003); United States v. Shellef, 507 F.3d 82, 98 (2d Cir. 2007).   For this analysis, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money and scarce judicial resources that joint trial permits." United States v. Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993).   The presumption in favor of a joint trial is especially compelling where, as here, the acts alleged in the indictment are "unified by some substantial identity of facts or participants or arise out of a common scheme or plan," United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (internal quotation marks and citations omitted), or where, as here, the defendants are all "charged in the same conspiracy." United States v. Pirro, 76 F. Supp. 2d 478, 483 (S.D.N.Y. 1999) (collecting cases).

Because Rule 8(b) "authorizes some prejudice against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice."   United States v. Amato, 15 F.3d 230, 237 (2d. Cir. 1994) (internal quotations and citations omitted); see also, e.g., United States v. Casamento, 887 F.2d 1141, 1149-50 (2d Cir. 1989) (defendant bears an "extremely difficult burden of proving not merely that he would be prejudiced by a joint trial, but that the prejudice would be so great as to deprive him of his right to a fair trial").   Thus, a court should sever defendants only where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."   Rittweger, 524 F.3d at 179 (quoting Zafiro, 506 U.S. at 539); see also United States v. Friedman, 854 F.2d 535, 563 (2d Cir. 1988) (defendant must show that a "miscarriage of justice" would result to warrant severance); see also United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998) (severance is appropriate only if a defendant can establish a risk of prejudice that is "sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials").   Ultimately, "the decision

29

whether to sever a trial is committed to the sound discretion of the district court." <u>Barret</u>, 824 F. Supp. 2d at 433.

Here, the defendants have been charged as co-conspirators in one murder-for-hire scheme set into motion by Zottola in 2017, which culminated in the murder of Sylvester Zottola on October 4, 2018. There is thus no question that joinder of Zottola, Shelton, Codner, Lopez and their co-defendants in the same indictment was proper under Rule 8. For the reasons set forth below, severance of their trials is not warranted.

B.   <u>Zottola and Shelton's Claims of Antagonistic Defenses Do Not Require Severance</u>

Zottola and Shelton argue that severance is required because their defenses will be antagonistic to each other, creating a scenario at trial where counsel for each defendant becomes a "second prosecutor" in the courtroom. Zottola Sev. Mot., ECF No. 332, at 7-15; Shelton Sev. Mot., ECF No. 336, at 3-6, 7-10. In support of this argument,



. Zottola Sev. Mot., ECF No. 332, at 1, 9. Conversely,

.[5]

. Shelton Sev. Mot., ECF No. 336, at 8.

---

[5]      Zottola and Shelton have shared their proffered defenses with each other. Zottola's motion for severance was filed under seal; however, Shelton's motion for severance states "Mr. Zottola has laid forth the crushing case against Mr. Shelton that he will wage if they are trial [sic] together." Shelton Sev. Mot., ECF No. 336, at 7. Nonetheless, in an abundance of caution, the government has redacted those portions of their arguments

For the reasons set forth below, Zottola, Shelton and their co-defendants' anticipated defenses are not in fact "mutually antagonistic," they do not cause the defendants to face "multiple prosecutors" at trial, and neither Zottola nor Shelton has established prejudice sufficient to require severance.  Zottola and Shelton, the masterminds of this murder-for-hire scheme, simply believe their chances of acquittal are best if they are not sitting together at trial; however, that is not grounds for severance.

1.    <u>Mutually Antagonistic Defenses</u>

The mere fact that two defendants advance defenses that are adversarial to one another "clearly does not, alone, require trials to be severed.  Were this true, a virtual ban on multi-defendant conspiracy trials would ensue since conspirators raise many different and conflicting defenses."  <u>Cardascia</u>, 951 F.2d at 482.  "Mere fingerpointing does not require severance." <u>Casamento</u>, 887 F.2d at 1154 (quotations omitted); <u>see also</u> <u>United States v. Serpoosh</u>, 919 F.2d 835, 837 (2d Cir. 1990) ("The mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance.").

The term "mutually antagonistic" describes a narrow category of adversarial defenses where "accepting one defense requires that the jury must of necessity convict a second defendant."  <u>United States v. Yousef</u>, 327 F.3d 56, 151 (2d Cir. 2003); <u>see also</u> <u>Zafiro</u>, 506 U.S. at 542 (Stevens, J., concurring) (describing "mutually antagonistic" defenses as those as to which "acceptance of one . . . necessarily preclude[s] acceptance of the other and acquittal of the codefendant").  However, the Supreme Court has held that even "mutually antagonistic defenses are not prejudicial <u>per se</u>," and that severance is not required when defendants adopt antagonistic defenses "even if prejudice is shown."  <u>Zafiro</u>, 506 U.S. at 538-39.  Rather, when defendants adopt mutually antagonistic defenses, severance is appropriate only if defendants can demonstrate "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or

prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539.  See also United States v. Scott, 637 F. App'x 10, 13 (2d Cir. 2015) ("It is not enough to demonstrate that separate trials would have increased the chances of the appellant's acquittal . . . the defendant must instead show prejudice so severe that his conviction constituted a miscarriage of justice and amounted to a denial of a constitutionally fair trial.").

"In those rare instances where a defendant establishes a 'high' risk of prejudice, however, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'"  United States v. Abakporo, No. 12-CR-340 (SAS), 2013 WL 6188260, at *3 (S.D.N.Y. Nov. 25, 2013) (quoting Zafiro, 506 U.S. at 539).  In such a case, "the tailoring of the relief to be granted, if any, [is left] to the district court's sound discretion."  Id.; see also Yousef, 327 F.3d at 150 ("[T]he fashioning of remedial steps to minimize prejudice to a defendant is committed to the sound discretion of the district court.").

To determine if severance is warranted on the ground of antagonistic defenses, the Court must first determine whether the adversarial defenses that Zottola, Shelton and their co-defendants may advance are in fact "mutually antagonistic," such that acceptance of one defense necessarily precludes acceptance of the other, or if they are merely "fingerpointing."  Next, the Court must determine whether, if the defenses are in fact "mutually antagonistic," such defenses are "prejudicial" to one or both sets of defendants.  Finally, even if the Court determines that one or both sets of defendants might suffer prejudice as a result of a joint trial, the Court must find that there is a serious risk that a "joint trial would compromise a specific trial right" or "prevent the jury from making a reliable judgment" about the defendants' guilt or innocence that cannot be mitigated by measures less drastic than severance, such as a series of limiting instructions.

2.    <u>Discussion</u>

In their motion papers, the defendants have described their intended trial defenses[6] in a manner that suggests each defense will stand in stark contrast with the another.  Specifically,

████████████████████████████████████████████████████████████████████████

████████████████████████████████,” Zottola Sev. Mot., ECF No. 332, at 1, ████████████

████████████████████████████████████████████████████████████████████████

████████,” Shelton Sev. Mot., ECF No. 336, at 8.  Both defendants then conclude that these defenses fit the definition of “mutually antagonistic” because it would not be possible for a jury to accept the defense advanced by one defendant without finding the other defendant guilty.  <u>See</u> Zottola Sev. Mot., ECF No. 332, at 12; Shelton Sev. Mot., ECF No. 336, at 7-8.

The defendants’ conclusion is incorrect.  Zottola and Shelton have not established that they will actually be able to present all of the facets of their stated defenses at trial through admissible evidence, nor that such defenses—and any codefendants’ anticipated defenses—are “mutually antagonistic” such that severance is required.  First, the defenses are not as adversarial as they appear, as certain aspects of the proffered “antagonistic” defenses cannot be advanced at trial, whether joint or separate.  Second, even if the defendants’ intended defenses could proceed exactly as Zottola and Shelton describe, such defenses do not require a jury to find one defendant

---

[6]    Neither defendant has taken steps to confirm that the defenses they describe herein are the defenses they will in fact assert at trial.  Comparatively, in <u>United States v. Shkreli</u>, 260 F. Supp. 3d 247 (E.D.N.Y. 2017), the defendants advanced this same argument in their motions for severance. Prior to arguing for severance based, in part, on antagonistic defenses, defendants Martin Shkreli and Evan Greebel took steps to confirm that the defenses they described in their severance motions were the defenses they would in fact assert at joint or separate trials: Shkreli waived attorney-client privilege over documents in connection with his assertion of an advice of counsel defense, and Greebel’s counsel, as an agent of Greebel, filed a declaration that Greebel would advance a defense that he was, <u>inter alia</u>, a pawn in “fraudulent schemes unbeknownst to him.”  <u>See</u> <u>United States v. Shkreli</u>, 15-CR-637 (KAM), Gov. Mem. of Law in Response to Severance Mot. at 23, ECF No. 166.

guilty if it credits the defense of the other.  Finally, even if the intended defenses were truly "mutually antagonistic," neither Zottola nor Shelton have demonstrated a severe risk of prejudice to themselves or their co-defendants.

    a.    The Proffered Defenses Face Evidentiary Hurdles

        i.    Zottola



Zottola Sev. Mot., ECF No. 332, at 7.  However, Zottola fails to explain how he will present evidence of this defense—including ███████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████," Zottola Sev. Mot., ECF No. 332, at 7— in compliance with the Rules of Evidence.  The hearsay rules prohibit Zottola from offering his own out-of-court statements for their truth.  See Fed. R. Evid. 801.  Indeed, the yarn Zottola intends to spin appears to be built entirely on inadmissible hearsay, such as ████████████████ ████████████████████████████████████████████████████████. Zottola Sev. Mot., ECF No. 332, at 10.  Zottola declines to articulate how any such evidence would overcome hearsay rules to become admissible, and instead states merely that "███████ ████████████████████████████████████████████████████ ███████████████████████████████████."  Id.  Zottola, in his motion, both lays out what he claims is a defense antagonistic to that of Shelton's, see Zottola Sev. Mot., ECF No. 332, at 9 (describing the three prongs of his defense), and at the same time states that he cannot discuss the evidence of his defense in his motion to sever "in the interests of preserving

34

Zottola's defenses," id. at 10.  Zottola therefore declines to provide any information as to how he would properly present evidence of the defense that he describes.

Moreover, even if Zottola were to testify at trial, he could testify only to facts of which he had personal knowledge—facts he had an opportunity to, and actually did, observe—at the time of the charged crimes.  See Fed. R. Evid. 602.  Zottola cannot offer testimony that, in hindsight, after the conclusion of relevant events, █████████████████████████████████

██████████████████████████████████████████████████████.[7]  He likewise cannot testify about what he "learned" or "discovered" from other sources (such as the discovery in this case); this is evidence that he presumably will concede that he did not actually perceive or observe when interacting with his co-defendants.  Finally, Zottola cannot testify directly to the state of mind of other individuals, including Shelton or his other co-defendants.  See, e.g., Fenje v. Feld, 301 F. Supp. 2d 781, 815-16 (N.D. Ill. 2003) (witness is not competent to testify as to another person's state of mind); Taylor v. Evans, No. 94-CV-8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) ("musings as to defendants' motivations would not be admissible if given by any witness—lay or expert").  Indeed, Zottola can no more testify that █████████████

████████████████████████████████████████████████████████," Zottola Sev. Mot., ECF No. 332, at 1, ████████████████████████—none of that testimony would be based on his knowledge at the time he acted.

---

[7]      Zottola's memorandum in support of severance consists of many speculative theories and retrospective conclusions.  See, e.g., Zottola Sev. Mot., ECF No. 332, at 1 ("█████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████.

ii.   <u>Shelton</u>

Similarly, Shelton's proffered defense is likely to face evidentiary hurdles. ███

████████████████████████████████████████████████████████

███████████████████████████████████████.″   Shelton Sev.

Mot., ECF No. 336, at 8.   However, Shelton then declines to provide <u>any</u> information about the

defense itself, how he would proceed with such a defense, what the defense is based on or how it

is antagonistic.   The little information that Shelton does provide suggests that Shelton will have

problems overcoming both relevancy and hearsay objections at trial.

Like Zottola, Shelton can only testify to facts that he had personal knowledge of at

the time of the charged conspiracy; that is, facts that he personally had an opportunity to, and

actually did, observe.   <u>See</u> Federal Rule of Evidence 602.   His attorney may ask him, and Shelton

may testify to, information that he personally knew or did not know at the time of the conspiracy;

his attorney may also ask him whether his actions would have been different if he had known

certain other independently established facts.   <u>See, e.g.</u>, <u>United States v. Cuti</u>, 720 F.3d 453, 458

(2d Cir. 2013).   However, Shelton cannot himself enter into evidence information that he "learned"

or "discovered" from other sources (such as the discovery in this case) <u>after</u> the conspiracy period

ended; this is evidence that he himself will ostensibly concede that he did not actually perceive or

observe when interacting with Zottola.   <u>See</u>, <u>e.g.</u>, 1 McCormick on Evid. § 10 (7th ed.). ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████," Shelton Sev. Mot., ECF No. 336, at 7 (emphasis omitted), that this is

based on Shelton's personal knowledge rather than information that he gathered from the

government's discovery.   In fact, there is no information in Shelton's severance motion to explain

this defense at all. ████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████

        ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████   Id.  Not only is that information inadmissible, self-serving hearsay, see Fed.

R. Evid. 801, but Shelton fails to demonstrate or even suggest how this information would be

relevant and therefore admissible at Shelton's joint or separate trial ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████.

Shelton simply asks the Court to assume, with no representations as to how any this evidence is

admissible or relevant, that it will somehow be admitted at trial.

        ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



       b.      **The Proffered Defenses Are Not Mutually Antagonistic**

Even assuming _arguendo_ that Zottola and Shelton could present their intended defenses successfully at trial, they have not established that such defenses are "mutually antagonistic." Were Zottola and Shelton to advance defenses that placed the blame for the murder-for-hire conspiracy solely on each other, the defenses still would not be mutually antagonistic because they would not _require_ a jury to find one defendant or set of defendants guilty if the jury accepted the other defense. _Yousef_, 327 F.3d at 151.

That is, it is eminently possible for a jury to credit the defense Zottola intends to advance without convicting Shelton of a crime, and vice versa. ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████. Zottola Sev. Mot., ECF No. 332, at 9. ███████████

███████████████████████████████████████

███████████████████████████ This is not the case. In fact, there are multiple scenarios in which this could occur. For example:

- ███████████████████████████████████████
  ███████████████[8]

———————————————————

[8] ███████████████████████████████████████
███████████████████████████████████████



The reason that there are so many potential avenues for a jury to credit one (or even both) of Zottola's and Shelton's defenses and still acquit the other is because the crimes charged are complex. This is not a case about a single murder or drug transaction, where there were only two individuals present when the crime occurred and believing the testimony of one defendant that he or she did not commit the crime necessarily requires disbelieving the testimony of another. Rather, this is a complex scheme to kill that took place over a year and involved numerous individuals, criminal acts, aborted attempts and violent incidents, finally culminating in murder.

As a result, it is implausible that Zottola and Shelton will provide diametrically opposed testimony on each and every relevant fact.

The Second Circuit has recognized this distinction between cases with a narrow set of facts where defenses can in fact be "mutually antagonistic," and cases with more complex sets of facts where the jury may find multiple avenues to its verdict. In advancing their argument, both Zottola and Shelton rely principally on three cases: Serpoosh, 919 F.2d 835, United States v. Shkreli, 260 F. Supp. 3d 247 (E.D.N.Y. 2017), and United States v. Nordlicht, No. 16-CR-640 (BMC), 2018 U.S. Dist. LEXIS 63890 (E.D.N.Y. Apr. 16, 2018). This reliance is misplaced, as each of these cases are distinguishable from the instant case.

In Serpoosh, two co-defendants were charged in connection with a single drug sale, and each testified at trial that the sale had been arranged by the other. Serpoosh, 919 F.2d at 838. The Second Circuit found that the co-defendants had provided "mutually exclusive explanations" of what happened in the hours leading up to the sale, and that as a result, the district court had erred in failing to sever the case. Id. In Serpoosh, the defendants did not simply blame each other; they offered testimony about the drug transaction where each agreed largely with the government's characterization of the facts of the case, but each described themselves as the dupe of the other during the transaction. Id. Therefore, the only question for the jury was which defendant was lying, as there was no question remaining as to any other aspect of the case. Id. This is in stark contrast to the instant case where, for example, both defendants can simply be wrong in their proffered theories of what took place and who was involved. The Serpoosh court also found that "the main purpose of the rule governing joinder, judicial economy, would not have been seriously frustrated by separate trials" because the "entire trial of both defendants, almost half of which was devoted to their testimony, lasted just over one day." Id. at 839. Again, this is unlike the instant

case, where the government anticipates a six-to-eight week trial with more than fifty testifying witnesses (depending on any stipulations that the parties may reach), including victim-witnesses.

In Nordlicht, multiple defendants were charged with schemes to defraud investors and prospective investors. 2018 U.S. Dist. LEXIS 63890, at *3-4. Several defendants, including Nordlicht, claimed that the frauds charged by the government were not fraud. However, one defendant, Shulse, claimed that they were fraud, but that Shulse was not involved in perpetrating the fraud. Id. at *4-5. The Court severed Shulse's case from that of his codefendants due to a combination of issues, not solely due to the fact that Shulse claimed to be "an unknowing pawn in [the] alleged frauds [of his codefendants]." Id. at *2. Severing Shulse from his codefendants focused the question in the Nordlicht trial solely on whether or not the conduct was fraudulent. Compare with United States v. Chierchio, et al, No. 20-CR-306 (NGG), 2022 WL 523603, at *6 (E.D.N.Y. Feb. 22, 2022) (denying severance and distinguishing Nordlicht, stating that "[t]ried together in this case . . . Kurland, Chierchio, and Russo may simply argue that one or the other was responsible . . . [t]here are not two issues that could confuse the jury . . . [t]here is only one: whodunit").

Shkreli, a complex case involving multiple charges of securities fraud, securities fraud conspiracy and wire fraud conspiracy, is both instructive and distinguishable from the instant case in important ways. In Shkreli, both defendants—Shkreli and Greebel, an attorney—moved for severance and claimed that their defenses would be mutually antagonistic. Shkreli's stated defense was that he "lacked intent to defraud because he relied and acted on the advice of counsel, one of whom was Greebel," and Greebel's defense was "that his legal advice was predicated on what he believed to be truthful and complete information provided by Shkreli but which, instead, was untrue." 260 F. Supp. 3d at 254. Even on those facts, where both defendants had committed

41

to pointing the finger directly at each other and accusing each other of lying, the district court ultimately concluded that the defenses were "not mutually antagonistic because they do not require a jury to find one defendant guilty if that jury accepts the other defendant's defense." Id. (listing scenarios in which jury could accept one defense yet not be required to find that other defendant had the requisite criminal intent to defraud).

Instead, the district court in Shkreli ultimately concluded that severance was appropriate due to "the extraordinary and unique circumstances presented" in that case—circumstances that are not present here. Id. at 257.  In his severance motion, Shkreli indicated he would advance a specific affirmative defense not applicable here, namely, an advice of counsel defense.  Id. at 254.  Greebel, in turn, intended to claim at trial that Shkreli did not give him full information, rendering him "a pawn in fraudulent schemes unbeknownst to [him]," which would result in Greebel's counsel acting as a second prosecutor against Shkreli by arguing that Shkreli was in fact guilty of fraud.  Id. at 254, 256.  The Shkreli court found that severance was warranted primarily because "Greebel's defense team will act as a second prosecutor against Shkreli, by arguing that Shkreli is guilty and offering "evidence, even if the government does not, that Shkreli lied to Greebel and other attorneys and investors."  Id. at 256.  The court found that this placed Greebel's defense theory and plan of attack against Shkreli in conflict with Shkreli's affirmative defense and, while noting that severing the trial of defendants indicted together is "rare," determined that severance was warranted "in the abundance of caution."  Id. at 257.[9]  As in

---

[9]     Notably, the Second Circuit has looked skeptically on severance even in circumstances similar to those in Shkreli.  See, e.g., United States v. Scott, 637 F. App'x 10, 13 (2d Cir. 2015) (summary order) (finding "unconvincing" the "contention that the anticipated defenses—that [client] lacked intent to defraud because he had relied on [lawyer's] legal advice, while [lawyer] lacked intent to defraud because he had unwittingly acted upon [client's] instructions—were mutually antagonistic, rather than mere 'finger-pointing'").

Nordlicht, if Shkreli and Greebel proceeded to trial together, a jury would have first had to determine whether there was fraud at all, and next who, if anyone, was culpable, creating a risk of confusing issues.  See Chierchio, et al., 2022 WL 523603, at *7.

Here, there is no risk of confusing issues.  The only issue before the jury will be who took part in the conspiracy to murder Sylvester and Salvatore Zottola.  Moreover, neither Zottola nor Shelton purport to offer an affirmative defense to the charged crimes, nor have either articulated that they will do more than standard blame shifting and finger-pointing, which the Second Circuit has consistently held does not mandate severance.  See, e.g., United States v. Adelekan, No. 19-CR-291 (LAP), 2021 WL 4839065, at *3 ("Although Adelekan may try to point the finger at his co-defendants and his co-defendants may try to do the same, '[t]he mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance.'" (quoting United States v. Villegas, 899 F.2d 1324, 1346 (2d Cir. 1990)); United States v. Hameedi, No. 17-CR-137 (JGK), 2017 WL 5152991, at *4 (S.D.N.Y. Nov. 3, 2017) ("The Second Circuit Court of Appeals has repeatedly rejected "fingerpointing" arguments of this sort as a basis for severance" (collecting cases)). ███████████████████

████████████████████████████,[10] ████████████████████

█████████ see Zottola Sev. Mot., ECF No. 332, at 9, ████████████████████

█████████, see Shelton Sev. Mot., ECF No. 336, at 8.  The Shkreli decision accordingly is inapposite here, and Zottola and Shelton's arguments are unavailing.

---

[10] ████████████████████████████████████████. In contrast, the Shkreli Court was able to consider both the type and volume of evidence that Greebel had committed to presenting at trial before deciding that severance was appropriate.  Shkreli, 15-CR-637 (KAM), Greebel's Mem. of Law in Support of His Mot. for Sev., ECF No. 163.

Additionally, Shelton's argument that his case must also be severed from other remaining co-defendants (Ross, Lopez and Codner) is without merit.  As an initial matter, there is no basis to believe, on the record before the Court, that Shelton and his other co-defendants will advance defenses that are mutually antagonistic.  It is currently unknown what defenses Ross, Lopez and Codner intend to raise should they choose to go to trial.  Shelton barely describes his own anticipated defense as it relates to Ross, Lopez and Codner (notably omitting any explanation for certain crucial facts, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  Shelton Sev. Mot., ECF No. 336, at 8.  Shelton's description of the anticipated defenses of his co-defendants is entirely speculative.  Given that Ross, Lopez and Codner have provided no indication as to their anticipated defenses (at least to the government and the Court), the Court has no basis to conclude that any such defenses would be mutually antagonistic to Shelton's proffered defense.  See United States v. Larranga Lopez, No. 05-CR-655 (SLT), 2006 WL 1307963, at *6 (E.D.N.Y. May 11, 2006) ("It is not yet clear whether the co-defendants in this case will rely on the same sort of antagonistic defenses as the co-defendants in Serpoosh.  [The defendant's] counsel avoids committing himself to a specific defense, saying only that 'it appears likely that [the defendant] and [his co-defendants] would have mutually antagonistic defenses.'   [The defendant's] counsel also does not allege his basis of knowledge concerning what defense his co-defendants intend to advance.  Therefore, there is no factual basis for concluding that the three co-defendants intend to put on mutually antagonistic defenses."

(citation omitted)).  To accept Shelton's argument for severance from Ross, Lopez and Codner would be to acquiesce to a standard that a defendant need only state that his defense will be antagonistic to show that a co-defendant is to blame and he is not in order to prevail on a motion for severance.  However, this is precisely what the Second Circuit has resoundingly rejected, as discussed above.

In any event, "[i]t is well established that a court can cure prejudice caused by allegedly antagonistic defenses through the use of jury instructions."  Hameedi, 2017 WL 5152991, at *5 (collecting cases).  Thus, the Court can cure any potential prejudice to Zottola, Shelton, Ross, Lopez or Codner by instructing the jury to consider the evidence against each defendant separately.  See, e.g., id. (holding that jury instruction could cure prejudice of antagonistic defenses); Adelekan, 2021 WL 4839065, at *4 (same).

       c.       <u>Zottola and Shelton's "Second Prosecutor" Argument is a Red Herring</u>

Both Zottola and Shelton assert that their cases must be severed in order to prevent defense counsel from acting as a second prosecutor in this case.  See Shelton Sev. Mot., ECF No. 336, at 3-6; Zottola Sev. Mot., ECF No. 332, at 12-15.  ██████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████  Zottola Sev. Mot., ECF No. 332, at 3.  ████████████████
██████████████████████████████████████████
Shelton Sev. Mot., ECF No. 336, at 3.  Ross, Lopez and Codner have offered no information about their defenses and made no indication that they will pursue a theory that involves arguing Shelton's guilt.

Despite Zottola's and Shelton's assertions that they will attack each other at trial, the "second prosecutor" argument is a red herring in this case.   The evidence that Zottola and Shelton appear to anticipate presenting of co-defendant participation in the murder conspiracy is the <u>government's</u> evidence, ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████   Therefore, while both Zottola and Shelton's defenses may lead to some repetition of, or increased emphasis on, certain of the government's evidence against these co-defendants, there is no reason to believe that a joint trial would lead to the admission of any new evidence against Zottola, Shelton or any of their co-defendants that would not otherwise be admissible if they were tried separately.[11] ████████████████████████

███████████████████████████████████████████

███████████   Zottola Sev. Mot. at 3, Zottola's speculation about what evidence the government may choose to present in its case is not a valid ground for severance.[12] ████████████████

---

[11] ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████.   In their briefs, both Zottola and Shelton fail to give any details that support their arguments for why their defenses are antagonistic or how they would act as a second prosecutor (other than emphasizing the government's evidence), but instead offer to submit materials <u>ex parte</u> to the Court.  This request should be rejected.  The government must have a meaningful opportunity to evaluate and respond to the defendants' claims, should the defendants make more than the blanket assertions currently laid out in their motions, which do not rise to a level that requires severance.

[12] ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████.  Conversely, Zottola

makes no representations about relying on any evidence other than the government's.

    C.    <u>Zottola, Shelton, Codner and Lopez Have Articulated No Spillover Prejudice Requiring Severance</u>

        In their motions, Zottola, Shelton, Codner and Lopez all argue that alleged "spillover prejudice" supports severance in this matter. Zottola Sev. Mot., ECF No. 332, at 2; Shelton Sev. Mot., ECF No. 336, at 10-11; Codner Mot., ECF No. 338, at 6-8; Lopez Mot., ECF No. 318-1, at 5-7. Zottola and Shelton, however, fail to articulate what spillover prejudice they would suffer by a joint trial. Zottola claims that there will be spillover prejudice by simply repeating his argument regarding "double prosecution." Zottola Sev. Mot., ECF No. 332, at 2. Shelton simply states that there will be spillover prejudice in a joint trial, providing no information about what would cause the prejudice and providing no factual support.[13] Codner argues that, were he to be tried jointly with the other defendants in the case, he would suffer spillover prejudice due to his "limited alleged role" and the disparity of evidence. Codner Mot., ECF No. 338, at 7. Like Codner, Lopez asserts that were he tried alongside any codefendant he would suffer spillover prejudice from "crimes and bad acts he has no connection with." Lopez Mot., ECF No. 318-1, at

---

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

[13]    Shelton states that there will be spillover prejudice pursuant to the rulings in <u>Bruton v. United States</u>, 391 U.S. 123 (1968) and <u>Cruz v. New York</u>, 481 U.S. 186 (1987). Shelton provides no support for this assertion. Like Zottola, Shelton states that he should be permitted to "put forth the specifics of the defense['s] claim" in an <u>ex parte</u> motion before the court, both implicitly acknowledging that he has provided the Court with no information upon which the Court could rule in his favor and suggesting a process by which the government would have no opportunity to evaluate and respond to his argument. This request should be denied.

5.  Because the rules are designed to promote economy and efficiency and to avoid a multiplicity of trials, "less drastic measures [than severance], such as limiting instructions, often will suffice" to cure any risk of prejudice.  Zafiro, 506 U.S. at 539.

As set forth below, all four defendants face a heavy burden of showing undue prejudice from a joint trial.  They have not met that burden here and the Court should deny severance on this basis.

1.    Legal Standard

As set forth above, "[a] defendant seeking severance under Rule 14 bears an 'extremely difficult burden of proving . . . that the prejudice would be so great as to deprive him of his right to a fair trial.'"  United States v. Bellomo, 954 F. Supp. 630, 649 (S.D.N.Y. 1997); Casamento, 887 F.2d at 1149.  "Evidence adduced against one alleged co-conspirator is 'neither spillover nor prejudicial' if it would be admissible at a separate trial against the movant as an act of a co-conspirator in furtherance of a conspiracy due to the nature of conspiratorial illegal activity."  United States v. Spicer, No. 10-CR-657 (SJ) (RML), 2013 WL 871952, at *3 (E.D.N.Y. Mar. 7, 2013) (citing United States v. Rosa, 11 F.3d 315, 341 (2d Cir.1993) ("A defendant's right to a fair trial does not include the right to exclude relevant and competent evidence.  Thus, the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately.  Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial.")).  "This is true even when the co-conspirator's acts are of greater severity."  Id.  "The defendant requesting severance must show substantial prejudice resulting from joinder, not just that he would have a better chance for acquittal at a separate trial."  United States v. Alegria, 761

48

F. Supp. 308, 312 (S.D.N.Y. 1991) (citing United States v. Torres, 901 F.2d 205, 230 (2d Cir.1990)).  "[W]here there is some connection between the alleged conspiracy and the counts that charge [the defendant alleging spillover prejudice] alone such that some overlap of evidence can be anticipated at trial, [the defendant] has not carried his burden for showing a single trial to be prejudicial."  Id.

Even where one defendant has been charged in fewer counts than another or played a lesser role than another, courts routinely deny severance motions.  "[I]t is well established that defendants who played a minor role in a conspiracy may be tried with those who played a larger or dominant role."  United States v. Ferrarini, 9 F. Supp. 2d 284, 290 (S.D.N.Y. 1998) (citing Cardascia, 951 F.2d at 483); Casamento, 887 F.2d at 1153.  A "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance."  Cardascia, 951 F.2d at 483.

2.    Discussion

Zottola, Shelton, Codner, Lopez and all other defendants charged in the Superseding Indictment were part of a common scheme—the murder for hire of Sylvester and Salvatore Zottola set in motion by defendant Zottola, closely assisted by Shelton and others.  The agreements and activities between November 2017 and October 2018 in furtherance of the conspiracy prove the existence of the conspiracy itself, the results of the conspiracy and the role played by each individual defendant during the course of the year that culminated in the murder of Sylvester Zottola on October 4, 2018.  All such evidence is admissible against each and every defendant, regardless of whether they are tried together or separately.

Codner argues that it would be "difficult, if not impossible, for a jury to appropriately and objectively analyze Codner's distinct and most limited alleged role in this case

. . . while sifting through the massive evidence related to multiple acts of violence, including murder . . . ."  Codner Mot., ECF No. 338, at 7.  Similarly, Lopez asserts that he will suffer substantial prejudice if the prosecution is "permitted to put before the jury numerous violent acts and conversations not involving Alfred Lopez."  Lopez Mot., ECF No. 318-1, at 7.  And yet, this "massive" trove of evidence showing multiple acts of violence, including murder, as well as conversations amongst the co-conspirators regarding the planning and commission of multiple acts of violence, is itself evidence of Codner's and Lopez's guilt.  The government is not limited in its presentation of proof of the murder-for-hire conspiracy joined by Codner and Lopez.  Were either defendant to go to trial alone, the government would not be confined to showing only the specific acts and conversations engaged in by the defendant on trial.  In his motion, Codner asserts that the murder of Sylvester Zottola would be inadmissible at a trial against Codner.  Codner Mot., ECF No. 338, at 7.  Codner's logic, however, is flawed.  Codner himself is charged with substantive murder-for-hire (Count Two), and the government will necessarily need to prove that Sylvester Zottola in fact was murdered.  In fact, Codner and Lopez both fail to articulate any evidence that would be inadmissible against them were they to be tried alone.

Joint trials are particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy.  United States v. James, 712 F. 3d 79, 104 (2d Cir. 2013).  In order to prove that Codner and Lopez are guilty of participating in a murder-for-hire conspiracy, the government must establish at trial that such a criminal conspiracy existed separate and apart from also proving that Codner and Lopez knowingly participated in the conspiracy.  To do so, even in a separate trial for just Codner or Lopez, all of the evidence of the existence of the criminal conspiracy, including all of their codefendants' communications and criminal activities in furtherance of the conspiracy, is clearly admissible.  Thus, there is no basis

for Codner's or Lopez's trials to be severed.  See id. at 104 (holding that evidence of co-defendant's participation in two murders that defendant was not charged with did not cause defendant prejudice because that evidence "was relevant to the racketeering charges against [the defendant] to prove the formation, existence, and nature of the racketeering enterprise . . . as well as to show the pattern of racketeering activity"); United States v. Stewart, 590 F.3d 93, 123-24 (2d Cir. 2009) ("[T]he fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately." (internal quotation marks omitted)).[14]

Zottola alleges that, were he to be tried alongside Shelton, there would be evidentiary obstacles that would "unduly prejudice and damage" either his or a codefendant's case. Zottola Sev. Mot., ECF No. 332, at 15. Zottola declines to articulate the alleged evidentiary issues, offering again to submit such details ex parte, where the government would have no ability to evaluate and respond to his claims. Id. Zottola then offers two examples of what he terms "evidentiary obstacles": (1) ███████████████████████████████████████ ███████████████████████████████████; and (2) ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████.[15]  Neither of these "obstacles" described by Zottola create spillover prejudice or present the Court with grounds to sever the Zottola and Shelton trials.

---

[14]    The government also disputes Codner's characterization of the strength of the evidence against him, as compared to his co-defendants. Codner's severance argument assumes, incorrectly, that the government's evidence consists solely of "circumstantial evidence that he was, in fact, behind the wheel of the vehicle driven during the single assault shooting in July 2018." See Codner Mot., ECF No. 338, at 7.

[15]    ██████████████████████████████████████████████████████ █████████████████████████████████████████

First, Zottola and Shelton must demonstrate not simply that some different evidence may come in if there is a joint trial.  Instead, he must show that evidence would be admitted at a joint trial that would otherwise be inadmissible, or that evidence would be excluded at a joint trial that would be admissible (and potentially helpful to the defendant) if severance were granted. Chierchio, 2022 WL 523603, at *7.  Neither Zottola nor Shelton have explained how this would occur. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. See Zottola Sev. Mot., ECF No. 332, at 7.

Even assuming, arguendo, that spillover prejudice exists, it can hardly be characterized as a "miscarriage of justice."  In any event, the Supreme Court has recognized that "limiting instructions are often sufficient to cure any risk of prejudice."  Zafiro, 506 U.S. at 539; see also United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003) (district court's explicit instruction that jury consider defendants individually remedied spillover prejudice); United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997) (noting that spillover prejudice may be cured through clear judicial instructions); United States v. Rivera, No. 09-CR-619 (SJF), 2011 WL 1429125, at *6 (E.D.N.Y. Apr. 13, 2011) (noting "defendants may request any appropriate limiting instruction, or other remedial measure, at trial" to avoid spillover prejudice).

Further, to retain the considerable benefits of a joint trial and cure any minimal risk of prejudice, the Court may give a limiting instruction similar to that given by the district court in

Zafiro, namely, that the government has the burden of proving beyond a reasonable doubt that each defendant committed the crimes with which he has been charged, and separate consideration should be given to each defendant and each charge based on the evidence applicable to that defendant.  See Zafiro, 506 U.S. at 540-41; see also United States v. DeVillio, 983 F.2d 1185, 1192-93 (2d Cir. 1993) (upholding the Judge Glasser's denial of severance where an explicit limiting instruction had been used).

      D.     <u>Judicial Efficiency Weighs Against Severance</u>

Zottola, Shelton, Codner and Lopez all inexplicably argue that judicial efficiency would be <u>increased</u> by granting their motions for severance.  Zottola Sev. Mot. ECF No. 332, at 16-18; Shelton Sev. Mot., ECF No. 336, at 6-7; Codner Mot., ECF No. 338, at 8; Lopez Mot., ECF No. 318-1, at 6.  This argument is, on its face, illogical.   If granted, the defendants' motions would result in Codner being tried alone, Lopez being tried alone, Zottola being tried with the remaining defendants, but not Shelton, and Shelton being tried separately three times: once for the murder conspiracy and related charges, once for being a felon in possession of a firearm (Count Five) and once for the perjury charge (Count Six).  The inefficiency in proceeding in this manner is self-evident.

Granting severance "would impair both the efficiency and the fairness of the criminal justice system" by requiring "that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand."  Richardson, 481 U.S. at 209-10.  Witnesses, including victims, would be required to testify multiple times regarding traumatic events including shootings, a home invasion and murder.  Moreover, and significantly, severance would create a risk of "the scandal and inequity of inconsistent verdicts."  Richardson, 481 U.S. at

210; see also Bruton, 391 U.S. at 134 (joint trials conserve state funds, diminish inconvenience to witnesses, and avoid delays).  This is another separate and independent reason that joint trials are almost always preferred, and another basis to deny the defendants' motions.  Severance in this case would result in multiple lengthy trials where nearly all of the government's evidence would be re-presented against each defendant tried separately.

Zottola and Shelton further argue that "trial management issues" created by a joint trial weigh in favor of severance.  Zottola Sev. Mot., ECF No. 332, at 16-17; Shelton Sev. Mot., ECF No. 336, at 6-7.  Shelton states that "motions in limine, side bars, and delays in the case to allow for last minute briefing on important issues . . ." will arise if severance is not granted.  Shelton Sev. Mot., ECF No. 336, at 6.  Similarly, Zottola suggests that "innumerable objections" and "frequent sidebars" may disrupt the trial.  Zottola Sev. Mot., ECF No. 332, at 16.  Zottola also suggests that, due to the number of defendants remaining and the COVID-19 pandemic, it will not be possible to conduct one trial in this matter.[16]  Id. at 17-18.  These arguments are entirely without merit.   It is clear that a joint trial would "conserve[] judicial resources, alleviate[] the burden on citizens serving as jurors, and avoid[] the necessity of having witnesses reiterate testimony in a series of trials."   Lyles, 593 F.2d at 191.   A joint trial would also "avoid delays in bringing defendants to trial and permit the entire story to be presented to a single jury."   Barret, 824 F. Supp. 2d at 432.

Contrary to the defendants' claims, there is no reason to believe that a joint trial in this case would involve an atypical number of defense objections or sidebars.  Indeed, Shelton fails

---

[16]     As Julian Snipe pled guilty on May 27, 2022 in this matter, the government expects that a maximum of five defendants will proceed to trial.  If so, the government advocates that the Court conduct one trial for all five defendants.  Moreover, plea negotiations are ongoing with additional defendants in this case and therefore any decision at this stage that the number of defendants would necessitate two trials is premature and not grounds for severance.

to explain how severance would create significantly fewer motions in limine, sidebars or last-minute briefing on important issues.  In a trial as complex as this, there are certain to be objections, sidebars, motions and briefing regardless of whether all defendants are tried together or separately.  To the extent that Zottola, Shelton, Codner, Lopez or their co-defendants anticipate any particular issues, they can raise them with the Court in advance of trial through motions in limine.

Additionally, the COVID-19 pandemic presents no basis for a severance, particularly considering the robust COVID-19 protocols in place at the courthouse.  Indeed, given the limited availability of courtrooms that can be used for trials during the pandemic, a joint trial in this case would promote the interests of justice by increasing courtroom availability for trials in other cases.  In Chierchio et al., when denying severance on this and other grounds, the Honorable Nicholas G. Garaufis stated:

> [t]he court is simply not persuaded, given its long history of trying complex and multi-defendant cases, that it cannot effectively dispatch with whatever evidentiary issues may arise at trial (or before, in further motion practice).  And although public health conditions continue to present challenges, the court has already scheduled two trials sooner than this one that involve greater number of defendants than [the three defendants] in this case.

2022 WL 523603, at *8.  Indeed, there is no rule, pandemic or otherwise, that five defendants cannot be tried together.[17]

Finally, Shelton argues that severance should be granted because he needs more time to prepare for trial due to the April 2022 production of certain co-defendants' electronic devices.  Shelton Sev. Mot., ECF No. 336, at 11.  The Court should deny this request.  A discrete number of additional forensic extractions of electronic devices, none of which belonged to Shelton,

---

[17]     Should there be need, this trial could be conducted in the ceremonial courtroom.

were produced to Shelton in April 2022, approximately four months prior to trial.[18]   However, the vast majority of device extractions requested by Shelton in his discovery letters were: (1) previously produced; (2) not discoverable; or (3) not extracted.   Of the forensic extractions produced in April, the government indicated that it did not anticipate using evidence at trial from three of them.   Additionally, going above and beyond its discovery obligations, as detailed further below, on April 18, 2022, the government provided all defendants with a specific production of the relevant portions of the forensic extractions of electronic devices that it may use at trial (the entire extractions were previously produced to the defendants).   As a result, the April production of these additional codefendants' electronic device reports cannot serve as a legitimate basis to delay a trial that is not set to begin until August 24, 2022, as also discussed more below.

E.      Severance of Counts Five and Six is Unwarranted

Finally, Shelton moves to sever his trial on the felon-in-possession count (Count Five) from the remaining counts in the Superseding Indictment on the basis that "knowledge that the defendant had a prior felony conviction would prevent a jury from making an impartial determination o[n] the remaining counts."   Shelton Sev. Mot., ECF No. 336, at 13.   Shelton further moves to sever his trial on the perjury count (Count Six) on the basis that it is "irrelevant to the case."   Id. at 15.   Shelton cannot meet his burden of showing that a single trial of all counts in the Superseding Indictment will result in substantial prejudice, much less prejudice that cannot be cured with an appropriate jury instruction.   Accordingly, his request should be denied.

---

[18]      Shelton states that "there were more than 45 devices mentioned that were not disclosed to him, belonging to codefendants," Shelton Sev. Mot., ECF No. 336, at 3, n.2, however, the government provided a chart of devices which showed that the vast majority of the defendant's requests were for forensic extractions that were not performed and, thus, could not be produced.

1.    <u>Applicable Law</u>

The Second Circuit has held that a murder-for-hire conspiracy charge and a felon-in-possession charge are properly joined where the facts supporting the two counts are part of a common scheme or plan and occurred in the same series of acts or transactions.  <u>United States v. Lee</u>, 549 F.3d 84, 94 (2d Cir. 2008).  In <u>Lee</u>, the Second Circuit held that the trial court did not err in denying the defendant's motion to sever the murder-for-hire charge from the felon-in-possession charge where the handgun found by the police in the rental car the defendant was driving at the time of his arrest was both "an instrumentality of the murder for hire conspiracy and the basis for the felon-in-possession charge."  <u>Id.</u>

The Second Circuit has further held that Rule 14(a) does not require severance of a felon-in-possession count from other related counts merely because one element of a felon-in-possession charge is the defendant's prior felony conviction.  <u>See</u> <u>United States v. Page</u>, 657 F.3d 126 (2d Cir. 2011).  In <u>Page</u>, the Second Circuit reviewed the district court's denial of a defendant's motion to sever a felon-in-possession charge from related narcotics charges.  The Second Circuit affirmed the denial of severance, concluding (1) "there was a 'sufficient logical connection' between the narcotics counts and the gun count" and (2) "separate trials of the narcotics counts and the gun count would have required much of the same evidence."  <u>Id.</u> at 130.  The Second Circuit also noted that "the district court gave a specific limiting instruction, telling the jury that it could consider the prior conviction only for the fact of its existence—the first element of the felon-in-possession charge—and not for any other purpose" and held that the defendant failed to meet his "heavy burden" to show "substantial prejudice" from the "sanitized evidence" of his prior felony conviction.  <u>Id.</u> at 130-31.

2.    Discussion

The Court should deny the motion for severance or bifurcation of the felon-in-possession charge in this case.  As in Lee, the handgun found in Shelton's residence is both an instrumentality of the murder-for-hire conspiracy and the basis for the felon-in-possession charge. The government will offer evidence to show that, as part of Shelton's participation in the conspiracy, Shelton provided firearms to co-conspirators.  The firearm that is the subject of Count Five was discovered during the execution of the October Premises Warrant, further supporting the government's position that Shelton had access to firearms.  Thus, the firearm found in Shelton's residence would be admissible at Shelton's murder trial, requiring repetition of the same evidence and a waste of resources.  Given these overlapping facts and their relevance to both charges against Shelton, severance is not warranted.  See Lee, 549 F.3d at 94-95.

Under these circumstances, a limiting instruction concerning the proper use of the defendant's prior felony conviction is sufficient to mitigate any prejudice to the defendant, and the Court should deny Shelton's motion to sever or bifurcate Count Five.  See, e.g., United States v. Mejias, No. 11-CR-506 (CBA), 2011 WL 5156440, at *2 (E.D.N.Y. Oct. 28, 2011) (denying motion to sever felon-in-possession charge from other firearm charges); United States v. Sterling, No. 16-CR-488 (LAK), 2017 WL 2304024, at *5 (S.D.N.Y. May 24, 2017) (denying motion to sever or bifurcate felon-in-possession charge from narcotics distribution charges).  Relatedly, in his motion, Codner asserts that he would be unduly prejudiced by his joinder with Shelton due to the fact that a jury would learn that Shelton is a convicted felon.  Not only is this fact far less prejudicial than the acts with which Codner is charged as having committed—and which the government will prove at trial—but, again, a limiting instruction as described above would alleviate any concern.

58

Further, the Court should deny the motion for severance or bifurcation of the perjury charge. Shelton's perjury charge is entirely intertwined with the facts of this case, as Shelton's perjury is consciousness of his guilt in the murder for hire scheme and thus would be part of the evidence at trial, even if this court were severed. The government will show at trial that Shelton's motivation for perjuring himself on a financial affidavit by stating that he had a total of $5,500 in cash to his name, when in fact he had $45,000 in cash in his residence at the time of his arrest, is that Shelton sought to conceal the large amount of cash that he possessed as his pay out for the murder of Sylvester Zottola. As there is a sufficient logical connection between the perjury count and the murder-for-hire charges, and a separate trial on the perjury count would necessitate the government presenting the entire murder-for-hire scheme at trial to prove that: (1) the $45,000 belonged to Shelton and (2) Shelton had motivation to lie about its existence due to its connection to a murder-for-hire, there are no grounds for severance or bifurcation. See Page, 657 F.3d at 130.

Thus, for all of the foregoing reasons, the defendants' motions for severance should be denied in their entirety.

## IV.   The Motions for Brady/Giglio Disclosures Should Be Denied

Zottola, Shelton and Lopez move for orders directing the disclosure of Brady material, including underlying reports summarized in a government disclosure letter dated October 20, 2019, and statements proffered by a witness's counsel to the government. See Zottola Omnibus Mem., ECF No. 335, Shelton Brady Mot., filed under seal and dated Apr. 29, 2022 ("Shelton Brady Motion"); Lopez Mot., ECF No. 318-1. Zottola further asks that the government identify (1) "what steps it took to ensure that relevant NYPD officers were questioned for Brady information;" (2) "what other steps it took to ensure that a proper review for Brady materials was conducted of the NYPD's files and investigating officers;" and (3) whether Zottola's father cooperated with the NYPD to avoid arrest and prosecution. See Zottola Omnibus Mem., ECF 335

at 9, 11-12.  Shelton and Lopez further request the immediate production of impeachment material

under <u>Giglio v. United States</u>, 405 U.S. 150 (1972), as well as a long list of other records that have

either already been produced or do not fall within the confines of the government's Rule 16 or

other disclosure obligations.  <u>See</u> Shelton Brady Mot., at 2-6; Lopez Mot., ECF No. 318-1, at 1-5.

For the reasons set forth below, these requests are either moot or should be denied.

      A.    <u>Applicable Law</u>

      Under <u>Brady</u> and its progeny, "[t]he prosecution has a constitutional duty to

disclose evidence favorable to an accused when such evidence is material to guilt or punishment."

<u>United States v. Coppa</u>, 267 F.3d 132, 135 (2d Cir. 2001).  That duty encompasses both

exculpatory materials and information that might be used to impeach a key government witness.

<u>Id.</u> (citing <u>Giglio</u>, 405 U.S. at 154).  "[A]s a general rule, <u>Brady</u> and its progeny do not require

immediate disclosure of all exculpatory and impeachment material upon request by a defendant."

<u>Id.</u> at 146; <u>see also</u> <u>United States v. Barret</u>, 824 F. Supp. 2d at 455 ("It is well-settled that the

government need not immediately disclose <u>Brady</u> or <u>Giglio</u> material simply upon request by the

defendant." (citing <u>Coppa</u>, 267 F.3d at 146)).  Rather, <u>Brady</u> and <u>Giglio</u> material must be disclosed

"in time for its effective use at trial."  <u>Coppa</u>, 267 F.3d at 144-46; <u>see also</u> <u>United States v.</u>

<u>Singletary</u>, 685 F. App'x 33, 34 (2d Cir. 2017) (summary order); <u>United States v. Rodriguez</u>, 496

F.3d 221, 226 (2d Cir. 2007).  The district court has the discretion to order <u>Brady/Giglio</u> disclosures

at any time as a matter of "sound case management."  <u>United States v. Taylor</u>, 17 F. Supp. 3d 162,

177 (E.D.N.Y. 2014), <u>aff'd</u>, No. 16-CR-3274, 2020 WL 629955 (2d Cir. 2020).

      B.    <u>Discussion</u>

      1.    <u>Brady Material</u>

      As an initial matter, the government affirms that it is aware of and will continue to

comply with its <u>Brady</u> obligations throughout the course of this case.  On October 8, 2020, the

government disclosed thorough summaries of information in its possession that could arguably be construed as exculpatory, taking a broad view of possible defense theories. See Zottola Omnibus Mot., ECF No. 334, Ex. E.   Then, on April 20, 2022, the government made a supplemental disclosure—in response to a defense request for information—regarding its search of particular records maintained by the Federal Bureau of Investigation ("FBI"), including that Title III and confidential source indices were queried for a specific set of search terms, which terms were provided to the defense. See Gov't Ex. 2 (Apr. 20, 2022 Ltr.).[19] ████████████████

████████████████████████████████████████████████████

████ .

        ████████████████████████████████████████

████████████████████████████████████████████████ .[20]

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████ .   While the summaries that the government has already produced satisfy the obligation to provide the defendants with essential facts so that the defendants can make

---

[19]     Zottola further asks that the government identify similar steps as to its review of NYPD files.  This argument takes literally the adage that no good deed goes unpunished.  There is no legal basis to require the government to identify the steps it took to search its files for Brady material.  As explained, the form and scope of the government's disclosures easily conform to what is required by law.  Nonetheless, the government has requested certain information and will respond separately by letter to the defense's query.

[20]     ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████ .   Similarly, at this time, the government is under no obligation to provide the full reports of statements from decedent Sylvestor Zottola, as discussed infra, pp. 66.

effective use of that information, the government will nonetheless provide the information described herein pursuant to a protective order identifying this material as subject to review for attorneys' eyes only.  See United States v. Stewart, 513 F.2d 957, 960 (2d Cir. 1975); see also, e.g., United States v. Middendorf, No. 18-CR-36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (finding government disclosure of individuals who could provide potentially exculpatory information and "essential facts" of that potentially exculpatory information was sufficient to comply with Brady obligations).

At this time, the government is not aware of any arguable Brady material currently in its possession that, in an abundance of caution, it is has not previously disclosed.  If the government becomes aware of any such material, it will continue to provide this information to the defense as soon as practicable after the government learns of it.  The government will also attempt to continue to be responsive to reasonable defense requests for information, as it has done. As such, the defendants' requests for an order pertaining to the disclosure of Brady material should be denied, consistent with the well-established practice in this district in such circumstances. "Courts of this Circuit have repeatedly denied pretrial requests for discovery orders pursuant to Brady where the [g]overnment has, as here, made a good-faith representation to the Court and defense counsel that it recognizes and will comply with its disclosure obligations under Brady." United States v. Shkreli, 15-CR-637 (KAM), 2016 WL 8711065, at *2 (E.D.N.Y. 2016) (citing cases).

2.     Giglio Material

The Court should also deny Shelton's and Lopez's requests for immediate production of Giglio material.  It is well-settled that the "Government satisfies its burden under Brady and Giglio so long as it turns over information in time for its 'effective use at trial.'" Coppa, 267 F.3d at 146; see also United States v. Conyers, No. 15-CR-537 (VEC), 2016 WL 7189850, at

*8 (S.D.N.Y. Dec. 9, 2016) (same); see, e.g., Shkreli, 2016 WL 8711065, at *3 (denying defense request for witness statements and Giglio materials more than six months before trial); United States v. Yu, No. 97-CR-102 (SJ), 1998 WL 57079, at *5 (E.D.N.Y. Feb. 5, 1998) ("Brady material of an impeachment nature, commonly referred to as Giglio material, is not required to be produced before trial.").

Here, the government will produce Giglio material in advance of trial.[21]  Because "impeachment material may be used effectively even if it is provided during the trial," disclosure of Giglio material even one week before trial provides sufficient time for the defendants to make effective use of any such material and for the parties and the Court to proceed to trial without undue delay or unnecessary continuances.  United States v. Vondette, 248 F.Supp.2d 149, 156 (E.D.N.Y. 2001) (citing United States v. Nixon, 418 U.S. 683, 701 (1974)); see also United States v. Saliba, No. 08-CR-792 (DLI) (RLM), 2010 WL 680986, at *4 (E.D.N.Y. Feb. 24, 2010) (denying defense request for immediate disclosure of Giglio material when the trial was over a month away and the government indicated that it would disclose the material shortly before trial).

Moreover, the scope of the defense request far exceeds material that could conceivably be considered proper impeachment material.  For example, Shelton requests (1) "any information that relates to the potential mental or physical impairment of any witness," (2) "any other known conditions that could affect the witness's bias such as animosity toward defendant, animosity toward a group of which the defendant is a member or with which defendant is affiliated,

---

[21]   The government intends to adhere to its customary practice of producing Giglio material in or around the same time it produces 18 U.S.C. § 3500 material.  By Order dated May 24, 2022, the Court directed the government produce § 3500 material on a rolling basis to begin July 25, 2022 to be completed by August 10, 2022, and for witnesses identified as sensitive, by August 15, 2022.

relationship with the victim, and known but uncharged criminal conduct," (3) criminal records of any witness, including the witness's prison records and probation records.  See Shelton Brady Mot., at 2-3.  Many of these requests are unclear, such as the requests for "any information that relates to the potential mental or physical impairment of any witness" or "any other known conditions that could affect bias."  Putting that aside, this request could encompass medical information far exceeding the bounds of legitimate Giglio material.  Nor does the government anticipate producing criminal histories or information about uncharged criminal conduct that may reflect, for example, arrests that did not result in convictions and have nothing to do with the witness's propensity for truthfulness or bear on a witness's biases or "prison records and probation records" for its witnesses, which the government does not seek without some reason.

Shelton's and Lopez's motions for immediate production of Giglio material should be denied, as the government will provide in advance of trial information bearing on its witnesses credibility and impeachment.

### 3.    Shelton's Other Requests

Shelton's other disclosure requests are either moot or should be denied.  Shelton requests:

- "any physical evidence, testing or reports tending to make guilt less likely," Shelton Brady Mot., at 4;

-  "any information that links someone other than the defendant to the crime," such as Zottola's communications with "anyone else about robbing, injuring or killing anyone in his family, including his father and/or brother Salvatore Zottola," id. at 5,

- "any information about any unindicted coconspirators and their involvement in any of these incidents," id.;

- "any information about any of the coconspirators or codefendants' communications with each other, or with members of the Zottola family or associates," id.;

- "[a]ny information that tends to support the defendant's pretrial constitutional motions or tends to show that defendant's constitutional rights were violated," id. at 6;

- "[a]ny and all records obtained by the government relating to searches of electronic devices of the codefendants or coconspirators in this case (whether or not obtained by search warrant), including but not limited to cellular phones, computers, or tablets," id.;

- "any and all information . . . that provide information about Anthony Zottola's motive and his culpability in the charged crimes," id. at 6-7;

- "any and all information about coconspirators' (including indicted and unindicted) membership in a gang, prior criminal activity, and police contacts, id. at 7; and

- "any and all records, including but not limited to police reports, forensic evidence, including ballistic, DNA, fingerprint reports, video evidence, dispositions and state or federal court files," regarding three arrests, id.

To the extent Shelton requests material that could be construed as exculpatory under Brady or as impeachment material under Giglio, such as reports tending to make guilt less likely or Zottola's communications with others about the murder of his father and brother, the government understands its obligations and will continue to comply with them.  To the extent the material does not fall within the ambit of Brady or Giglio, Shelton's basis for these requests is unclear.  For example, Shelton is not entitled to all information about unindicted co-conspirators, all communications between co-conspirators, all records from co-defendant or co-conspirator devices, whether by judicially-authorized warrant or consent.  In support, Shelton relies on three cases in which courts determined prosecutors should have turned over Brady evidence, not all evidence as Shelton seeks.  See id. at 5.  The same rationale applies to Shelton's requests for all information about coconspirators' gang membership, criminal activity and police contacts as well as all information concerning three specific arrests.  The government is in compliance with, and will continue to comply with, its obligations under Rule 16, Brady, Giglio, and 18 U.S.C. § 3500.  Nothing more is required.

65

\* \* \*

In sum, the government has complied with its <u>Brady</u> obligations and will produce <u>Giglio</u> and § 3500 material before trial.  Court intervention is therefore unnecessary at this time, and Zottola's and Shelton's motions for the production of such information are either moot or should be denied.

V.     <u>The Motion to Produce All Statements by Sylvester Zottola Should Be Denied</u>

The Court should deny Zottola's motion[22] to compel the government to produce all statements by the decedent Sylvester Zottola, because Zottola has identified no basis under which the government is required to disclose those statements at this time.

Zottola first argues that the decedent's statements qualify as "documents and objects" under Fed. R. Crim. P. 16(a)(1)(E)(i), that are "material to preparing the defense."  Zottola Omnibus Mem., ECF No. 335 at 14.  However, Rule 16(a)(2) of the Federal Rules of Criminal Procedure limits the information that a criminal defendant is entitled to receive.  The rule states:

> Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.  Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500.

Fed. R. Crim. P. 16(a)(2).  Rule 16 entitles a defendant to disclosure of statements that he himself made.  <u>United States v. Barrera</u>, 950 F. Supp. 2d 461, 474-75 (E.D.N.Y. 2013) (citing <u>United States v. Mannino</u>, 480 F. Supp. 1182, 1187 (S.D.N.Y. 1979)).  The plain language of Rule 16(a)(2) shields the government from producing reports prepared by law enforcement.  <u>Id.</u> (collecting cases); <u>see also</u> <u>United States v. Koskerides</u>, 877 F.2d 1129, 1133-34 (2d Cir. 1989) (protecting

---

[22]     Shelton joins Zottola's motion to compel production of these statements.  <u>See</u> Shelton's Joinder Motion, ECF No. 337.

IRS agent's tax report from discovery on the ground that "reports, memoranda, or other internal government documents made by . . . government agents in connection with the investigation or prosecution of the case are not subject to disclosure").  Zottola cites to no court which has ordered the production of a decedent's statements as recorded in law enforcement reports under the ambit of Rule 16.[23]

Zottola also argues the decedent's statements should be disclosed as <u>Brady</u> material.  However, in October 2020, the government provided summaries of any arguably exculpatory statements provided by the decedent.  In doing so, the government has met its <u>Brady</u> obligations.  <u>United States v. Collins</u>, 409 F. Supp. 3d 228, 245 (2019) (rejecting claim defendant was entitled to law enforcement reports and finding the provision of summaries satisfied the government's obligation).  To be sure, the government need only disclose "the essential facts which would enable [the defendants] to call the witness[es] and thus take advantage of any exculpatory testimony that [they] might furnish."  <u>United States v. Stewart</u>, 513 F.2d 957, 960 (2d Cir. 1975).  Nor is government under any legal obligation to explain why it chose to summarize the statements at issue rather than produce the notes and reports by law enforcement.  <u>Collins</u>, 409 F. Supp. 3d at 245.  Finally, despite Zottola's arguments to the contrary, the fact that the government produced reports made by other witnesses "is of no legal significance."  <u>Id.</u>  The cases cited by Zottola, <u>see</u> Zottola Omnibus Mem., ECF No. 335 at 14-15, merely restate the government's obligations under <u>Brady</u>.  As explained, the government is aware of those obligations and has and will continue to comply with them.

---

[23]   Zottola also argues that should the government seek to introduce the decedent's statements at trial, it must produce them given the "likely evidentiary disputes" that should be resolved <u>in</u> <u>limine</u>.  The Court's deadline for motions <u>in</u> <u>limine</u> is July 22, 2022, and the government will comply with that deadline.

Accordingly, Zottola's motion to compel the release of law enforcement reports capturing Sylvester Zottola's statements should be denied.

## VI.   The Motion to Preclude Evidence Produced in April 2022 Should Be Denied

The Court should deny Zottola's motion to preclude the government from using evidence produced to the defense in April 2022.[24]   The government's supplemental Rule 16 production more than four months in advance of trial largely sought to cure deficiencies with prior productions that the defendants identified during the parties' "meet and confers" and defense letter requests, that the government in good faith worked to address.   More importantly, neither Zottola nor any other defendant has shown that the timing of this production has prejudiced them in some way.   Accordingly, the Court should not adopt the extreme remedy of precluding the government from use of this material at trial.

### 1.   The April 2022 Rule 16 Discovery Production

By way of background, by letter dated April 18, 2022, the government produced the following materials:

- A forensic image of a Black Dell Inspiron ONE computer (assigned FBI Evidence Number 1B149), which the government informed the defense that it does not intend to rely on at trial;

- A partial forensic image of an Alcatel Cricket cell phone recovered and searched upon the arrest of defendant Julian Snipe on February 23, 2018 (assigned FBI Evidence Number 1B29[25]), which contains metadata only (no files) and is approximately only 600 megabytes in size;

---

[24]   To the extent Shelton joined in this motion, the Court should similarly deny Shelton's motion for the same reasons.

[25]   This phone was mislabeled in the government's discovery production as being assigned FBI evidence number 1B27.   In fact, this device is assigned FBI evidence number 1B29.

- Extraction reports for eight devices recovered from Zottola and his residence, which were previously produced only to defendant Zottola in November 2020.[26]

- Ten pages of documents seized from Zottola's residence that had undergone an attorney-client filter privilege review;

- Four photographs of a jacket seized from Zottola's residence, which was listed in the search warrant returns produced on October 7, 2019, and was available for physical inspection at any time and was in fact inspected by Zottola's counsel in March 2022;

- Recorded jail calls of Vincent Basciano, which were produced in response to Zottola's letter request dated January 14, 2022;

- A slideshow of photographs created for the funeral of Sylvester Zottola and recently obtained by the government;

- Photographs of relevant locations recently taken by the FBI in preparation for trial in this case;

- NYPD license plate reader data; and

- Supplemental data to four NYPD laboratory reports, including analysts' notes, chain of custody notes and analysts' curriculum vitae. Three of the four substantive laboratory reports with the analysts' conclusion were previously produced to the defense on January 16, 2019 (No. 2018-036840), May 8, 2019 (No. 2017-112514), and October 7, 2019 (2019-042123), and this data is largely more properly better categorized as expert disclosures or § 3500 material provided in advance of the analysts' testimony.

With respect to the small volume of discovery produced after the Court's January 2022 deadline—much of which the government has already identified will not be used at trial but was nonetheless produced to the defendants in an abundance of caution, produced to the defendants in response to recent defense requests, or produced to aid the defendants in their submissions for

---

[26]   As detailed below, at the same time as producing the full extraction reports for these 1B numbers to all of the defendants, the government also simultaneously produced the subset of records from the same devices that the government intends to rely on at trial, which numbered fewer than 400 pages for the five cell phones (1B116, 1B117, 1B120, 1B123 and 1B125) and approximately 219 total files for the two computers (1B148 and 1B150).

motions and preparation for trial—such evidence should not be precluded from use at trial.  In the alternative, rather than entering an order precluding the government from introducing at trial any discovery produced after January 2022, the Court should evaluate such discovery on a case-by-case basis, and determine what, if any, remedy is appropriate under the circumstances.  See United States v. Lee, 834 F.3d 145, 158 (2d Cir. 2016) (district court has "broad discretion in fashioning a remedy" under Rule 16).

As a preliminary matter, Zottola's characterization of these productions as "substantial" is misleading.  As explained above, the government produced two devices not previously received by Zottola, one of which it does not intend to rely on at trial and the other of which contains little data; ten pages of documents; four photographs of a jacket previously physically inspected by Zottola's counsel; license plate reader data; photographs of relevant residences and other locations that may be useful to witness testimony in this case and which the government created recently in advance of trial; and supplemental data that the government could have instead produced with its expert disclosures or as § 3500 material.  While Zottola claims the production includes 10 devices, only two devices (1B149 and 1B29) had not been previously produced to Zottola—and the government indicated that it would not rely on one of those two devices at trial, and the other is only a partial, very small extraction report.  Zottola thus fails to explain what makes the April Rule 16 production so substantial.

2.    The April 2022 Pretrial Disclosure

Separately, but also by letter dated April 18, 2022, the government identified for the defense the subset of electronic devices it intends to rely on at trial and produced materials within those devices it may mark as exhibits.  These devices had previously been produced to Zottola in their entirety, as depicted in the following chart:

| 1B # | Item Type | Date Produced | Beginning Bates Number |
|------|-----------|---------------|------------------------|
| 5 | Phone | 2021.02.24 | BLANCO ET AL 021215 |
| 5 | DVR | 2019.01.16;<br>2019.07.11 | BLANCO ET AL 000545;<br>BLANCO ET AL 015044-015046;<br>BLANCO ET AL 015049-015050;<br>BLANCO ET AL 015060 (relevant clips);<br>full DVR available for inspection |
| 6 | Phone | 2021.02.24 | BLANCO ET AL 021216 |
| 6 | GPS Device | 2019.01.16 | BLANCO ET AL 000924 (photographs);<br>physical GPS device available for inspection |
| 7 | Phone | 2019.01.16;<br>2020.10.05 | BLANCO ET AL 004569;<br>BLANCO ET AL 019448 |
| 8 | Ford Fusion GPS Onboard Computer | 2019.10.17 | BLANCO ET AL 17324-17879 |
| 19 | Phone | 2019.01.16 | BLANCO ET AL 004570 |
| 26 | Phone | 2019.01.16 | BLANCO ET AL 004571 |
| 29[27] | Phone | 2022.04.18 | BLANCO ET AL 035454 |
| 32 | SIM Card | 2020.10.05 | BLANCO ET AL 019426 |
| 36 | Phone | 2019.01.16 | BLANCO ET AL 004572 |
| 45 | Laptop | 2019.10.07 | BLANCO ET AL 018737 |
| 46 | Phone | 2019.01.16 | BLANCO ET AL 004576 |
| 51 | Phone | 2019.01.16;<br>2019.07.11 | BLANCO ET AL 004577;<br>BLANCO ET AL 015377 |
| 55 | Phone | 2019.01.16;<br>2020.10.05 | BLANCO ET AL 004580;<br>BLANCO ET AL 019427 |
| 61 | Phone | 2019.01.16 | BLANCO ET AL 004581 |
| 62 | Phone | 2019.01.16 | BLANCO ET AL 004582 |
| 63 | Phone | 2019.01.16 | BLANCO ET AL 004583 |
| 75 | DVR | 2019.01.16 | BLANCO ET AL 000916-000918<br>(relevant clips);<br>full DVR available for inspection |
| 93 | GPS Device | N/A | physical GPS device available for inspection |

[27]    As noted, this device was mislabeled in discovery as 1B27; it is 1B29.

| 1B # | Item Type | Date Produced | Beginning Bates Number |
|------|-----------|---------------|------------------------|
| 94 | Phone | 2020.10.05 | BLANCO ET AL 019428; BLANCO ET AL 019429 |
| 100 | Phone | 2019.07.11; 2020.10.05 | BLANCO ET AL 015378; BLANCO ET AL 019430; BLANCO ET AL 019431 |
| 101 | Phone | 2020.10.05 | BLANCO ET AL 019432 |
| 102 | Phone | 2020.10.05 | BLANCO ET AL 019433 |
| 116 | Phone | 2019.11.04 2022.04.18 (to all other defendants) | ZOTTOLA000032; BLANCO ET AL 035455 |
| 117 | Phone | 2019.11.04 2022.04.18 (to all other defendants) | ZOTTOLA 000032; BLANCO ET AL 035455 |
| 120 | Phone | 2019.11.04 2022.04.18 (to all other defendants) | ZOTTOLA000032; BLANCO ET AL 035455 |
| 123 | iPod | 2019.11.04 2022.04.18 (to all other defendants) | ZOTTOLA000032; BLANCO ET AL 035455 |
| 125 | Phone | 2019.11.04 2022.04.18 (to all other defendants) | ZOTTOLA000032; BLANCO ET AL 035455 |
| 148 | Computer | 2019.11.04 2022.04.18 (to all other defendants) | ZOTTOLA000032; BLANCO ET AL 035455 |
| 150 | Computer | 2019.11.04 2022.04.18 (to all other defendants) | ZOTTOLA000032; BLANCO ET AL 035455 |
| 165 | Phone | 2020.10.05; 2022.01.14 | BLANCO ET AL 019439; BLANCO ET AL 035357 |
| 168 | Phone | 2020.10.05; 2022.01.14 | BLANCO ET AL 019441; BLANCO ET AL 035359 |
| 170 | Phone | 2020.10.05; 2022.01.14 | BLANCO ET AL 019443; BLANCO ET AL 035361[28] |

---

[28]    The government had initially identified data from 1B204 as comprising the set it may rely on at trial.  This was simply an error.  The FBI has not been able to unlock or image that device to date, which belonged to Sylvester Zottola.  Should the FBI be able to extract records, relevant records will be promptly provided to the defense.  (Should the FBI be unable to access the phone, or access it too late to afford the defendants sufficient time to review it before its use at trial, the government will obviously not rely on it at trial.)

Zottola characterizes the government's identification of the subset of materials from these already-produced electronic devices that the government may rely on at trial as the "second" and "more extensive" April 18, 2022 Rule 16 production. His claims are simply incorrect. As an initial matter, this production was an early identification for the defendants of the subset of electronically-stored information it may rely on at trial. As the above chart indicates, contrary to Zottola's misleading claim that "15 of the 36 devices had not been previously produced," the only electronic device Zottola received for the first time on that date was the small forensic extraction contained within FBI evidence number 1B29, discussed above. Nor does Zottola identify the "12 of the 36 devices" that the government has purportedly yet to produce. As to the two items Zottola claims have not been submitted for imaging, insofar as Zottola is referencing FBI evidence numbers 1B6 and 1B93, there are no extractions of those devices; both are GPS devices that the government will offer as physical evidence at trial. They have been and remain available for inspection by the defense.

Shelton too claims not to have received seven of the devices, although Shelton also fails to identify which devices he has purportedly not received. See Shelton Elec. Devices Mot., ECF 342, at 9-10. As set forth in the chart above, the government has produced or made available each of these devices. Shelton also complains of having recently received the Zottola devices in a production dated April 18, 2022. Id. at 10. However, as noted, the government produced the full Zottola devices along with a pretrial disclosure identifying the precise data from those devices that the government will seek to introduce at trial. This material comprised less than 400 total pages from the cell phones and approximately 219 computer files.

To exclude evidence on the grounds of untimeliness, a defendant must show prejudice resulted from the timing of the disclosures. See United States v. Cantoni, No. 18-CR-

562 (ENV), 2019 WL 1264899, at *1 (E.D.N.Y. Mar. 19, 2019) ("To exclude evidence on the grounds of a discovery violation, a criminal defendant must show prejudice resulting from the government's untimely disclosure of evidence, rather than the prejudice attributable to the evidence itself.  The showing must be heightened where, as here, the record indicates that the government's purported discovery violation was negligent rather than intentional." (internal quotations and citations omitted)).  Given that Zottola had previously received every device (in most cases, many years prior)—except one small forensic report contained in 1B29—he cannot satisfy this standard.  Nor can Shelton, despite his receipt of Zottola's devices in April 2022. Indeed, the Second Circuit has held that a district court did not abuse its discretion in permitting introduction of evidence that was disclosed <u>during</u> trial, notwithstanding the putative Rule 16 violation, because there was no substantial prejudice to the defense resulting from the late disclosure.  <u>See</u> <u>Lee</u>, 834 F.3d at 161.  The government has been clear and will continue to be clear that, even though it has substantially complied with the Court's January deadline, nonetheless as it responds to defense requests and prepares for trial, it expects that it will produce small supplemental productions to the defense group, consistent with its obligations under Rule 16 and its continuing review of its files (as happens in every criminal case).  The April 2022 Rule 16 production, made months in advance of trial, has not caused Zottola or Shelton prejudice.

Indeed, the government's disclosure of the precise subset of data from various devices it intends to rely on at trial, accompanied by a spreadsheet identifying the production status of certain electronic devices maintained in connection with this case, was intended to provide the defendants with an early roadmap of the government's device-related trial evidence, in light of the size of the case and in an effort to provide guidance to the defendants.  Once again, each of the

extractions, apart from that contained in 1B29, that the government informed Zottola it would draw on for trial exhibits had previously been produced to Zottola.[29]

Accordingly, the Court should deny Zottola's motion to preclude the government from using evidence produced after January 2022, including the subset of trial device evidence that it had already produced to the defendants.

VII.    The Motions to Suppress Shelton's and Zottola's Statements Should Be Denied

Shelton and Zottola move to suppress statements made after their respective arrests, claiming those statements were the product of custodial interrogation and made in violation of their Fifth Amendment rights under Miranda v. Arizona, 384 U.S. 436 (1966).  For the following reasons, those motions are without merit and should be denied.  Zottola's statements, which were recorded on video at the FBI's offices, fall within the booking exception the U.S. Supreme Court set forth in Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (plurality op.).  In the alternative, the Court can also find certain of Zottola's statements were spontaneous, unsolicited utterances. As to Shelton, the government does not intend to introduce evidence of Shelton's video-recorded statements at FBI offices on October 11, 2018, and therefore, his motion is moot.  Shelton also seeks to suppress the fruits of a statement he claims he made to law enforcement officers during his arrest at his residence.  Even assuming for purposes of this motion that Shelton in fact made a statement to officers in which he specified where his car was parked, law enforcement agents had independent information as to the car's location unconnected to Shelton's statement.  Therefore, the Court need not determine whether Shelton's purported statement should be suppressed because

---

[29]    Zottola also argues that the government's pretrial disclosure somehow indicates that the government only had the authority to seize this small subset of materials under the Fourth Amendment.  Zottola Omnibus Mem., ECF No. 335, at 4.  As the government explained in its letter, this material represents what the government expects it may rely on at trial—not the only records responsive to the search warrant within the devices.

the rule of inevitable discovery applies.  Furthermore, as to both Zottola's and Shelton's motions, no hearing is necessary as neither defendant has raised a credible issue of fact.  Accordingly, Zottola's and Shelton's motions to suppress statements are without merit and should be denied without a hearing.

A.    <u>Additional Facts</u>

1.    <u>Zottola's Post-Arrest Statements</u>

FBI agents arrested Zottola in Larchmont, New York, at approximately 6:00 p.m. on June 17, 2019, and transported him to the FBI offices in Manhattan for booking and processing. According to an affidavit filed with his motion to suppress, Zottola claims he requested to speak with his attorney on the ride to the FBI offices.  Once at the FBI offices, Zottola was placed inside an interview room.  In his affidavit, he claims he again asked the agents if he could speak with his attorney.  A video camera documenting the encounter with the FBI was turned on at approximately 7:02 p.m.[30]  At this time, the video footage shows Zottola, whose left hand is handcuffed to a bar attached to the wall of an interview room, engaged in conversation with an FBI task force officer ("TFO") in the room:

| | |
|---|---|
| FBI TFO: | [U/I] how old's your little gal? |
| Zottola: | My girl's four going on thirty. |
| FBI TFO: | Yeah, yeah, yeah.  Most girls are. |
| FBI TFO: | Does your wife work or is she . . . |
| Zottola: | Stay at home mom. |
| FBI TFO: | She works harder than the rest of us. |
| Zottola: | You got that right. |
| FBI TFO: | Yeah. |
| Zottola: | I wouldn't do her job. |
| FBI TFO: | [U/I.] |
| Zottola: | Not easy. It's hard. |

---

[30]    The video-recorded interview is attached to Zottola's Omnibus Motion as Exhibit S.  A draft transcript of the video attached hereto as Gov't Exhibit 3.

Gov't Ex. 3 (transcript of Zottola booking and processing).  At approximately 7:03:09 p.m., an

FBI Special Agent entered the room and briefly spoke to the other agent.  At approximately 7:03:28

p.m., the Special Agent and Zottola engaged in the following conversation:

| | |
|---|---|
| FBI SA: | Need a bottle of water or anything? |
| Zottola: | No, because I'll have to go to the bathroom as soon as I drink it. |
| FBI SA: | Ok. |
| Zottola: | Thank you. |
| FBI SA: | [Hands a dollar to other FBI Agent].  I know it's like dinnertime, so any food or whatever you need man . . . |
| Zottola: | Nah don't worry about it [U/I] . . . sorry about my kids. |
| FBI SA: | Yeah, it's, it's not how I wanted to do it either man, I'm sorry. |
| Zottola: | One thing I can say is, I had a feeling you were coming. When I don't know, but I can thank you that it was after Father's day and it was after all my kid's birthdays. Whatever it is. |
| FBI SA: | So start with just vouchering your property, so, um. |
| Zottola: | They're off or they're on? |
| FBI SA: | They're on, I believe. |

Gov't Ex. 3.  The FBI Special Agent then began filling out the vouchering and booking paperwork.

At approximately 7:06:14 p.m., the FBI Special Agent addressed Zottola:

| | |
|---|---|
| FBI SA: | In the spirit of doing this before we proceed . . . we're going to have to take your shoelaces. |
| Zottola: | I don't have shoelaces. |
| FBI SA: | You don't have them?  Oh, that's good.  And, uh, do you have a belt?  Yeah, I'll take your belt.  [U/I]  Do you have a wallet or keys on you, anything like that? |
| Zottola: | No [U/I] . . . when I got my kids. |
| FBI SA: | And probably won't let you keep the cap either.  This is a new company, right?  ASZ? |
| Zottola: | Mmhmm. |

Gov't Ex. 3.  The FBI Special Agent continued to document Zottola's property, at one point remarking to himself, "Today's the 17th."  As the FBI Special Agent continued to write, Zottola began to speak:

| | |
|---|---|
| Zottola: | I'm sorry. I'm just worried about my kids.  That's it. |
| Agent 1: | You have two or three? |

| Zottola: | Sal's is having three.  His wife is pregnant.  Due in September. |
| FBI SA: | Anthony are you the older brother or the younger brother? |
| Zottola: | The youngest child. |
| FBI SA: | Youngest child. |
| FBI SA: | [*Shows paperwork to Zottola*]  This just says what I'm taking from you right now.  You don't have a wedding band do you? |
| Zottola: | Don't wear one.  In the process— |
| FBI SA: | Any other jewelry on? |
| Zottola: | Don't wear jewelry. |
| FBI SA: | OK.  You're a lucky guy.  Um, so basically one black Apple iPhone with a black case, one white Apple iPhone with a whi- black case, your hat and your belt. |
| Zottola: | Ok. |
| FBI SA: | Sign that and basically means we have it.  You'd be amazed how much paperwork comes with this stuff.   Just going to go over some of your biographical stuff real quick for booking purposes.  Last name Zottola, first name Anthony.  Do you have a middle name? |

Gov't Ex. 3.  The FBI Special Agent asked Zottola's hair and eye color, height, weight, date of birth, city of birth, social security number, home address and health information.  Id.  The FBI Special Agent then read Zottola his Miranda rights.  Zottola refused to speak without his lawyer present.  The FBI Special Agent noted Zottola's refusal on the waiver form and then helped Zottola locate his lawyer's phone number.  The video ends at 7:25:38 p.m.  Zottola states in his affidavit that he was permitted to speak to his attorney.

### 2. Shelton's Post-Arrest Statements

Prior to Shelton's arrest on October 11, 2018, law enforcement agents monitored Shelton's movements.  A surveillance report sent by email dated October 9, 2018, see Emails dated October 9-11, 2018, attached as Gov't Exhibit 4, indicates that on October 9, agents observed Shelton leave his workplace, which was located at 35 Main Street, Hempstead, New York, in a red and black Dodge Charger (the "Dodge Charger") and after several stops, return to his residence where he parked the Dodge Charger.  Gov't Ex. 4, at 5.  On October 10, 2018, as discussed above,

Judge Reyes issued the October Premises Warrant and October Vehicle Warrant, the latter of which permitted law enforcement officers to search the Dodge Charger for evidence, fruits, and instrumentalities of the Subject Offenses.

Law enforcement agents arrested Shelton on October 11, 2018, and transported him to FBI offices for booking and processing.  At approximately 7:06 a.m., the FBI Special Agent advised Shelton of his Miranda rights, and Shelton requested to speak to an attorney.  The FBI Special Agent documented Shelton's refusal to speak on an FBI Advice of Rights form.  See Shelton Advice of Rights Form, attached as Gov't Ex. 5.

The Dodge Charger was not parked at Shelton's Residence at the time of his arrest.[31]  At approximately 7:20 a.m. that morning, another team of FBI agents located the Dodge Charger in the parking lot of Shelton's workplace at 35 Main Street, Hempstead, New York, where they had observed him parking the vehicle two days earlier, and where they knew Shelton worked.

B.    Applicable Law

1.    Spontaneous Utterances

It is well-established that, prior to any custodial interrogation, a defendant must be informed of his Fifth Amendment rights as set forth in Miranda v. Arizona, 384 U.S. 436 (1966). A defendant who invokes his right to counsel cannot be interrogated without counsel "unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); see, e.g., United States v. Oehne, 698 F.3d 119, 122 (2d Cir. 2012).  It follows that, even after a defendant invokes his right to counsel, if he

---

[31]    In fact, the night before his arrest, agents conducting surveillance observed Shelton leave his residence shortly after 11:00 p.m. in the Dodge Charger.  Gov't Ex. 4, at 1.  At approximately the same time, his wife also left the home, driving a red Honda Accord.  Id. at 1. An hour later, Shelton and his wife returned to the residence together, driving a red Honda Accord. Id.

spontaneously initiates communication with law enforcement agents, those spontaneous statements are admissible. See, e.g., United States v. Montana, 958 F.2d 516, 519 (2d Cir. 1992) (holding that defendant's "spontaneous and unsolicited declaration was admissible" after earlier invocation of right to counsel); United States v. Choudhry, 24 F. Supp. 3d 273, 279-80 (E.D.N.Y. 2014), aff'd 649 F. App'x 60 (2d Cir. 2016) (holding that "spontaneous, unprovoked, and incriminating statements" made after defendant invoked right to counsel were admissible); United States v. Annucci, No. 06-CR-982 (BSJ), 2007 WL 1310156, at *6 (S.D.N.Y. May 3, 2007) (same); United States v. Cohen, 372 F. Supp. 2d 340, 361 n.9 (E.D.N.Y. 2005) (same).

For instance, in United States v. Colon, the defendant invoked his right to counsel but initiated a conversation with law enforcement agents on the car ride to the courthouse. 835 F.2d 27, 29 (2d Cir. 1987). The agent responded that he would bring the defendant's cooperation to the attention of the prosecutors. Id. The Second Circuit concluded that the defendant's statements were admissible, notwithstanding his prior invocation of his right to counsel, because his "statement was spontaneous and not the product of an interrogation or its functional equivalent." Id. at 30. The Second Circuit found significant that the defendant "was not questioned, confronted with evidence, or even encouraged to be honest and tell the facts." Id. "The Government has the burden of proving by a preponderance of the evidence that a defendant made his statements spontaneously and not as the result of custodial interrogation." Annucci, 2007 WL 1310156, at *4 (citing United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)).

2.   Routine Booking Exception

Unlike case-related interrogation, routine booking or pedigree questions are not subject to the Fifth Amendment's protections. The booking exception applies where the question asked by law enforcement authorities "seeks 'biographical data necessary to complete booking or pretrial services,' 'appear[s] reasonably related to the police's administrative concerns,' and is not

80

likely to elicit an incriminating response." United States v. Durand, 767 F. App'x 83, 87 (2d Cir. 2019) (quoting Rosa v. McCray, 396 F.3d 210, 221 (2d Cir. 2005)).  These background questions can include questions about the arrestee's identity, date of birth, address, telephone number, employment status, family and marital status and health information.  United States v. Choudhry, 24 F. Supp. 3d 273, 278–79 (E.D.N.Y. 2014), aff'd 649 F. App'x 60 (2d Cir. 2016) (citing United States v. Gotchis, 803 F.2d 74, 78–79 (2d Cir.1986)); see also United States v. Hill, No. 12-CR-214 (KAM), 2013 WL 3243657, at *7 (E.D.N.Y. June 26, 2013) ("Pedigree questions can include subjects like a suspect's name, address, employment history, date of birth, nicknames, and other basic identification-related information.").  Even if an individual has invoked his right to counsel, law enforcement are still permitted to ask routine booking or pedigree questions.  United States v. Stewart, 770 F. Supp. 872, 879 (S.D.N.Y. 1991) (permitting pedigree questions after defendant invoked his right to counsel).

That is because pedigree questions or "[r]outine questions about a suspect's identity," "ordinarily innocent of any investigative purpose, do not pose the dangers Miranda [v. Arizona, 384 U.S. 436 (1996)] was designed to check" but are "rather the sort of questions normally attendant to arrest and custody." United States v. Gotchis, 803 F.2d 74, 79 (2d Cir. 1986) (internal citations and marks omitted); see also United States v. Rodriguez, 356 F.3d 254, 259 n.2 (2d Cir. 2004) ("[P]edigree information solicited through routine questioning of arrested persons . . . does not implicate the protections of Miranda[.]").  Whether a pedigree question seeks "basic identification-related information" or "incriminatory information" is an objective test.  McCray, 396 F.3d at 222.  That "information gathered turns out to be incriminating in some respect," however, "does not, by itself, alter the general rule that pedigree questioning does not fall under the strictures of Miranda." Id. at 221.

81

3.     Inevitable Discovery

The Supreme Court has long held that before a court may find suppression of evidence is warranted, the evidence at issue must be the product of illegal government activity. United States v. Pabon, 871 F.3d 164, 179-80 (2d Cir. 2017) ("But-for causality is . . . a necessary, [but] not a sufficient, condition for suppression." (quoting Hudson v. Michigan, 547 U.S. 586, 592 (2006))).  Cases implementing the exclusionary rule "begin with the premise that the challenged evidence is in some sense the product of illegal governmental activity."  United States v. Crews, 445 U.S. 463, 471 (1980).

Under the "inevitable discovery" doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded "if the government can prove that the evidence would have been obtained inevitably" without the constitutional violation.  Nix v. Williams, 467 U.S. 431, 447 (1984); see also United States v. Eng, 997 F.2d 987, 990 (2d Cir.1993) (inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred" (emphasis in original) (internal quotation marks omitted)).  As the Second Circuit has explained, the application of the inevitable discovery doctrine depends on the following inquiry:  "Would the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation?  If the answer is 'yes,' the evidence seized will not be excluded." United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006).

C.     Discussion

1.     Zottola's Motion to Suppress His Statements Should Be Denied

Zottola's post-arrest statements were not the product of custodial interrogation and therefore should not be suppressed.  Even assuming arguendo that Zottola invoked his right to counsel before the video recording began, as he claims (see Zottola Omnibus Mem., ECF No. 335,

Ex. R ¶¶ 3-4), Zottola's remarks about the timing of his arrest and the biographical data he provided

to the FBI fall within the exception to <u>Miranda</u> for routine booking questions.  In addition, the

Court should also find that Zottola's statement about the timing of his arrest was a spontaneous

utterance.

a. <u>The Routine Booking Exception Applies</u>

The booking exception applies here because (1) the agent sought biographical data

necessary to complete a booking form, (2) the questions were reasonably related to administrative

concerns and (3) the questions were not likely to elicit an "incriminating response." <u>Durand</u>, 767

F. App'x at 87.

The agent's questions to Zottola after his arrest and prior to the reading of his

<u>Miranda</u> rights consisted of standard booking questions or questions related to his pedigree.  No

questions were asked concerning the substantive offenses with which Zottola was charged.  As

shown in the video, the FBI Special Agent entered the interview room with papers in hand.  The

agent asked Zottola if he would like some water or food.  The agent then told Zottola he would

begin with "vouchering his property" and took custody of prohibited clothing or jewelry, such as

his baseball cap.  He also asked about Zottola's biographical details, including his full name, hair

and eye color, birth date, address, cell phone number, wife's name, and medical information, while

noting the information on the United States Marshals Form 312.  These questions fall well within

the bounds of routine "biographical data necessary to complete booking or pretrial services."

<u>Pennsylvania v. Muniz</u>, 496 U.S. at 601; <u>see</u> <u>McCray</u>, 396 F.3d at 221 ("[The officers] were

engaged in a routine administrative process, and the booking questions were presented to Rosa in

the exact order that the questions appeared on the booking form and without any substantive

deviation from the form of the questions presented."); <u>United States v. Brown</u>, No. 07-CR-1341,

2008 WL 4585325, at *3 (2d. Cir. Oct. 14, 2008) (finding no violation of the defendant's <u>Miranda</u>

83

rights where the "defendant was asked a series of questions from a standard police booking form.").

These questions were reasonably related to administrative law enforcement concerns, because, as the agent explained, such information was needed to house Zottola overnight at the Metropolitan Detention Center before his arraignment the following day.  The questions were designed to acquire accurate property information for the FBI property receipt and pedigree information for the Marshals forms.  Nothing about the circumstances suggests that the agent asked questions designed to get an incriminating response.  Even if Zottola's information may turn out to be important to the government's case at trial, that "information gathered turns out to be incriminating in some respect," "does not, by itself, alter the general rule that pedigree questioning does not fall under the strictures of Miranda."  McCray, 396 F.3d at 221.

Zottola's arguments to the contrary do not alter this conclusion.[32]  While he claims that the agent's questions were not routine because they referenced his family, background questions can include questions about the arrestee's "family and marital status."  Choudhry, 24 F. Supp. 3d at 278-79.  In this instance, when Zottola noted he was worried for his kids as well as his brother and sister-in-law, the agent asked Zottola whether he was younger or older.  This was not an open-ended question that invited conversation or sought additional information.  The remainder of the conversation further informs the agent's intent:  Zottola replied, "The youngest child," to which the agent asked no additional questions.  Instead, he finished the paperwork documenting his property and showed it to Zottola.  Finally, Zottola points to the agent's question about a hat

---

[32]     The government does not intend to offer either of the specific statements referenced here—either Zottola's answer that he is "the youngest child" or his indication of assent that ASZ is his company.  Therefore, the Court need not reach the suppression issue as to these specific statements.

bearing the logo of Zottola's company.  In this instance, the agent simply remarked on Zottola's company, ASZ, while vouchering his hat ("FBI Agent:  This is a new company, right? ASZ?"), to which, Zottola gave an response (Zottola:  Mmhmm.").  Again, this question was not open-ended or designed to elicit incriminating information, and the agent asked no follow-up questions.  And, as mentioned, the government does not seek to introduce Zottola's answers to these questions at trial.

The Court should find Zottola's statements are admissible pursuant to the booking exception.

        b.     <u>Zottola's Statements as to the Timing of His Arrest Were Spontaneous and Voluntary Statements</u>

In the alternative, the Court can find that Zottola's statement about the timing of his arrest was a spontaneous utterance.  As the transcript shows, the FBI Special Agent asked Zottola whether he wanted dinner, and Zottola raised the topic of his children and arrest.

| | |
|---|---|
| FBI Agent: | [Hands a dollar to FBI Agent].  I know it's like dinnertime, so any food or whatever you need man |
| Zottola: | Nah don't worry about it [U/I] . . . sorry about my kids. |
| FBI Agent: | Yeah, it's, it's not how I wanted to do it either man, I'm sorry. |
| Zottola: | One thing I can say is, I had a feeling you were coming.  When I don't know, but I can thank you that it was after Father's Day and it was after all my kid's birthdays.  Whatever it is. |
| FBI Agent: | So start with just vouchering your property, so, um. |

Gov't Ex. 3.  The video recording shows that the agent "strictly refrained from asking the Defendant any questions about the case or taking any actions to elicit statements from the Defendant."  <u>Choudhry</u>, 24 F. Supp. 3d at 280.  At no point during the booking process was Zottola

"questioned, confronted with evidence, or even encouraged to be honest and tell the facts." Colon, 835 F.2d at 31.  The FBI Special Agent "made [no] comments to elicit the statements."  Cohen, 372 F.Supp.2d at 361 n. 9.  Furthermore, the agent's only statements, which were limited to his acknowledgement that Zottola was arrested in the presence of his children, were plainly not designed to elicit inculpatory statements.

Zottola nonetheless argues that this statement was not a spontaneous utterance because he had purportedly retained criminal counsel and therefore he would not "voluntarily and spontaneously" speak to agents.  Zottola Omnibus Mem., ECF No. 335, at 64 n.25.  Cases concerning spontaneous statements often occur after an arrestee has invoked his right to counsel. See, e.g., Choudhry, 24 F. Supp. 3d at 280; Colon, 835 F.2d at 30.  These cases demonstrate that individuals who have invoked their right to counsel and even retained counsel nonetheless make spontaneous statements, which by definition are made on impulse and without premeditation.  The decision in United States v. Alleyne does not change this result.  No. 20-CR-266 (AMD), 2021 WL 5496044, at *10 (E.D.N.Y. Nov. 23, 2021).  In Alleyne, the case agent did "simply sit and listen" but told the defendant he was a gang member and should cooperate with law enforcement, which was reasonably likely to elicit an incriminating response.  Id. at *11.  The agent's actions were far different here; at most, he offered the defendant dinner and acknowledged the difficulty in being arrested in front of his children—not actions reasonably likely to elicit incriminating responses.  Thus, in the alternative, should the government seek to elicit these statements at trial, the Court can admit Zottola's statements concerning his arrest as spontaneous utterances.

2.    Shelton's Motion to Suppress His Statements Should Be Denied

The Court should also deny Shelton's motion to suppress his post-arrest statements. First, the government does not intend to introduce evidence of Shelton's video-recorded statements at FBI offices on October 11, 2018, and therefore, this motion is moot.  Second, the government

does not intend to offer Shelton's statement about the location of his car because there is no evidence that he made such a statement to arresting officers.  Even if Shelton did make a statement and the Court determined the statement was the result of custodial interrogation, the subsequent search of the car was not "fruit of the poisonous tree" because law enforcement agents would have located and searched the car regardless of any information Shelton provided (and, in fact, did so). Accordingly, the search of the car is not the fruit of any illegally-obtained statement and to the extent any such statements was made and relied upon (it was not), agents would have inevitably discovered the car for which they had already obtained a search warrant.

The car was located shortly after Shelton's arrest at his workplace in Hempstead, Long Island—the very location where agents had observed Shelton drive and park it two days earlier.  Gov't Ex. 4.  The day before Shelton's arrest and before he allegedly revealed the car's location, the government had obtained a search warrant for the vehicle.  Id.  Prior to his arrest, the agents were aware the car was not parked at his home because they surveilled him as he moved the car and returned home in a different vehicle.  Id.  Regardless of any information Shelton purportedly provided, law enforcement agents would have traveled to Shelton's work to search for the vehicle.  On those facts alone, the Court can find with a "high level of confidence" that the agents would have located Shelton's car at his office when they discovered it was not parked at his residence.  Heath, 455 F.3d at 60.  Shelton's claim that law enforcement would not have successfully located the car without his information is absurd.  Notably, Shelton makes no mention that the car was parked at his workplace; instead, he tells the Court the car was "nowhere near his home" and "in Hempstead, New York."  See Shelton's Statements Mot., ECF No. 319, at 3.

The Supreme Court in Nix v. Williams applied the doctrine of inevitable discovery on a far more speculative set of facts to admit the body of a murdered girl.  See 467 U.S. at 435.

In <u>Nix</u>, after a 10-year-old girl went missing, 200 police officers and other volunteers searched "all roads, abandoned farm buildings, ditches, culverts, and . . . other place[s]" in a 21-mile area for approximately six hours without success.  <u>Id.</u> at 435, 449.  Officers had no information—as agents did here—that would suggest the defendant frequented or had been recently observed in a specific place.  Nevertheless, the court applied the doctrine of inevitable discovery, holding the search party would have inevitably found the girl's body.  <u>Id.</u> at 450.  The Supreme Court noted, "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial."  <u>Id.</u> at 446.

Therefore, even assuming a constitutional violation occurred here (which the government in no way concedes), the Court can say with confidence that officers would have located Shelton's car at his workplace.  Accordingly, the evidence found in the lawful search of the car should not be excluded.

### 3.   No Hearing as to Either Motion is Necessary

No hearing on either Zottola's or Shelton's motion is warranted.  Neither defendant offers specific, factual allegations, which if true, would warrant suppression.

A defendant has no absolute right to an evidentiary hearing on a motion to suppress statements.  <u>See</u> <u>United States v. Watson</u>, 404 F.3d 163, 167 (2d Cir. 2005).  Rather, a trial court must grant such a hearing only if a movant's affidavit contains specific factual allegations which, if proven, would warrant the relief requested.  <u>See id.</u>; <u>United States v. Pena</u>, 961 F.2d 333, 339 (2d Cir. 1992) (hearing on a motion to suppress not required unless the defendant's submissions raise a "sufficiently definite, specific, detailed, and nonconjectural" factual basis for the motion).  In other words, there must be a material factual dispute for a hearing to be justified.  <u>See United States v. Gillette</u>, 383 F.2d 843, 848 (2d Cir. 1967) (suppression hearing available only if there is a "factual issue to be resolved"); <u>United States v. Viscioso</u>, 711 F. Supp. 740, 745 (S.D.N.Y. 1989)

("the defendant must show that disputed issues of material fact exist before an evidentiary hearing is required" (internal quotation marks omitted)).

As to Zottola, even assuming he had invoked his right to counsel prior to being asked routine booking questions, as described above, his statements are admissible under the booking exception or as a spontaneous utterance.  The circumstances surrounding these statements are clear from the videotape of his interview and the attached transcript.  Because the Court must apply an objective standard to determine whether the booking exception applies, testimony of the agent's intent would not aid the Court in its determination.  Therefore, even if Zottola were able to prove his claims, suppression is not warranted here.

Shelton's motion also does not raise a sufficient factual dispute warranting a hearing.  Shelton did not submit an affidavit or point to any record evidence that he told agents the location of his car.  See Gillette, 383 F.2d at 848 (suppression hearing available only if there is a "factual issue to be resolved"); see also United States v. Palmer, No. 14-CR-788 (NSR), 2015 WL 6459271, *4 (S.D.N.Y. Oct. 23, 2015) (no hearing necessary where facts purportedly in dispute were absent from the defendant's affidavit).  Even assuming Shelton had been subject to custodial interrogation prior to being advised of his Miranda rights and revealed the location of his car, which the government submits he was not, agents would have quickly located his car at his workplace, where they had surveilled it in the days leading up to his arrest.  Consequently, the Court should deny Zottola's and Shelton's motions without a hearing.

VIII.   The Motions to Suppress Evidence Seized from Premises, Electronics Devices, Cell Phones and Social Media Accounts Should Be Denied

Shelton and Zottola make numerous motions to dismiss evidence seized by the government in connection with 11 search warrants, specifically: (1) three social media search warrants challenged by Shelton, namely, the MMBCertified Instagram Warrant, the KINGSHELZ

Instagram Warrant and the Joint Instagram Warrant; (2) three search warrants for information associated with cellular devices belonging to Shelton or Zottola, namely, the 4515 Historical Cell-Site Warrant, the 3484 Historical Cell-Site Warrant and the October Verizon Warrant (collectively, the "Cell-Site Warrants"); (3) three premises warrants for Shelton's and Zottola's residences, namely, the October Premises Warrant, the December Premises Warrant and the June Premises Warrant; and (4) two SIM card search warrants for a SIM card belonging to Shelton, namely, the October and July SIM Card Warrants.

For the reasons set forth below, the motions are either moot or should be denied in their entirety without a hearing. Specifically, Shelton's and Zottola's arguments that certain warrants are overbroad and insufficiently particular are meritless. The warrants establish probable cause that the identified crimes were committed and that "evidence, contraband, instrumentalities and/or fruits" of those crimes would be found in the devices identified in the warrants. Moreover, as set forth in detail below, the challenged affidavits are accurate and Shelton has not identified any evidence of law enforcement misconduct to warrant a <u>Franks</u> hearing. Moreover, the Court should deny Zottola's motion to suppress his conversations with Shelton that were recovered from Shelton's phone, as well as Shelton's motion to suppress evidence obtained from a laptop owned by his employer, because they each do not have a legitimate expectation of privacy in the searched devices and thus have no standing to challenge those searches.

In any event, as to each of the warrants, even if the Court finds any of the defense arguments meritorious, the motions fail because the agents relied in good faith on the magistrate judges' probable cause determinations and the duly issued warrants. The defendants offer no evidence of deliberate, reckless or grossly negligent law enforcement conduct, and their

unsupported incantations to the contrary provide no basis for the Court to exercise the "last resort" of suppression.

Finally, law enforcement agents' execution of the October and June Premises not only compiled with the Fourth Amendment but were entirely reasonable and consistent with Rule 41 of the Federal Rules of Criminal Procedure.  To be sure, any perceived shortcomings raised by the defendants do not require the drastic remedy of suppression here.

Accordingly, the defendants' motions to suppress should be denied in their entirety without a hearing.

A.     Applicable Law

1.     Standing

"Fourth Amendment rights are personal rights which may not be vicariously asserted."  Brown v. United States, 411 U.S. 223, 230 (1973).  In order to challenge a search or seizure, a defendant "bears the burden of proving . . . that he had a legitimate expectation of privacy" in the things searched or seized.  Watson, 404 F.3d at 166 (internal quotation marks omitted).  Whether a defendant has standing to challenge a search warrant is "a threshold issue." United States v. Dupigny, No. S1 18 Cr. 528 (JMF), 2019 WL 2327697, at *3 (S.D.N.Y. May 20, 2019).

2.     Probable Cause

The Fourth Amendment to the U.S. Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.   Whether the "probable cause" clause of the Fourth Amendment is satisfied depends on the "totality of the circumstances."  United States v. Wagner,

989 F.2d 69, 71-72 (2d Cir. 1993).  As to each request to search, "[t]he issuing judicial officer must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  Id. at 72 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)); accord Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007).

Probable cause "does not demand any showing that a good-faith belief be 'correct or more likely true than false.'"  Walczyk, 496 F.3d at 157 (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)).  Rather, probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable."  Id.  "A showing of nexus [between the criminal activity and the thing to be searched] does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience."  United States v. Singh, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted).

In considering a challenge to the probable cause determination, the court reviews the search warrant affidavit "simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."  United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993) (citations and internal quotation marks omitted); accord, Singh, 390 F.3d at 181. This is not a de novo review.  Gates, 462 U.S. at 236.  A judge's determination of probable cause is entitled to substantial deference and "doubts should be resolved in favor of upholding the warrant."  Rosa, 11 F.3d at 326; United States v. Martin, 157 F.3d 46, 52 (2d Cir. 1998).  Resolving doubts in favor of the warrant encourages the use of the warrants and also recognizes that "once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case."  Gates, 462 U.S. at 237 n.10.

92

3.    Particularity / Overbreadth

The Fourth Amendment's particularity requirement "makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another," Marron v. United States, 275 U.S. 192, 196 (1927), by foreclosing a "general, exploratory rummaging in a person's belongings," Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  To satisfy the particularity requirement, warrants must specify (1) the offenses for which probable cause has been established; (2) the place or thing to be searched; and (3) the items to be seized relating to the specified offenses.  United States v. Galpin, 720 F.3d 436, 445-46 (2d Cir. 2013); United States v. Purcell, 967 F.3d 159, 178 (2d Cir. 2020) (internal quotation marks omitted).

"[B]readth and particularity are related but distinct concepts."  Ulbricht, 858 F.3d at 102. "[A]n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." Galpin, 720 F.3d at 446 (internal quotation marks omitted). "Nevertheless, 'in many cases, the volume of records properly subject to seizure because of their evidentiary value may be vast.'" United States v. Purcell, 967 F.3d 159, 179 (2d Cir. 2020) (quoting Ulbricht, 858 F.3d at 100). The Second Circuit "has found, for example, that 'a broad warrant allowing the government to search [a defendant's] laptop for potentially extensive evidence of' charged crimes committed using that laptop 'does not offend the Fourth Amendment, as long as that warrant meets the three particularity criteria.'" Id. (quoting Ulbricht, 858 F.3d at 100).

Accordingly, "broadly worded categories of items available for seizure" do not necessarily render a warrant deficient.  United States v. Riley, 906 F.2d 841, 844 (2d Cir. 1990). "Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular

93

document falls within the described category." Riley, 906 F.2d at 843-45 (upholding warrant that authorized a search for "records and other items that constitute evidence of the offenses of conspiracy to distribute controlled substances and distribution of the same").  "It is true that a warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category.  But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'"  Id. at 845; see also Andresen v. Maryland, 427 U.S. 463, 480-82 & n.10 (1976) (upholding warrant that authorized the seizure of "other fruits, instrumentalities, and evidence of crime at this [time] unknown," when limited to a real estate fraud relating to a particular parcel of land); United States v. Young, 745 F.2d 733, 759-60 (2d Cir. 1984) ("[U]se of the term 'other evidence' following the term 'money' was sufficient to permit the agents to seize such manifestations of wealth as furs, jewelry, and expensive automobiles."); United States v. George, 975 F.2d 72, 76 (2d Cir. 1992) (collecting similar cases).

4.      Good Faith Exception

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation" of its terms.  United States v. leon 468 U.S. 897, 906 (1984).  The exclusionary rule developed as "a 'prudential' remedy, crafted by the Supreme Court," United States v. Raymonda, 780 F.3d 105, 117 (2d Cir. 2015), and it is neither a "personal constitutional right" nor a means "to 'redress the injury' occasioned by an unconstitutional search," Davis v. United States, 564 U.S. 229, 237 (2009).  Rather, "[t]he rule's sole purpose . . . is to deter future Fourth Amendment violations."  Id.  Accordingly, "the exclusionary rule is designed to deter police misconduct," not mistakes by judges and magistrates.  Leon, 468 U.S. at 916.

Thus, even where probable cause is lacking or a warrant is overbroad, suppression will rarely be the appropriate remedy.  As the Supreme Court has explained, suppression is the

Court's "last resort, not [its] first impulse." <u>Michigan</u>, 547 U.S. at 591.  Suppression is an appropriate remedy only where it deters "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." <u>Herring v. United States</u>, 555 U.S. 135, 144 (2009).  The Supreme Court has explained that where law enforcement has obtained a warrant, suppression will be "an appropriate remedy" only where (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) "the issuing magistrate wholly abandoned his judicial role," such that "no reasonably well trained officer should rely on the warrant;" (3) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "facially deficient" in that it "fail[s] to particularize the place to be searched or the things to be seized . . . that the executing officers cannot reasonably presume it to be valid." <u>Leon</u>, 468 U.S. at 923; <u>United States v. Clark</u>, 638 F.3d 89, 99 (2d Cir. 2011) (holding that warrant lacked probable cause to believe evidence of criminal conduct would be found throughout the premises searched, but citing <u>Leon</u>, applying good faith exception and reversing district court's grant of suppression motion).

    As the Second Circuit has explained, "[a]pplication of the exclusionary rule depends on the 'efficacy of the rule in deterring Fourth Amendment violations in the future' as well as a determination that 'the benefits of deterrence . . . outweigh the costs.'" <u>United States v. Rosa</u>, 626 F.3d 56, 64 (2d Cir. 2010) (quoting <u>Herring</u>, 555 U.S. at 141).  Accordingly, "'[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct.'" <u>Id.</u> at 64 (quoting <u>Herring</u>, 555 U.S. at 143).  A reviewing court will therefore "look to whether 'police conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the

price paid by the justice system.'" Id. at 64 (quoting Herring, 555 U.S. at 143); see also Leon, 468 U.S. at 911 ("[A]n assessment of the flagrancy of the police misconduct constitutes an important step in the calculus."). "'The pertinent analysis of deterrence and culpability is objective,' and '[this Court's] good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" Rosa, 626 F.3d at 64 (quoting Herring, 555 U.S. at 145).

5.   *Franks* Doctrine

"Ordinarily, a search or seizure pursuant to a warrant is presumed valid."  United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003).  Where, however, a defendant alleges that an affidavit in support of a search warrant contains deliberately misleading or recklessly false information, a district court should determine whether circumstances warrant a hearing to test the accuracy of those claims in accordance with Franks v. Delaware, 438 U.S. 154, 155-56 (1978).

To warrant a hearing, "a defendant must make a substantial preliminary showing that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding."  United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998) (internal quotation marks omitted); see also Awadallah, 349 F.3d at 64 (noting that "in order to invoke Franks doctrine, a defendant must show that there were intentional and material misrepresentations or omissions in the warrant affidavit.").  As the Supreme Court explained in Franks:

> to mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting

96

reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

Franks, 438 U.S. at 171.

### a. Intentionality or Recklessness

A defendant seeking to make the first required showing of an intentional or reckless misstatement or omission must show more than inadvertent error. "[E]very statement in a written affidavit does not have to be true." United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005). With respect to omissions, "the mere intent to exclude information is insufficient . . . [because] every decision not to include certain information in the affidavit is intentional insofar as it is made knowingly . . . . An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." Awadallah, 349 F.3d at 67-68 (internal quotation marks omitted).

In reviewing a challenge to a warrant, "[o]missions are not subject to the same high level of scrutiny as misstatements." United States v. Rivera, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). Because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." United States v. Vilar, No. 05-CR-621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (citations and internal quotation marks omitted); see also Awadallah, 349 F.3d at 67. Thus, "as a practical matter the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." Mandell, 710 F. Supp. at 374 (internal quotation marks omitted). This is because "allegations of omission potentially open officers to endless conjecture about investigative leads,

fragments of information, or other matter that might, if included, have redounded to defendant's benefit." Id. (internal quotation marks omitted).

"A misrepresentation or omission is intentional when 'the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth.'" Awadallah, 349 F.3d at 64 (quoting United States v. Canfield, 212 F.3d 713, 717–18 (2d Cir. 2000)). "'To prove reckless disregard for the truth,'" a defendant must "'prove that the affiant in fact entertained serious doubts as to the truth of his allegations.'" United States v. Rajaratnam, 719 F.3d 139, 154 (2d Cir. 2013) (quoting United States v. Whitley, 249 F.3d 614, 621 (7th Cir. 2001)). Reckless disregard "can sometimes be inferred from the omission of critical information in a[n] . . . application." Id. at 154. "But such an inference is not to be automatically drawn simply because a reasonable person would have included the omitted information . . . [T]he inference is particularly inappropriate where the government comes forward with evidence indicating that the omission resulted from nothing more than negligence, or that the omission was the result of a considered and reasonable judgment that the information was not necessary to the . . . application." Id. at 154-55.

b.    Materiality

The moving defendant must also prove that any misstatements or omissions alleged were material. To determine if the false information was material, i.e., "necessary to the issuing judge's probable cause determination[,] . . . a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." Canfield, 212 F.3d at 718 (citing Salameh, 152 F.3d at 113). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate. As with the inclusion of false information, 'omissions from an affidavit that are claimed to be material are governed by the same rules.'" Id.

(quoting United States v. Ferguson, 758 F.2d 843, 848 (2d Cir. 1985)); see also Rajaratnam, 719 F.3d at 146 (stating that, to determine whether omissions are material, a court should consider whether, "if the omitted material had been included in the affidavit, the affidavit would still establish probable cause" (internal quotation marks omitted)).

B.    The MMBCERTIFIED Instagram Warrant, the KINGSHELZ Instagram Warrant and the Joint Instagram Warrant Were Sufficiently Particularized and Issued Upon Probable Cause

1.    The Instagram Warrants Were Sufficiently Particularized and Not Overbroad

Shelton does not appear to dispute—and there can be no reasonable dispute—that the Instagram Warrants satisfy the first two particularity requirements enumerated in Purcell: that they each particularly identify the criminal offenses of which evidence is sought, as well as the place to be searched.  As for the first requirement, the MMBCERTIFIED Instagram Warrant and the KINGSHELZ Instagram Warrant state on their face and in Attachment B, which is incorporated by reference, that they authorize a search for fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1958, 1959 and 924(c).  See Shelton's Instagram Mot., ECF No. 329, Exs. A & B.  The Joint Instagram Warrant states on its face and in Attachment B, which is incorporated by reference, that it authorizes a search for fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1958, 1959, 924(c) and 924(j).[33]  See Shelton's Instagram Mot., ECF No. 329, Ex. C.  No greater particularity is necessary to identify specific offenses.[34]  The same is

---

[33]    Shelton was subsequently indicted for violations of 18 U.S.C. §§ 1958, 924(j) and 924(c).

[34]    Without drawing a parallel to the instant case, Shelton's motion references United States v. Zemlyansky, 945 F. Supp. 2d 438 (S.D.N.Y. 2013), a case in which the court held that a warrant lacked particularity where nothing on the face of the warrant informed the searching officer for which crimes the search was being undertaken.  945 F. Supp. 2d at 454.  The court in Zemlyansky noted that at no point during the enumeration of items to be searched did the warrant

99

true for the second requirement, given that each of the three warrants specify in Attachment A that the property to be searched is one or more particular Instagram accounts, identified by the unique usernames MMBCERTIFIED and KINGSHELZ. <u>See</u> Shelton's Instagram Mot., ECF No. 329, Exs. A-C.

Rather, Shelton misleadingly argues that the Instagram Warrants were overbroad because they "request[ed] the entirety of information for Mr. Shelton's Instagram accounts." Shelton Instagram Mot., ECF No. 329, at 7.  Although the Instagram Warrants specified that certain encompassing categories of information be provided to law enforcement in Attachment B(I), law enforcement's seizure of items pursuant to the warrants was further limited "by reference to particular offenses and the use of an illustrative list." <u>United States v. Messalas</u>, No. 17-CR-339 (RRM), 2020 WL 4003604, at *5 (E.D.N.Y. July 14, 2020).  Specifically, Attachment B(II), attached to each of the Instagram Warrants and expressly incorporated by reference, follows precisely the formula described in <u>Messalas</u> by authorizing the search for and the seizure of records that constitute fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1958 (conspiracy to commit murder-for-hire), 1959 (conspiracy to commit murder in-aid-of racketeering) and 924(c) (unlawful use and possession of firearms)[35] and including an illustrative list of six detailed categories of items (in addition to a seventh category pertaining to user login and account identification information).  This is "sufficiently specific to permit the rational exercise of

offer any indication of the relevant criminal allegations.  <u>Id.</u>  This is the antithesis of the Instagram Warrants at issue here, where the relevant crimes are enumerated, and where, throughout Attachment B(II) is guidance on how each category of items to be seized relates to the criminal activity (ex: "[c]omments, communications, photographs, and images about any activity designed to enrich [Shelton] through the Subject Offenses").  <u>See</u> Shelton's Instagram Mot., ECF No. 329, Exs. A-C (Attachment B).

[35]     As discussed, the Joint Instagram Warrant, which issued after Sylvester Zottola's death, added 18 U.S.C. § 924(j) (causing death through use of a firearm) to the list of offenses.

judgment in selecting what items to seize," and is a type of search warrant that "courts in this Circuit have routinely upheld."  Id.; see also, e.g., Jacobson, 4 F. Supp. 3d at 524; Riley, 906 F.2d at 843; United States v. Lustyik, 57 F. Supp. 3d 213, 227-28 (S.D.N.Y. 2014); United States v. Levy, No. 11-CR-62 (PAC), 2013 WL 664712, at *9 (S.D.N.Y. Feb. 25, 2013).   Thus, the Instagram Warrants also satisfy the third requirement enumerated in Purcell because they particularly specify the items to be seized.

Indeed, courts routinely recognize that in the context of electronic evidence, it is reasonable under the Fourth Amendment for a warrant to authorize agents to conduct a broad search of all data on a device or in an electronic account to identify and seize specified types of evidence of specified crimes.  See, e.g., United States v. Dawkins, No. 17-CR-684 (ER), 2019 WL 2464924, at *7 (S.D.N.Y. May 23, 2019) (rejecting a challenge to search warrants that "allowed law enforcement agents to review the full contents of the [seized] phones instead of specific places" because the warrants "described the target crimes, identified the phones as the items to be searched, and specified the types of data that would be seized from the phones," reasoning that "it will often be impossible to identify in advance the words or phrases that will separate relevant files or documents before the search takes place, because officers cannot readily anticipate how a suspect will store information related to the charged crimes."); United States v. Scully, 108 F. Supp. 3d 59, 89–95 (E.D.N.Y. 2015) (rejecting a challenge to search warrants that allowed seizure of entire contents of email accounts in order to review and identify which emails were evidence of specified crimes); United States v. Scarfo, 180 F. Supp. 2d 572, 578 (D.N.J. 2001) ("Where proof of wrongdoing depends upon documents . . . whose precise nature cannot be known in advance, law enforcement officers must be afforded the leeway to wade through a potential morass of information in the target location to find the particular evidence which is properly specified in the

warrant."); cf. Riley, 906 F.2d at 844–45 (2d Cir. 1990) ("It is true that a warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category.  But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'").  As permitted, law enforcement received account records from Instagram pursuant to the Instagram Warrants and conducted a narrowly tailored search based on the parameters enumerated in Attachment B to each Instagram Warrant.  Law enforcement then seized only data that was responsive to the warrants, which amounted to fewer than 200 pages of electronic information from the Instagram records (and not the 2,385 pages alleged in Shelton's motion, which was the entirety of the material provided by Instagram).

In support of his argument that the warrants were overbroad and not sufficiently particularized, the defendant mistakenly relies on Rosa, 626 F.3d at 62, where the court held that the warrant at issue violated the Fourth Amendment because it allowed a search of electronic records without description or limitation.  In Rosa, the contested search warrant directed law enforcement to seize and search certain electronic devices without any guidance as to the type of evidence sought.  Id.  Here, by contrast, the Instagram Warrants give specific guidance as to the types of evidence sought and the specific criminal activity at issue.

Shelton's citation to two out-of-Circuit cases—United States v. Blake, 868 F.3d 960 (11th Cir. 2017) and United States v. Abboud, 438 F.3d 554 (6th Cir. 2006)—to argue that the Instagram Warrants were overbroad and insufficiently particularized because, in essence, they authorized a search of too much of the Instagram Accounts, is equally misplaced.  Abboud supports the government's position.  In Abboud, law enforcement sought business and financial records in connection with a bank fraud.  Abboud, 438 F.3d at 575.  In upholding the validity of the warrant,

the Sixth Circuit determined that the warrant was specific in terms of the items to be seized and "law enforcement . . . could not have known the precise documents and records Defendants utilized in the check kiting scheme." Id. The court went on to say that the items listed in the warrant were items "likely to provide information" about the scheme. Id. Further, the court in Abboud articulated that the time frame of the documents requested by the warrant should not exceed the time frame of the criminal scheme. Id. at 576. This is precisely what the Instagram Warrants requested—records within the time frame of the murder conspiracy, which was defined in the Instagram Warrants as November of 2017 to "the present," which was September 2018 and October 2018, respectively. This timeframe was reflected in the ultimate charges against the defendants, who, as described above, have been indicted for a murder conspiracy spanning November 2017 through October 2018.

In Blake, 868 F.3d at 974, the Eleventh Circuit did not reach a decision on whether the Facebook warrants at issue there violated the Fourth Amendment, holding that the warrants fell into the good faith exception to the exclusionary rule. In dicta, the court stated that the warrants required disclosure of "virtually every kind of data that could be found in a social media account . . . and should have requested data only from the period of time during which [the defendant] was suspected of taking part in the prostitution conspiracy." Id. Here, by contrast, the Instagram Warrants authorized seizure of a specific list of data sought only for the time period of a murder-for-hire conspiracy in which Shelton played a prominent role.

Although Shelton asserts in support of his overbreadth argument that the Instagram Warrants lack probable cause to support the entirety of the authorized time period—between November 2017 and either September or October 2018, depending on the warrant—that claim is belied by the probable cause determinations of Judge Reyes, who authorized the Joint Warrant and

the MMBCERTIFIED Warrant, and Judge Levy, who authorized the KINGSHELZ Warrant, as well as the facts supporting probable cause set forth in the affidavits supporting each of the three warrants. Specifically, the affidavits in support of the Instagram Warrants describe that beginning in September 2017, Sylvester Zottola (referred to as "Victim-1" in the Instagram Warrants) and one of his sons, Salvatore Zottola ("Victim-2" in the Instagram Warrants), became the targets of numerous violent acts perpetrated by unknown men. See Shelton's Instagram Mot., ECF No. 329, Ex D, ¶¶ 18-23; Ex. E ¶¶ 5-6; Ex. F. The affidavits detail six violent acts committed against Sylvester and Salvatore Zottola between September 2017 and July 2018. Id. The affidavits then describe how Shelton recruited an individual ███████████████████████[36]████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████—a statement corroborated by the acts of violence outlined in the affidavits supporting the Instagram Warrants predating ████████████████████████████. See Shelton's Instagram Mot., ECF No. 329, Ex. D, ¶¶ 24-25; Ex. E ¶ 5; Ex. F. ███████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ The Instagram Affidavits further detail the attempted murder of Salvatore Zottola in July 11, 2018—another failed attempt on the victim's life occurring after the June 2018 attempt, thus evidencing that the object of the

---

[36]     The government respectfully requests that this opposition be filed partially under seal. The government's opposition discusses the statements of cooperating witnesses. Public disclosure of the redacted portions of this letter could expose them to risk of harm. See, e.g., United States v. Doe, 63 F.3d 121, 127-28 (2d Cir. 1995) (danger to person can justify courtroom closure). Further, details concerning these individuals could compromise the government's compelling interest to secure current and future cooperation from persons similarly situated. Amodeo, 44 F.3d at 147 (discussing justifications for sealing).

scheme, at the time of the MMBCERTIFIED and KINGSHELZ Instagram Warrants, had yet to be completed.  See Shelton's Instagram Mot., ECF No. 329, Ex. D, ¶ 23; Ex. E ¶ 5; Ex. F.

Accordingly, both the MMBCERTIFIED and the KINGSHELZ Instagram Warrants, issued in September 2018, sought permission to search and seize items enumerated in Attachment B during the period of the conspiracy in which Shelton had been identified as a participant and recruiter—November 2017 through the present, i.e., September 2018.  The Joint Instagram Warrant, signed on October 9, 2018, incorporated the prior affidavits and detailed the subsequent October 4, 2018 murder of Sylvester Zottola.  See Shelton's Instagram Mot., ECF No. 329, Ex. F. ¶ 6.  It thus sought an expanded date range for the Instagram Accounts of September 11, 2018 to the present, i.e., October 9, 2018 due to the unquestionable fact that the murder for hire scheme was ongoing.  See Joint Instagram Warrant, Attachment B(I).

Thus, because the facts articulated in the Instagram Warrants far exceed the threshold of probable cause as "a practical, common-sense decision whether . . . there is a fair probability that" Shelton committed a crime during the period for which records were sought, United States v. Falso, 544 F.3d 110, 117 (2d Cir. 2008), Shelton's overbreadth argument—"that there was no basis to search Mr. Shelton's Instagram accounts" prior to January 2018—fails. Indeed, as the affidavits supporting the Instagram Warrants make clear, Shelton was working closely with others to commit numerous acts of violence as part of a murder-for-hire conspiracy that occurred throughout the time period specified in the Instagram Warrants.

Finally, Shelton's one-sentence argument that because ███████████████████ ████████████████████████ "they should have" limited their search to only ███████████ communications, see Shelton's Instagram Mot., ECF No. 329, at 9, is unsupported by the law or the common-sense concept of probable cause.  As detailed above and in the affidavits in support

of the Instagram Warrants, Shelton participated in an extended conspiracy involving numerous participants and comprising multiple attempts on the lives of Sylvester and Salvatore Zottola, and CS-2 communicated with Shelton via Instagram in furtherance of the Subject Offenses. Moreover, it is the nature of the crimes specified in the Instagram Warrants that many categories of data from the Instagram Accounts—including, inter alia, certain communications, comments, photographs, and associations tied to the crimes—could contain evidence responsive to that outlined as subject to seizure. Accordingly, the categories of data contemplated by the illustrative list on Attachment B(II) of the Instagram Warrants do not create an impermissible "general warrant"; rather, they are a reasonable reflection of the "reality" acknowledged by the Second Circuit in Riley "that few people keep documents of their criminal transactions in a folder marked 'drug records.'" 906 F.2d at 845.

In sum, the Instagram Warrants satisfy the particularity requirements of the Fourth Amendment by specifying the places to be searched and the types of evidence of specified crimes to be seized. They fall well within the norm for similar warrants that courts routinely authorize and uphold in this district and beyond. They are not overbroad or impermissible "general warrants."

In any event, the remedy for an overbroad warrant is not suppression of all evidence, but only the portion seized pursuant to the overbroad portion of the warrant. See, e.g., George, 975 F.2d at 79 ("When a warrant is severed (or redacted) the constitutionally infirm portion—usually for lack of particularity or probable cause—is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted."). Here, at most, any suppression remedy would extend only to those portions Shelton claims are overbroad.

2.   <u>The Instagram Warrants Were Issued Upon Probable Cause</u>

Shelton next urges that the Instagram Warrants lacked "a sufficient nexus between the massive quantity of information sought and any probable cause asserted," renewing his arguments about the date range of the warrants, already addressed above.  Shelton Instagram Mot. at 11-12.  In addition, although Shelton does not contest the government's showing of probable cause that he committed a crime, Shelton argues that the government failed to establish probable cause and a nexus that evidence of the crimes would be found in the particular Instagram Accounts to be searched.

Shelton is wrong.  Shelton's claim requires the Court to reject the probable cause determinations not only of Judge Reyes when he signed the Joint Warrant and the MMBCERTIFIED Warrant, but also of Judge Levy when he signed the KINGSHELZ Warrant. The Instagram Warrants all established a "fair probability" to believe that evidence, contraband, instrumentalities and/or fruits of the specified crimes would be found in the places to be searched, here, the Instagram Accounts.  <u>See</u> Wagner, 989 F.2d at 71-72.  As the Second Circuit has explained, "[a] showing of nexus [between the criminal activity and the thing to be searched] does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience."  <u>Singh</u>, 390 F.3d at 182 (internal quotation marks omitted).  Moreover, the government need not establish that the place to be searched will contain "smoking gun," or direct, evidence of the identified crimes.  <u>See</u> <u>United States v. Abu-Jihaad</u>, 630 F.3d 102, 132 (2d Cir. 2010) (explaining, in context of more exacting standard for admission of evidence under Rule 401, that to be relevant "evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt"); <u>see also</u> <u>Old Chief v. United States</u>, 519 U.S. 172, 179 (1997) ("The fact to which the evidence is directed need not be in dispute.").

The facts alleged in the Instagram Warrants easily met this standard.  In order to show probable cause that "evidence of [that] crime will be found in" Shelton's Instagram Accounts, the affidavits (1) clearly identified the accounts as belonging to Shelton, see Shelton's Instagram Mot., ECF No. 329, Ex. D, ¶¶ 26-27; Ex. E ¶ 5; Ex. F; and (2) described the reasons why there was probable cause to believe that evidence of the crimes would be found within Shelton's Instagram Accounts.  Specifically, as to the latter, the Instagram Affidavits described how CS-2 directed law enforcement to Shelton's MMBCERTIFIED Instagram Account, identified multiple photographs of Shelton on that account and described private conversations he had with Shelton on that account that related to the murder for hire plot.[37]  Moreover, the Instagram Affidavits outline that, visible on Shelton's MMBCERTIFIED Instagram Account, was a picture of an individual wearing sneakers that matched the type of sneakers worn on July 11, 2018 by Salvatore Zottola's shooter.[38]  Shelton's Instagram Mot., ECF No. 329, Ex. D, ¶¶ 26-27; Ex. E ¶ 5; Ex. F.  As stated in the affidavits in support of the Instagram Warrants, evidence establishing the connection and relationships between Shelton and others involved in the crimes against the Zottolas is direct evidence of the crimes.

---

[37]     Shelton mistakenly asserts that the government must identify the dates of CS-2's conversations via Instagram with Shelton and request a warrant solely within the parameters of those dates.  To the contrary, the information gathered from CS-2 provides probable cause to believe that Shelton was using the Instagram Accounts to communicate with co-conspirators about the murder-for-hire conspiracy during the time frame of the conspiracy (November 2017 through October 2018).

[38]     Shelton's argument that this photograph is insufficient to support probable cause falls flat, as it presumes that this photograph is the only information proffered by the government in the Instagram Warrants in support of probable cause.  To the contrary, this photograph and explanation of the significance of the sneakers pictured within merely supplements the probable cause outlined in the affidavits supporting the Instagram Warrants.

The affidavit in support of the KINGSHELZ Instagram Warrant adds the following facts in support of its showing of probable cause: the affiant, through the MMBCERTIFIED Account, was able to identify a second account for Shelton – the KINGSHELZ Instagram Account. The affiant explained why the KINGSHELZ Account appears to be Shelton's personal Instagram account, noting that it was a private account (unlike the MMBCERTIFIED business account), and realleged that CS-2 had private conversations via Instagram with Shelton about the murder for hire plot, stating:

> "based upon my training and experience, among other things, I believe that [Shelton] would communicate and post similarly on the [KINGSHELZ] Account, if not more explicitly about criminal activity, given that the [KINGSHELZ] Account is private and cannot freely be reviewed by law enforcement or the general public.

Id. at ¶¶ 27, 29.

In United States v. White, the court held that a cooperating witness' statement that he saw the defendant wearing a stolen piece of jewelry in a photo posted on the defendant's Instagram account, combined with publicly available photos on the defendant's Instagram account showing jewelry consistent with the description of the stolen jewelry, was sufficient to make a reasonably prudent person think that the search of the Instagram account would reveal evidence of a crime. 489 F. Supp. 3d 274, 278-279 (S.D.N.Y. 2020). Here, there is remarkably more than just photographs from Shelton's Instagram Accounts described in the Instagram Warrants. CS-2 provided information that Shelton specifically offered to pay CS-2 to commit murder and corresponded via Instagram private message with CS-2 about the murder conspiracy.

Further, the affiant's explanatory sentence in the KINGSHELZ Instagram Warrant ("based on my training and experience, among other things, I believe that [Shelton] would communicate and post similarly on the [KINGSHELZ] Account, if not more explicitly about criminal activity, given that the [KINGSHELZ] Account is private and cannot freely be reviewed

by law enforcement or the general public") is a permissible, common sense conclusion that is grounded in the affiant's years investigating criminal cases and collecting evidence from social media accounts, and follows the facts laid out in the warrant affidavits.  Even without this explanatory reference, the facts alleged in the affidavits are sufficient to establish probable cause for the Instagram Warrant.

Shelton's reliance on United States v. Scales, in advancing his argument for suppression of the evidence obtained via Instagram Warrants is misplaced.  Docket No. 19-CR-296 (S.D.N.Y. Mar. 17, 2021).  Shelton states that Judge Rakoff suppressed a Facebook account in Scales "based on similar facts as here."  Shelton's Instagram Mot., ECF No. 329, at 12.  However, the facts are clearly distinguishable.  In Scales, the court held that while the social media warrant application contained an allegation of fraud and evidence that the defendant was engaged in criminal activity, it had "very little evidence to show that it was likely that evidence of that activity could be found on [the defendant's] Facebook account."  Scales, Tr. at 17-18, Mar. 17, 2021.  The court went on to say that although the defendant was Facebook friends with two coconspirators, there was no evidence of the defendant using Facebook to communicate about the criminal activity (and only evidence that a coconspirator used Facebook to communicate about the criminal activity with someone other than the defendant).  Id.  Here, however, the Instagram Warrants contain evidence of precisely what the Scales warrant lacked—Shelton used Instagram to communicate with a co-conspirator in furtherance of the conspiracy.

In sum, the Instagram Warrants were abundantly supported by probable cause; and even if it were a closer call, in light of the Second Circuit's instruction to afford "considerable deference to the probable cause determination of the issuing magistrate," Clark, 638 F.3d at 93, Shelton's argument should be rejected.

3.    The Instagram Affidavits Did Not Omit Material Information

Shelton's claim that the affiant of the Instagram Warrants omitted material information from the affidavits underlying the warrants is wholly without merit.  See Shelton Instagram Mot., ECF No. 329, at 9-11.  ██████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████  However, that purported omission was immaterial and Shelton identifies no law enforcement wrongdoing.  His motion should be denied.

As an initial matter, Shelton fails to acknowledge that in all three affidavits the affiant expressly stated that the "affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter."  Shelton Instagram Mot., ECF No. 329, Ex. D ¶ 3; Ex. E ¶ 3; Ex. F ¶ 3.  As the Second Circuit has explained in the course of rejecting a defendant's argument that he was entitled to a Franks hearing based on alleged omissions,

> [a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.  However, every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly.  If . . . this type of 'intentional' omission is all that Franks requires, the Franks intent prerequisite would be satisfied in almost every case. . . .  [Rather,] Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate.

Awadallah, 349 F.3d at 67–68 (quoting United States v. Colkley, 899 F.2d 297, 300–01 (4th Cir. 1990)).

Shelton's assertion that the affidavits contained a material omission misconstrues the probable cause set forth in the warrant affidavits and the Franks standard.  ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

111



██████████████████████████████████████████████

█████████████████████████████████████████ First, this argument

incorrectly presumes that the Instagram Warrants requested (or authorized) a search only for

conversations between Shelton and CS-2.[39] █████████████████████████████████

██████████████████████████████████████████ or the probable cause to search

the Instagram Accounts.  As stated in the three warrant affidavits, information provided by CS-2

had been corroborated by law enforcement by reports, video surveillance, physical evidence and

other evidence.  As detailed in the affidavits, █████████████████████████████

████████████████████████████████████████████████

████████████████████████. ███████████████████████████

██████████ informed law enforcement that CS-2 and Shelton had conversations via Instagram

private message about the murder-for-hire plot via the MMBCERTIFIED Account.   Law

enforcement then corroborated the connection between the MMBCERTIFIED Account and

Shelton and, in the KINGSHELZ Instagram Warrant, the connection between the KINGSHELZ

Account and Shelton.   The information provided in the affidavits permitted the search for

communications with any and all co-conspirators, among other types of evidence, related to the

crimes throughout the course of the conspiracy. █████████████████████████

---

[39]      Even if that were the case, which it was not, the time period to be searched need
not have been limited any further than it was.  The Instagram Warrants appropriately requested
that the search be limited to the duration of the conspiracy.  Relatedly, Shelton's claim that the
FBI agent "could have disclosed the period that CS-2 was supposedly communicating with Mr.
Shelton over Instagram and could even have obtained the messages from CS-2's account to . . .
corroborate CS-2's account," Shelton Instagram Mot., ECF No. 329, at 11, has no relation to
whether the affidavits contained a "material omission" ████████████████████████
██████████████████████ Nor are they in themselves a basis for a <u>Franks</u> hearing, because any
such omission would not have changed the existence of probable cause and Shelton has not even
come close to establishing intentionality or recklessness.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████ indeed, Shelton

himself is charged in the S-3 Indictment with Possessing Contraband in Prison for his unlawful

possession of a cell phone while incarcerated.  See S-3 Indictment, ECF No. 229.

Shelton offers only conclusory assertions about the affiant's intent that are

insufficient under this Circuit's case law.  See Rajaratnam, 719 F.3d at 154 ("A[n] . . . applicant

does not necessarily act with 'reckless disregard for the truth' simply because he or she omits

certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'"

(emphasis in original)).  Shelton offers nothing to support his assertion that "the omission was at

least reckless and perhaps intentional."  Shelton Instagram Mot., ECF No. 329, at 11.  The absence

of any evidence that the affiant acted intentionally or with reckless disregard provides a separate

basis to deny Shelton's motion.

For the forgoing reasons, Shelton's motion to suppress evidence seized pursuant to

the Instagram Warrants should be denied.

C.    The Warrants for Shelton's Historical Cell Site Information and Zottola's Verizon
       Information Were Sufficiently Particularized and Issued Upon Probable Cause

The Court should deny Shelton's and Zottola's motion to suppress cell phone

records and cell-site location information obtained through valid warrants, specifically the Shelton

4515 Historical Cell-Site Warrant, the Shelton 3484 Historical Cell-Site Warrant, and the Zottola October Verizon Warrant.[40]

> 1. The 4515 Historical Cell-Site Warrant as to Shelton

Shelton argues the 4515 Historical Cell-Site Warrant is invalid because it lacked sufficient probable cause and its date range was both overbroad and insufficiently particular. See Shelton Cell Records Mot., ECF No. 327 at 3-6. Shelton's arguments are without merit.

> a. The 4515 Historical Cell-Site Warrant Did Not Lack Probable Cause

Shelton incorrectly claims the 4515 Historical Cell-Site Warrant lacked probable cause because it contained "no facts" with which the magistrate judge could determine the reliability of CS-2 who provided information concerning Shelton's role in a murder-for-hire scheme. Id. at 3-4. This argument not only disregards the numerous facts in the affidavit but also ignores the standard courts apply to confidential source information.

When a warrant is based upon information obtained through a confidential source, courts assess that information by examining that information and its reliability in light of the totality of the circumstances. United States v. Snape, 116 Fed. App'x 317, 319 (2d Cir. 2004). For example, a detailed eye-witness account is "self-corroborating" and supplies "its own indicia of reliability." United States v. Smith, 9 F.3d 1007, 1013 (2d Cir. 1993) (quoting United States v. Elliott, 893 F.2d 220, 223 (9th Cir. 1990)). Even information provided anonymously, when coupled with corroboration, can provide an adequate basis for probable cause. Gates, 462 U.S. at 243-46.

---

[40] Shelton also moves to suppress a warrant authorizing law enforcement to obtain prospective location information for the assigned call number 917-562-4515. The government does not seek to introduce evidence obtained through this warrant at trial, and therefore the motion, while baseless, is moot and need not be addressed by the Court.

The 4515 Historical Cell-Site Warrant contained more than sufficient information for the reviewing magistrate judge to find the warrant contained probable cause. ████████

████████████████████████████████████████

See Shelton Cell Records Mot., ECF No. 327, Ex. A ¶ 26. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ This is the type of direct, first-hand information that courts have found sufficient for probable cause. See, e.g., Smith, 9 F.3d at 1013. Furthermore, this information was corroborated by law enforcement's investigation. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ Id. at ¶¶ 23-25.

   b.   The 4515 Historical Cell-Site Warrant Was Sufficiently
        Particularized

Shelton's claim that the date range for the 4515 Historical Cell-Site Warrant also renders it "both overbroad and insufficiently particular" should also be summarily rejected. Shelton Mot. Cell Records at 4-6. The 4515 Historical Cell-Site Warrant sought location information from November 1, 2017 through July 20, 2018. The affidavit includes detail on several violent attacks against Victim-1 and Victim-2 from approximately September 2017 through July 11, 2018. Shelton's Cell Phone Records Mot., ECF No. 327, Ex. A ¶¶ 18-25. Given

that information, it is clear the search was properly particularized.  Shelton's citation to two out-of-district cases are of little value to the Court given the facts of this case.  United States v. Abboud, 438 F.3d at 576 (finding overbreadth when warrant sought six-year date range and affidavit articulated criminal conduct for a three-month period in 1999); United States v. Cerna, No. 08-CR-0730 (WHA), 2010 U.S. Dist. LEXIS 145991, at *47-48 (N.D. Cal. Sept. 22, 2010) (finding overbreadth when warrant sought records nine months before alleged criminal conduct).  Here, the warrant sought information two months after the violence began and nine days after the most recent attack against Victim-1.

### 2.   The 3484 Historical Cell-Site Warrant As to Shelton

Shelton argues the 3484 Historical Cell-Site Warrant is invalid because the affidavit included information concerning Shelton's use of the 3484 Number adduced during, what Shelton claims, was an "illegal" search of his residence.  See Shelton Cell Records Mot., ECF No. 327 at 6-7.  As a preliminary matter, for all the reasons explained below, the search of Shelton's residence complied with the Fourth Amendment, and therefore, his motion to suppress evidence seized pursuant to the 3484 Historical Cell-Site Warrant cannot succeed.  However, even if the Court were to invalidate the search of Shelton's residence, which there is no basis to do, the fruits of the 3484 Historical Cell-Site Warrant should not be excluded because the affidavit included sufficient probable cause without the information gleaned from the residence search.

"Fruits of a search generally are not all suppressed merely because some of the evidence was seized pursuant to the invalid portion of a warrant."  George, 975 F.2d at 79; see also United States v. Marcus, 807 F. Supp. 934, 936 (E.D.N.Y. 1992).  If a court is "able to excise from the warrant those clauses that fail the particularity or probable cause requirements in a manner that leaves behind a coherent, constitutionally compliant redacted warrant," the warrant can be enforced.  United States v. Galpin, 720 F.3d 436, 449 (2d Cir. 2013).  To make that determination,

a court "must separate the warrant into its constituent clauses," "examine each individual clause to determine whether it is . . . supported by probable cause," and "determine whether the valid parts are distinguishable from the nonvalid parts." Id. at 448–49.

The affidavit for the 3484 Historical Cell-Site Warrant connected Shelton to the use of the 3484 Number in two ways: first, on September 20, 2018, at approximately 4:30 a.m., a male caller who identified himself as "Shelton" placed a call from the 3484 Number to 911 to report a vehicular accident involving a red Dodge Charger,[41] and second, toll records show hundreds of contacts between a phone associated with co-defendant Anthony Zottola (the brother of Victim-1 and Victim-2) and the 3484 Number between June and October 2018, including calls on the day Sylvester Zottola was murdered.[42] Shelton Cell Records Mot., ECF No. 327, Ex. C ¶¶ 33-34. Therefore, as set forth in Galpin, after excising the information from the residence search, the Court can determine that the affidavit provided sufficient probable cause as to Shelton's use of the 3484 Number through the identifying 911 call and frequent phone contacts with co-defendant Anthony Zottola during the scheme. Galpin, 720 F.3d at 449. Because that information on its own provides sufficient probable cause and can be distinguished from the information collected in the residence search, the 3484 Historical Cell-Site Warrant is valid. Id.

* * *

Accordingly, Shelton's motions to suppress the Historical Cell-Site Warrants should be denied.

---

[41]     As also noted in the affidavit, Shelton drove a red Dodge Charger.

[42]     The affidavit notes any relationship between Shelton and Zottola was previously unknown to law enforcement. Shelton Cell Records Mot., ECF No. 327, Ex. C ¶ 33.

3.     The October Verizon Warrant As to Zottola

The Court should deny Zottola's motion to suppress the October Verizon Warrant because, despite his arguments to the contrary, the warrant was particularized and the seizure did not exceed the warrant's scope.

a.     The October Verizon Warrant was Particularized

The October Verizon Warrant satisfied the requirements for particularity. It identified the subject offenses, see Zottola's Omnibus Mot., ECF No. 334, Ex. N, Attachment B.II. (identifying the subject offenses as "Title 18, United States Code, Section 1958 (murder-for-hire and conspiracy to commit the same), Title 18, United States Code, Section 1959 (murder in-aid-of racketeering and conspiracy to commit the same), Title 18, United States Code, Section 924(c) (unlawful possession and use of firearms) and Title 18, United States Code, Section 924(j) (causing death through use of a firearm)"), and it described the place to be searched, see id., Attachment A (listing assigned call number and Verizon as the provider storing the data). No more is required under the law.

Zottola argues that the October Verizon Warrant provided "no particularity" because it listed the offenses "without providing any guidance, detail, or factual information to curtail the search." Not so. Judge Pollak authorized Verizon to provide particular and limited information between November 1, 2017 and October 12, 2018, including information about the customer or subscriber of the account, records relating to the date, time and cell towers through which the communication were sent and received (i.e., historical location information), and messaging application contents, including SMS messages. Zottola's Omnibus Mot., ECF No. 334, Ex. N, Attachment B.II. Judge Pollak then authorized the government to search the provided records and "seize" information within an 11-month timeframe that constituted evidence, fruits and instrumentalities of the listed subject offenses. Id. As explained above, this resulted in the

118

seizure of approximately <u>four days' worth</u> of messages from October 7 to October 10, 2018 between Zottola and Bushawn Shelton, in which Zottola exchanged coded messages with Shelton, as well as one days' worth of messages on October 9, 2018, between Zottola and an individual purporting to be Takeisha Shelton, Bushawn Shelton's wife, in which the two discuss work Zottola was performing on the Sheltons' home as compensation for the murder-for-hire, as well as demonstrate the closeness of Zottola's relationship with Bushawn Shelton.  It also resulted in the seizure of historical cell site location data between approximately November 1, 2017 and October 12, 2018.  Given that Verizon was directed to provide a limited set of records and that agents had to cull those records by the enumerated subject offenses, the warrant clearly "enable[d] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate ha[d] authorized him to seize."  <u>George</u>, 975 F.2d at 75; <u>see also</u> <u>Ulbricht</u>, 858 F.3d at 100 ("[A] search warrant does not necessarily lack particularity simply because it is broad.").

Zottola's citations to <u>Wey</u> and <u>Zemlyansky</u> are misplaced because the district courts in those cases found those warrants failed to identify any particular crime for which evidence was sought.  <u>United States v. Wey</u>, 256 F. Supp. 3d 355, 384-86 (S.D.N.Y. 2017) (concluding that warrants failed to set forth crimes under investigation by "neither cit[ing] criminal statutes nor in any way describ[ing] any suspected criminal conduct" and thus failed to connect "expansive categories of often generic items subject to seizure . . . without, crucially, any linkage to the suspected criminal activity"); <u>Zemlyansky</u>, 945 F. Supp. 2d at 454-56 (described <u>supra</u>, at pp. 99 n.34); <u>cf.</u> <u>United States v. LaChance</u>, 788 F.2d 856, 874 (2d Cir. 1986) (finding description for money and records of sale of controlled substances and documentary evidence "sufficiently

specific" for home and two vans).   The October Verizon Warrant does not suffer the same defects.[43]

> b.    The Seizure Did Not Exceed the October Verizon Warrant's Scope

Nor was law enforcement's search and seizure overbroad.   Zottola argues the agents' review of the Verizon data and the production of that data to him in discovery indicate the review exceeded the scope, but courts considering these issues have determined otherwise.   The agents were permitted to review all the records provided by Verizon for responsive materials. United States v. Ganias, 824 F.3d 199, 216 (2d Cir. 2016) (en banc) (upholding the process of obtaining the entirety of an electronic account); In re Warrant for xxxxxxx@gmail.com, 33 F. Supp. 3d 386, 390 (S.D.N.Y. 2014) ("Notably, every case of which we are aware that has entertained a suppression motion relating to the search of an email account has upheld the Government's ability to obtain the entire contents of the email account to determine which particular emails come within the search warrant."); see also United States v. Robinson, No. 16-CR-545 (S-3) (ADS), 2018 WL 5928120, at *18 (E.D.N.Y. Nov. 13, 2018) (seizure of entire Gmail account for subsequent search "is consistent with the well-established law of this Circuit"). Therefore, despite Zottola's claims, the agents' review of the Verizon records itself does not indicate that law enforcement seized every record provided.   As directed by the warrant, the agents reviewed the data—Zottola's text messages over a four-day period, his cell site location information and his call records—by looking to the enumerated crimes under investigation.

---

[43]    Zottola also argues that the affidavit, which he acknowledges includes "significant factual detail," is not expressly incorporated to the warrant and therefore cannot cure a non-particularized search.   Zottola Omnibus Mem., ECF No. 335, at 46.   The Court need not reach this argument as the government has shown the warrant itself satisfied the requirements for particularity.

Nor did retaining or producing the full account to Zottola indicate the agents exceeded the warrant's scope.  The government has a right to retain lawfully-seized property "subject to the Government's legitimate continuing interest in that property."  Lavin v. United States, 299 F.3d 123, 128 (2d Cir. 2002).  This rule is consistent with the general principle that the government's retention of property is reasonable if the government needs the property for an ongoing investigation or prosecution.  See, e.g., Krimstock v. Kelly, 464 F.3d 246, 251-52 (2d Cir. 2006) (noting that the government's need to retain evidence should be evaluated for reasonableness and that the government may have a continuing need to hold evidence).  Further, the government's production of that data to Zottola was necessary to fulfill its disclosure obligations, as well as to preserve its usefulness at trial for authentication.  Despite Zottola's assertion to the contrary, the court in United States v. Messalas does not instruct otherwise.  See No. 17-CR-339 (RRM), 2020 WL 4003604, at *6 (E.D.N.Y. July 14, 2020).  The "drastic remedy of blanket suppression" is only appropriate when "those executing the warrant acted in flagrant disregard of the warrant's terms." Id. (internal quotation marks omitted).  Zottola offers no basis to show that occurred here.[44]

D.    The October Premises Warrant

Shelton, in two briefs, moves to suppress all evidence obtained from the execution of the October Premises Warrant.  See Shelton's Premises Mot., ECF No. 325; Shelton's Electronic Devices Mot., ECF No. 324.[45]  Zottola also moves to suppress evidence from the

---

[44]    Further, even assuming arguendo that the Court were to find fault with the October Verizon Warrant (which it should not), the information about the customer or subscriber of the account and toll records relating to the date, time, duration and parties to calls, should not be suppressed as that information is available by subpoena alone and therefore need not meet the standards set forth above for valid warrants.

[45]    Because of the duplicative nature of the two motions, which often simply repeat the same arguments, the government addresses them together.

execution of the October Premises Warrant and, specifically, any of his conversations with Shelton recovered from any of Shelton's devices. See Zottola Omnibus Mem., ECF No. 335, at 48-57. Each of those motions should be denied. As an initial matter, Zottola wholly lacks standing to challenge the warrant and the evidence obtained from it, and Shelton lacks standing to challenge the search of the contents of a laptop seized from his residence but owned by his then-employer. In any event, because the October Premises warrant, issued on probable cause, was sufficiently particular and was not overbroad, the Court should deny the motions in their entirety.

1. Zottola Has Failed to Demonstrate Standing to Move to Suppress the October Premises Warrant

Zottola has moved to suppress evidence obtained from one of Shelton's devices recovered pursuant to the October Premises Warrant. Zottola Omnibus Mem., ECF No. 335, at 48-57. Because Zottola has plainly failed to demonstrate that he has standing to move to suppress this evidence, the Court should deny the motion on this basis alone. Watson, 404 F.3d at 166.

In order to challenge the October Premises Warrant, Zottola "bears the burden of proving . . . that he had a legitimate expectation of privacy" in the contents of Shelton's residence and the devices therein. The starting point for this analysis is the principle that "Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted." United States v. Haqq, 278 F.3d 44, 47 (2d Cir. 2002). "[A] defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest" in the property searched or seized. United States v. Ruggiero, 824 F. Supp. 379, 391 (S.D.N.Y. 1993), aff'd sub nom., United States v. Aulicino, 44 F.3d 1102 (2d Cir. 1995). Thus, to establish standing, a defendant "generally must establish at the outset that he had a 'property or possessory interest in the place searched or the items seized.'" United States v. White, No. 17-CR-611 (RWS), 2018 WL 4103490, at *8 (S.D.N.Y. Aug. 28, 2018) (quoting United States

v. Osario, 949 F.2d 38, 40 (2d Cir. 1991)).  From the proposition that "the Fourth Amendment protects people, not places," Katz v. United States, 389 U.S. 347, 351-52 (1967), "the Supreme Court [has] reasoned it is a person's legitimate expectation of privacy in the space invaded that is critical."  United States v. Paulino, 850 F.2d 93, 96 (2d Cir. 1988).

Here, Zottola acknowledges that the residence from which Shelton's devices were seized was Shelton's home, and the devices belonged to Shelton.  See Zottola Omnibus Mem., ECF No. 335, at 48.  This acknowledgement is dispositive of his motion.  See, e.g., United States v. White, No. 17-CR-611 (RWS), 2018 WL 4103490, at *8 (S.D.N.Y. Aug. 28, 2018) (denying motion to suppress for lack of standing where defendant "takes issue with whether the account is his").  Zottola had neither a property nor possessory interest in the items on Shelton's phone.

Zottola nonetheless urges that individuals who text with other individuals have standing to suppress text message conversations recovered from the other individual's phone.  Zottola Omnibus Mem., ECF 335, at 51-55.  Zottola cites no court decision supporting such a sweeping expansion of Fourth Amendment rights, nor could he.  Indeed, it is well established that an individual lacks any reasonable expectation of privacy in electronic communications sent to others.  See United States v. Lifshitz, 369 F.3d 173, 190 (2d Cir. 2004) (individuals lack "expectation of privacy in transmissions over the Internet or e-mail that have already arrived at the recipient"); Lustyik, 57 F. Supp. 3d at 223 ("a person has no expectation of privacy in another person's email account"); United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012) (individual "surrendered his expectation of privacy" in information when he published it in Facebook posts shared with "friends"); cf. United States v. Dupree, 781 F. Supp. 115, 159 (E.D.N.Y. 2011) ("Defendants cannot claim a legitimate expectation of privacy in emails that they have [a third-party] permission to access and view."); United States v. Knoll, 16 F.3d 1313, 1321

(2d Cir. 1994) ("[W]hen one party relinquishes control of a letter by sending it to a third party, the reasonableness of the privacy expectation is undermined.").

Indeed, this principle is grounded in decades of case law surrounding the legitimate expectation of privacy in others' spaces.  For example, in Paulino, the Second Circuit determined that even where a defendant had a possessory interest in counterfeit money seized from a car in which he was a passenger, the defendant had no claim of privacy in the car because he was a passenger and "had no right to exclude others from the vehicle."  850 F.2d 93, 97 (2d Cir. 1988). Despite Zottola's attempts to twist the Fourth Amendment to assert standing, the Supreme Court has explicitly rejected his claim, holding that a "person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."  "This principle applies to the search of cell phones."  United States v. Lucas, 382 F. Supp. 3d 280, 282 (W.D.N.Y. May 13, 2019) (citing United States v. Dore, 582 F. App'x 42, 46 (2d Cir. 2014) ("As [the defendant] conceded below, he did not submit an affidavit establishing that the cell phones in question belonged to him or that he had a subjective expectation of privacy in them.  Nor did [the defendant] assert a privacy interest in the cell phones in some other manner.  Consequently, [the defendant] does not have standing to assert Fourth Amendment rights in those phone records.")); see also United States v. Beaudion, 979 F.3d 1092 (5th Cir. 2020) (rejecting defendant's argument that he had a privacy expectation in evidence from another individual's phone even where the defendant had purchased the phone; had permission to use it; had password access to it; and had used it, because the phone was primarily used by another and that other individual maintained possession of the phone); United States v. Payner, 447 U.S. 727, 732 (1980) (holding that defendant had no legitimate expectation of privacy in financial documents obtained from bank

official's briefcase); cf. Jones v. United States, 362 U.S. 257 (1960) (holding that Jones had control over apartment to exclusion of others and thus had legitimate privacy interest).  Here, Zottola has failed to demonstrate that he had a legitimate expectation of privacy in text message content from another individual's phone.  It would be absurd for Zottola to expect—much less claim—a legitimate expectation of privacy in the contents of another person's phone over which Zottola had no ownership and had never possessed, nor had any control over what Shelton did with the contents of the phone.

The cases cited by Zottola do not disturb the settled rule that a person lacks a privacy interest in communications, whether electronic or in paper form, shared with others and obtained from others through consent or a warrant.  For example, Zottola relies on Riley v. California, 134 S. Ct. 2473 (2014), for his novel argument.  Zottola Omnibus Mem., ECF No. 335, at 53.  But there is a clear distinction between Riley and the present matter.  In Riley, the Court held that police could not, incident to an individual's arrest, search his cellular phone without a warrant lacking some other basis for the search.  In so holding, the Court balanced recognized government interests supporting searches incident to arrest—principally, safeguarding the arresting officers and preventing the destruction of evidence, Chimel v. California, 395 U.S. 752, 762-63 (1969)—against an individual's recognized privacy interest.  See Riley, 134 S. Ct. at 2488 ("The fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely.").  The Court held that the Chimel concerns were inapplicable or of lesser concern in the context of electronic devices, and that the counterbalancing privacy intrusion was great because digital devices can contain "a digital record of nearly every aspect of their [owners'] lives." Riley, 134 S. Ct. at 2485-90.  Crucially, the arrestee in Riley had a privacy interest in the device; the issue before the Court was how to weigh that interest against

various counterbalancing concerns.  By contrast, as set forth above, Zottola has no privacy interest in Shelton's device or the communications that he transmitted to his co-defendant, and therefore offers no legitimate interest for this Court to weigh.  Moreover, of course, in this case, law enforcement officers searched the device and the communications at issue pursuant to a warrant and a magistrate judge's probable cause determination.

Carpenter v. United States, 138 S. Ct. 2206 (2018), similarly does not change the result in this case.  Carpenter held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through" cell site location information held by his cellphone provider, in part because the records were not truly voluntarily shared: "[c]ell phone location information is not truly 'shared' as one normally understands the term," because, among other reasons, "a cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up."  Id. at 2220.  This case presents the opposite scenario.  Zottola voluntarily communicated and shared information with Shelton, taking affirmative steps to transmit messages to him.  As set forth above, when those communications arrived in Shelton's cellphone, Zottola forfeited any privacy interest in them.  See Lifshitz, 369 F.3d at 190.

Nor do Katz v. United States, 389 U.S. 347 (1967) and Alderman v. United States, 394 U.S. 165 (1969), which predate each of the cases cited above clearly rejecting Zottola's argument, somehow overrule the reasoning in those cases.  In Katz, the Supreme Court determined that the defendant had a legitimate expectation of privacy in statements he made in a telephone booth because "[o]ne who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world."  389 U.S. at 352.  However, Katz also stood for the proposition that

126

"[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection," id. at 351, which the Second Circuit has cited in holding that where a defendant sent communications to another, "any legitimate expectation of privacy he may have had in them was abandoned." Knoll, 16 F.3d at 1322.[46]  And although Alderman v. United States, 394 U.S. 165 (1969), and its progeny addressing wiretapping and eavesdropping certainly recognize a privacy right in conversations, there is an obvious difference in kind between conversations intercepted through wiretaps—governed by Title III—and conversations obtained from a warrant to search and seize letters, emails or text messages stored in another person's account or from another person's device.

The long history of case law rejecting the kind of wholesale expansion of Fourth Amendment protection that Zottola asks this Court to adopt is grounded in the purpose of the exclusionary rule: "an attempt to effectuate the guarantees of the Fourth Amendment" by motivating those whose personal Fourth Amendment rights may have been violated to "have ample motivation to move to suppress." Rakas v. Illinois, 439 U.S. 128, 134 (1978).  The Supreme Court has been clear that "[s]ince our cases generally have held that one whose Fourth Amendment rights are violated may successfully suppress evidence obtained in the course of an illegal search and seizure, misgivings as to the benefit of enlarging the class of persons who may invoke that rule are properly considered when deciding whether to expand standing to assert Fourth Amendment violations." Id. at 137-38.  This caution is particularly appropriate here, where Shelton, who does have standing to challenge the search and seizure of evidence from his phone, has not only filed

---

[46]      Zottola's citation to United States v. DiTomasso, 56 F. Supp. 3d 584 (S.D.N.Y. 2014), is wholly irrelevant, because in that case—unlike here—the court was addressing the reasonableness of the government's search of the defendant's own accounts—not the content of the communications in another person's phone seized from that other person's phone in that other person's residence.

one, but two, suppression motions aimed at trying to exclude evidence from the same device from being introduced at trial.

Accordingly, Zottola lacks standing to join Shelton's motion to suppress evidence. In any event, for the reasons detailed below, any suppression motion as to evidence seized from Shelton's devices fails and the jury should be permitted to see the text messages between them in which Shelton and Zottola, over the course of months, orchestrate brutal attacks on Zottola's father and brother.

2.    Shelton Failed to Demonstrate Standing to Move to Suppress the Search of the Laptop Identified as FBI Evidence Number 1B45

Shelton has also failed to demonstrate that he has standing to move to suppress the search of a laptop identified by FBI evidence number 1B45 (the "Laptop").  To challenge the October Premises Warrant and subsequent search of that device, Shelton "bears the burden of proving . . . that he had a legitimate expectation of privacy" in the contents of the Laptop.  Watson, 404 F.3d at 166.  To do so, "a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest" in the property searched or seized.  Ruggiero, 824 F. Supp. at 391.  As Shelton himself acknowledges, "[r]eview of the laptop clearly shows that it was a laptop associated with Mr. Shelton's employment at People Ready."  See Shelton Devices Mot., ECF No. 324, at 31.  Indeed, the laptop was the property of People Ready, Shelton's employer, and Shelton has filed no affidavit coming close to establishing that he had a legally cognizable privacy interest in its contents.[47] Shelton's lack of standing is dispositive of his motion to suppress evidence seized from the Laptop.

---

[47]    Indeed, to be able to access the contents of the laptop, the government had to seek—and obtained—a bitlocker recovery code for the laptop from the company so that it could be searched and, when ultimately appropriate, the government will return the Laptop to the company, not Shelton.

Accordingly, the motion to suppress evidence seized pursuant to the October Premises Warrant as to the search of the Laptop should be denied for lack of standing.  See, e.g., Dupigny, 2019 WL 2327697, at *3 (denying motion to dismiss because "the burden is on [defendant] to establish his Fourth Amendment interests in the items searched and seized, and he has failed to carry that burden").

### 3. The October Premises Warrant Was Not Overbroad

Shelton argues that the October Premises Warrant is overbroad because (1) it authorized a search of the entire premises; (2) it permitted the seizure and subsequent review of all electronic devices; and (3) it resulted in an unlimited review of the items seized.  See Shelton's Premises Mot., ECF No. 325; see also Shelton's Electronic Devices Mot., ECF No. 324 (making same argument).  However, Shelton has not, and cannot, overcome the substantial deference the Court must afford to the magistrate judge's determination that there was probable cause that evidence of the Subject Offenses would be found in Shelton's residence and on Shelton's devices.

### a. The October Premises Warrant Was Not Overbroad in Its Authorization to Search the Entire Premises

The Court can quickly reject Shelton's first argument that the October Premises Warrant is invalid because "it place[d] no limits on the particular places within the residence," a four-bedroom, single-family home, "to be searched."  See Shelton's Premises Mot., ECF No. 325, at 6.  It is well-settled Second Circuit law that where the government has probable cause to search a particular place, probable cause permits the government to search the entire identified location. See United States v. Ulbricht, No. 14-CR-68 (KBF), 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 10, 2014) ("It has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized."), aff'd, 858 F.3d 71 (2d Cir. 2017).  As the district court that

was affirmed in <u>Ulbricht</u> explained, "warrants have long allowed searching a house high and low for narcotics . . . or reviewing an entire file cabinet to find files that serve as evidence of money laundering activity, which might be intermingled with files documenting lawful and irrelevant activity." <u>Id.</u> at *14.  The same is true for electronic devices.  As explained in <u>Ulbricht</u>, "[t]his case simply involves the digital equivalent of seizing the entirety of a car to search for weapons located within it, where the probable cause for the search is based on a possible weapons offense." <u>Id.</u> at *14 (upholding search of entire electronic accounts where the warrant was specific as to the items to be seized and was therefore not a "general warrant").  As the Second Circuit has reasoned, where, as here, "[o]n its face the search warrant directed the officers to search the entire . . . house," to exclude one area of the home "would be to suggest that the purposes of a search warrant could be frustrated by the mere declaration of the owner of a one-family residence that one of the rooms therein 'belongs' to a party not named in the warrant," a result that would be "clearly . . . inappropriate."  <u>United States v. Canestri</u>, 518 F.2d 269, 273 (2d Cir. 1975) (citations omitted); <u>see also</u> <u>United States v. Griffith</u>, 867 F.3d 1265, 1271 (D.C. Cir. 2017) ("Authorization to search for an item fitting in the palm of a hand, like a cell phone, thus can entail an intrusive inspection of all corners of a home."); <u>United States v. Ayers</u>, 924 F.2d 1468, 1480 (9th Cir. 1991) ("A search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of a residence.").

Here, Judge Reyes determined that the October Affidavit underlying the October Premises Warrant established probable cause to believe that Shelton, a Bloods gang member, was involved in a murder-for-hire scheme that spanned more than a year, and set forth facts sufficient to establish that the scope of the conspiracy was large and complex, involving numerous attempts

on the lives of the victims, committed by numerous individuals at multiple locations communicating via multiple electronic means, all for financial enrichment. See generally Shelton's Premises Mot., ECF No. 325, Ex. A. Judge Reyes also determined that the October Affidavit established probable cause to believe that Shelton lived at the residence, had traveled to and from that residence while committing crimes specified in the warrant and stored items relevant to the Subject Offenses at that residence. Id. In light of Shelton's leadership role in the protracted attempts on the lives of two victims, as detailed in the October Premises Affidavit and specified in the October Premises Warrant, the warrant authorized the seizure of, among other things, firearms, ammunition, writings and records indicating a connection between Shelton and the victims and Shelton's whereabouts during the relevant time period, evidence of association and communication with co-conspirators in furtherance of the Subject Offenses, evidence of financial enrichment from participation in the Subject Offenses, vehicle registration paperwork and purchase records, license plates and electronic devices—items storable anywhere in the home. See Shelton's Premises Mot., ECF No. 325, Ex. A, Attachment B-1. Because it is well-settled that law enforcement agents are entitled to search the entirety of the premises for the items for which they had probable cause, Shelton's overbreadth argument fails as a matter of law. See, e.g., Ulbricht, 2014 WL 5090039, at *14; United States v. Graziano, 558 F. Supp. 2d 304 (E.D.N.Y. 2008) (holding that agents' search of entire house for records, rather than solely basement office area, was permissible where it was "clear from the warrant that the searches were permitted to go into every room" and "[t]he reason for the scope of the warrant is clear—gambling records can easily be hidden in any area of a residence by the occupant of that residence," and reasoning that "[i]t would defy logic to conclude that criminals would limit themselves to . . . customary storage containers, rather than attempting to conceal records of criminal activity in more obscure places").

     b.      The October Premises Warrant Was Not Overbroad in Its Authorization to Seize Electronic Devices

Shelton argues that the October Premises Warrant's authorization for law enforcement to seize and search devices found within Shelton's Residence "is a clear violation of the Fourth Amendment." See Shelton's Premises Mot., ECF No. 325, at 6 (citing Ex. A, ¶ 62); Shelton Devices Mot., ECF No. 324, at 16 (making exact same argument). Shelton again ignores the law. The question before a magistrate at this stage is not whether there is probable cause to believe the identified crimes were committed by the person who owns or controls the thing to be searched. Rather, a search warrant is addressed to the link between alleged crimes and the place or thing to be searched—not, as Shelton suggests, to the link between alleged crimes and a particular person; evidence of the latter would support an arrest warrant or indictment. As the Supreme Court explained in Steagald v. United States,

> [W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

451 U.S. 204, 212–13 (1981). Indeed, as the Court is aware, information obtained by the government in the course of a court-authorized search of a place often subsequently establishes probable cause that the person who owns or controls the searched location committed the identified crimes.

Shelton, however, asserts that the October Affidavit established probable cause to seize only two cell phones, and thus the seizure of more than two cell phones renders the October

Premises Warrant overbroad. Shelton Devices Mot., ECF No. 324, at 17-18. However, Shelton's assertion ignores swaths of the October Affidavit, including: the October Affidavit's (1) description of coordination among multiple individuals over months to perpetrate seven separate attacks, including explicitly using cell phones during multiple of those attacks, see Oct. Aff., ¶¶ 23-29; 38-46; (2) explanation that a tracking device was used to track the murder victim in October 2018 (days prior to the obtaining and execution of the October Premises Warrant) and that cell phones and other Internet-capable devices, including computers and tablets, are used to receive information from such devices, id. ¶ 32; (3) recounting that CS-2 and Shelton "communicated in furtherance of the Subject Offenses via cellular telephones and Instagram, a social media platform that is accessible through internet capable devices, such as cellular telephones, iPads and computers" and that CS-2 knew Shelton possessed a laptop, id. ¶ 35; (4) detailed explanation of Shelton's use of a phone during the attempted murder of one of the victims in this case, including cell site location information placing Shelton's phone in the vicinity of relevant locations on that date and Shelton's communication via cell phone with other individuals who participated in the attempted murder, id. ¶¶ 38-45; (5) recounting of the affiant's belief, based on years of training and experience and participation in the instant investigation, that it is "common for individuals involved in criminal activity to use multiple cell phones to avoid detection by law enforcement," id. ¶¶ 1, 50; and (6) inclusion of the affiant's belief—based on the affiant's years of training and experience and participation in the instant investigation, including that Shelton's co-conspirators each used multiple cell phones in furtherance of the Subject Offenses—that Shelton used multiple phones because he was aware that he and his co-conspirators were under law enforcement scrutiny "based on the widespread news coverage of some of the events described herein." Id. ¶¶ 1, 51.

133

The assertion that the warrant provides probable cause for "**at most**" only two of Shelton's devices, see Shelton Devices Mot., ECF No. 324, at 17 (emphasis in original), assumes that Shelton used the same phone or two phones for each of the activities identified above; and assumes that Shelton did not access social media from any device other than those phones.  Such assumptions are neither mandated by the warrant affidavit nor consistent with how courts review warrants or analyze probable cause.  See, e.g., Rosa, 11 F.3d at 326 (holding that magistrate judges' determination of probable cause are entitled to substantial deference and "doubts should be resolved in favor of upholding the warrant"); Walczyk, 496 F.3d at 157 (probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable").   The Court should reject Shelton's attempt to have this Court ignore the facts and circumstances comprising probable cause set forth in the October Affidavit.[48]

The sole case cited by Shelton in support of the proposition that the October Premises Warrant was overbroad in its authorization to seize and search electronic devices is United States v. Griffith, 867 F.3d 1265 (D.C. Cir. 2017).  Griffith could not be further from the facts of this case.  In Griffith, only "two sentences" in an affidavit supporting a premises search warrant "set out the basis for believing incriminating evidence" would be discovered in that apartment, setting forth the law enforcement officer's knowledge that those "involved in criminal activity maintain regular contact with each other," often through cell phones and the Internet.  Id.

---

[48]    Moreover, Shelton's argument that the October Affidavit "conveniently omit[ted]" details about "identifying features or other information" about any of Shelton's devices is absurd. There are multiple bases for probable cause of the seizure of Shelton's devices and Shelton cites no case law demanding that law enforcement first identify features of any relevant cell phones prior to obtaining a warrant—much less in a murder investigation in which one of two victims targeted for months was still alive and the perpetrators of the murder and attempted murder were still at large.

at 1269.  On those facts alone, the warrant in <u>Griffith</u> authorized the seizure and search of any cell phones and electronic devices found in the premises.  <u>Id.</u>  Thus, the D.C. Circuit determined that "the affidavit supporting the warrant application provided virtually no reason to suspect that Griffith in fact owned a cell phone, let alone that any phone belonging to him and containing incriminating information would be found in the residence," and concluded that "the warrant was unsupported by probable cause and unduly broad in its reach."  <u>Id.</u> at 1270-71.  That is not this case, where the warrant set forth each of the ways for which there was probable cause to believe that Shelton was using electronic devices.[49]

<blockquote>
c.   <u>The October Premises Warrant Was Not Overbroad in The Scope of Its Authorization to Search Electronic Devices</u>
</blockquote>

Shelton next argues that the October Premises Warrant is overbroad because it lacks "any temporal or content-based limit on the ESI to be seized."  Shelton Devices Mot., ECF No. 324, at 19.  Shelton is wrong on the facts and the law.  As a factual matter, Attachment B-1 of the October Premises Warrant limited the particular things to evidence of the Subject Offenses, and set forth a non-exhaustive list of such things, including, "with regard to any cellular telephones and Internet-capable devices," as relevant to ESI, "names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails . . . instant messages, photographs, videos, Facebook posts, FaceTime logs, Google Voice calls, Internet activity . . . and other electronic media <u>constituting evidence, fruits or instrumentalities</u>" of the Subject Offenses (which

---

[49]   Indeed, certain of the dicta in <u>Griffith</u> about ways in which the affidavit at issue there could have been cured are present in this case.  For example, the <u>Griffith</u> court opined that there would be a likelier reason to believe a cell phone in that case would contain evidence of a crime "if officers had been investigating a more recent crime," observing that "police often might fairly infer that a suspect's phone contains evidence of recent criminal activity."  <u>Id.</u> at 1274.  Here, of course, the October 4 murder of Sylvester Zottola plotted by Shelton occurred just days prior to the execution of the October Premises Warrant.

were specifically enumerated in the attachment).[50]  See Shelton Devices Mot., ECF No. 324, Ex.

A.  As a legal matter, a warrant is overbroad only "if it permits a search for evidence of crimes for

which there is no probable cause."  Pugh, 2015 WL 9450598, at *21.  Here, because Judge Reyes

found probable cause to believe that evidence of the Subject Offenses would be found in Shelton's

Residence and on Shelton's devices, the warrant was not overbroad for permitting a search of

electronic devices to determine which items may be seized pursuant to Attachment B-1.[51]

        Shelton asserts that the October Affidavit's authorization of the seizure and

potential copying of ESI as contemplated by Rule 41(e)(2)(B) of the Federal Rules of Criminal

Procedure is mere "exploratory rummaging."  Shelton Devices Mot. at 26-27.  But a two-step

warrant that permits law enforcement agents to seize certain material particularly described in the

warrant after making a complete forensic copy of the electronic device is routinely found to comply

with the Fourth Amendment, and Shelton cites no case to the contrary.  See, e.g., United States v.

Akparanta, No. 19-CR-363 (LGS), 2019 WL 5616875, at *7 (S.D.N.Y. Oct. 30, 2019) ("The

warrant's data review protocol is not a basis for suppression.  The protocol permits the Government

to acquire the cell phone and then review its contents for information responsive to the warrant.");

---

[50]     With respect to ESI, Attachment B-1 also authorized the seizure of contextual information necessary to understand the evidence sought, such as evidence of user attribution, Internet Protocol addresses and software that would allow others to control the phone (relevant to evidence of ownership and use of the device) and evidence of counter-forensic programs that could eliminate data from the device (relevant to determining whether the defendant sought to destroy or conceal evidence, which would also be relevant to the defendant's state of mind, including consciousness of guilt).

[51]     Shelton ignores Attachment B-1 to the October Premises Warrant completely and instead appears to intentionally conflate the production of the entire extraction of his device to him in discovery—"[t]wo other cell phone extractions contain massive amounts of data beginning in January and February of 2014," Shelton's Electronic Devices Mot., ECF No. 324, at 19—and evidence seized pursuant to agents' review of Attachment B-1.  However, they are obviously different, as detailed in the October Premises Warrant and herein.

United States v. Gatto, 313 F. Supp. 3d 551, 560 (S.D.N.Y. 2018) ("Nor were the warrants rendered invalid by virtue of their having authorized searches of the entirety of the cell phones for data responsive to the warrants.").  And courts routinely permit the search of the "entire contents" of accounts "even if the account also contained information unrelated to criminal activity" because the magistrate had found probable cause to believe that the account contained evidence of the defendant's criminal activity.  See No. 17-CR-296 (PKC), 2018 WL 2709199, at *3 (E.D.N.Y. June 5, 2018); see also In re Warrant for xxxxxxx@gmail.com, 33 F. Supp. 3d at 394 ("[E]very case of which we are aware that has entertained a suppression motion relating to the search of an email account has upheld the Government's ability to obtain the entire contents of the email account to determine which particular emails come within the search warrant." (citing cases)); United States v. Williams, 592 F.3d 511, 520-22 (4th Cir. 2010) ("To conduct that search, the warrant impliedly authorized officers to open each file on the computer and view its contents, at least cursorily, to determine whether the file fell within the scope of the warrant's authorization . . . To be effective, such a search could not be limited to reviewing only the files' designation or labeling, because the designation or labeling of files on a computer can easily be manipulated to hide their substance.  Surely, the owner of a computer, who is engaged in criminal conduct on that computer, will not label his files to indicate their criminality."); Riley, 906 F.2d at 845.[52]

Insofar as Shelton also suggests that the October Premises Warrant needed to have included a search protocol for the cellphone searches, including requiring specific (but unidentified

---

[52]      Relatedly, courts also routinely find warrants' authorization of the seizure of "any electronic devices that may contain relevant ESI" sufficiently particular.  United States v. Almaleh, No. 17-CR-25 (ER), 2022 WL 602069, at *18 (S.D.N.Y. Feb. 28, 2022); Ray, 541 F. Supp. 3d at 391 (same); Levy, 2013 WL 664712, at *9-10 (warrant authorizing seizure of evidence, fruits, and instrumentalities of violations of certain fraud charges, including computers, phones and electronic data storage devices, was sufficiently particular), aff'd, 803 F.3d 120.

in Shelton's motion) filtering, see Shelton Devices Mot., ECF No. 324, at 27, courts in this Circuit have been clear that a warrant need not include a specific protocol so long as the warrant is supported by probable cause and identifies with particularity the things to be seized—here, items that are evidence of the Subject Offenses.  See, e.g., Lustyik, 57 F. Supp. 3d at 230 ("The Second Circuit has not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants." (internal quotation marks omitted)); Pugh, 2015 WL 9450598, at *27 (observing that "the Second Circuit does not require a search protocol in the event of a digital search" and that "courts in this circuit repeatedly have recognized that, in the context of such a search, avoiding the intrusiveness of a search while maintaining its efficacy is largely infeasible," but that "it has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized" (internal quotation marks omitted) (collecting cases)).  Shelton's citation to and heavy reliance on a 1982 Ninth Circuit case is inapposite, because there, law enforcement agents seized large amounts of documents—a seizure not contemplated in the warrant in that case.  United States v. Tamura, 694 F.3d 591, 595-96 (9th Cir. 1982).  Indeed, the constitutionally sufficient process the Tamura court contemplated—getting a warrant authorizing the seizure of all such documents for off-site review—is precisely what law enforcement agents did here.  See id., 694 F.3d at 595-96; see also Shelton Devices Mot., ECF No. 24, Ex. A ¶ 61 ("[T]he warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.").

Perhaps acknowledging that his argument regarding the two-step process lacks any basis in precedent or the realities of review of large amounts of ESI, Shelton resorts to recycling the same unsupportable arguments as to time frame and scope of the October Premises Warrant that he raised with respect to the Instagram Warrants: namely, that the October Affidavit "only supported probable cause to search a time period within the year 2018, and specifically July 2018." Shelton Devices Mot., ECF No. 324, at 20.  Again, these claims are belied by the probable cause determination of Judge Reyes and the facts set forth in the October Affidavit, many of which are outlined above and in connection with the Instagram Warrants, and which the government will not repeat again.[53]  See supra pp. 132-34.  Although Shelton concedes the government had probable cause to seize call logs, contact lists and text messages from Shelton's devices, Shelton nonetheless asserts that the warrant was overbroad in other types of "generic" data it authorized agents to collect from the devices, including "emails . . . instant messages, photographs, videos, Facebook posts, FaceTime logs, Google Voice calls, [and] Internet activity."  Shelton Devices Mot., ECF No. 324, at 23-24.  But again, Shelton participated in lengthy conspiracy involving numerous participants and comprising multiple attempts on the lives of multiple victims, and the October Affidavit outlines the numerous ways in which there was probable cause to believe that the devices contained evidence in furtherance of the Subject Offenses—including methods of communication among co-conspirators (relevant to the warrant's authorization of methods of communication including emails, instant messages, Facebook posts, FaceTime logs documenting calls and other forms of contact and Google calls); use of the Internet to perpetrate the offense via the use of,

---

[53]    Indeed, Shelton acknowledges that statements made by CS-2 constitute probable cause, but asserts their placement in the October Affidavit is "deliberately misleading."  Shelton Shelton's Electronic Mot., ECF No. 329, at 21.  The government addresses this Franks claim below.

among other things, tracking devices (relevant to the warrant's authorization of Internet activity);
and use of photography during at least one of the incidents, in April 2018, ███████████████
██████████████████ and to demonstrate relationships among co-conspirators (relevant
to the warrant's authorization of photographs and video).[54] Moreover, as also detailed above in
connection with Shelton's similar arguments as to the Instagram Warrants, see supra, Section XI.B,
it is the nature of the Subject Offenses and the way that Shelton and his coconspirators committed
them that many categories of data from Shelton's devices—including, inter alia, certain
communications, comments, photographs, and associations tied to the crimes—could contain
evidence responsive to that outlined as subject to seizure. Accordingly, the categories of data
contemplated by the illustrative list on Attachment B-1 of the October Premises Warrant, including
those specified for cellular telephones and Internet-capable devices, do not create an impermissible
"general warrant"; rather, they are a reasonable reflection of the "reality" acknowledged by the
Second Circuit in Riley "that few people keep documents of their criminal transactions in a folder
marked 'drug records.'" 906 F.2d at 845.

---

[54]    Shelton, in his footnote ascribing only a "single (undated) reference" to a
photograph in the October Affidavit is false and simply ignores the rest of affidavit. Compare
Shelton's Electronic Devices Mot. at 23 n.15 (describing "single" reference) with Oct. Aff. ¶ 26
(describing surveillance video showing an unknown male exit a car near Victim-2's residence and
use a phone to take a photograph of it); ¶ 33 ████████████████████████████████████
████████████████████████ ¶ 45 (describing a photograph posted to Instagram showing
associations among possible co-conspirators). Similarly, Shelton argues the October Premises
Warrant's authorization for the government to search FaceTime logs for evidence of the Subject
Offenses offends the Fourth Amendment because the government did not in fact search any iPhone
belonging to Shelton. Shelton Devices Mot., ECF No. 324, at 23 n.16. The argument makes little
sense, because the warrant simply set forth illustrative methods of communication in which
evidence of the Subject Devices were likely to be found, such as call logs, including FaceTime
logs. That law enforcement did not subsequently identify FaceTime logs responsive to the warrant
does not mean their inclusion in the warrant renders it overbroad.

Shelton's citations to (mostly out-of-Circuit) cases purportedly in support of his claims warrant little discussion because the facts are not analogous.  See Wey, 256 F. Supp. 3d at 385 (suppressing evidence obtained from warrants that failed to cite any criminal statutes or describe any suspected criminal conduct, described supra at pp. 119); United States v. Lofstead, No. 3:20-CR-53 (MMD), 2021 U.S. Dist. LEXIS 224735 (D. Nev. Nov. 22, 2021) (finding warrant overbroad where warrant cited crimes for which there was no probable cause and government "lacked probable cause to search for evidence of other incidents of wrongdoing" because "the information supplying probable cause was cabined to a single evening"); United States v. Chandler, No. 20-CR-20476 (DML), 2021 U.S. 217265, at *9 (E.D. Mich. Nov. 10, 2021) (upholding search warrant for several categories of cell phone data, including "[a]ny and all incoming or outgoing communications including, but not limited to, call and text messages, and any and all logs of such communications" and "[a]ny and all photographs and videos" because the warrant, as here, "limited the authority to search [those categories of data on] the phone for evidence of violations" of a specific offense for which there was probable cause); United States v. Morales, 77 M.J. 567, 574 (A. Ct. Crim. App. 2017) (holding that sole basis for probable cause set forth in an affidavit to search a phone was text message communications and thus the evidence was limited to that, particularly in light of fact that the relevant crime was a single instance of sexual assault and "[i]t would be an inferential fallacy to assume without evidence that someone committing sexual assault would also photograph evidence of the crime on their phone").

      d.    The Remedy for an Overbroad Search Warrant is Not Wholesale Suppression

In any event, even if the Court were to find that the October Premises Warrant were overbroad (which it was not), the remedy for an overbroad warrant is not suppression of all evidence, but only the portion seized pursuant to the overbroad portion of the warrant.  See, e.g.,

George, 975 F.2d at 79.  Here, Shelton does not seriously contend that there was no probable cause to believe that the shared spaces of the residence would contain evidence of the Subject Offenses listed in the October Premises Warrant, and there was more than a substantial basis for the magistrate judge to so conclude.  Although Shelton asserts there was no probable cause to search his grandmother's room (despite that the warrant lawfully authorized that search, as discussed above), his grandmother's room was in the basement of the premises—along with a separate bathroom and living area.  Compare Gov't Ex. 6 (FBI Sketch of Residence, detaining rooms in the basement, first floor, second floor and backyard/shed of the premises); with Shelton's Electronic Devices Mot., ECF 324, Ex. E (Collected Items Log indicating room from which each item was collected).  The only item seized from the basement area occupied by Shelton's grandmother was $5000 in currency that she informed law enforcement officers at the time of the search was given to her by Shelton in the days following Zottola's murder.  The remainder of the items were seized from common areas or floors occupied by Shelton.

Specifically, one of Shelton's phones (1B51) was seized from the hallway where law enforcement agents instructed him to place it after observing Shelton with the phone in his hand upon their entry into the residence; the SIM Card (1B32) was seized from inside Shelton's wallet; a USB drive and multiple cell phones (including 1B36) were seized from a men's boot in the living room; a red bandana, a laptop (1B45), a cell phone (1B46) and miscellaneous documents from a backpack in the living room pertaining to Shelton; DMV paperwork, a USB drive, multiple cell phones, a firearm and ammunition from boxes on the floor of the living room; a camera and tablet from one of the extra bedrooms; $40,000 in banded currency from another of the extra bedrooms; multiple phones (including 1B55) and tablets from a bedroom identified as belonging to Shelton; and, as discussed, $5000 in banded currency from Shelton's grandmother's room.  See

Gov't Ex. 7 (photographs 1 and 2 depicting the SIM Card, 1B32, recovered from the kitchen counter; photograph 3 depicting a phone, 1B51, seized from the hallway of the second floor of the residence; photographs 4 and 5 depicting the spare bedroom on the second floor of the premises where $40,000 in banded currency was recovered; photographs 6 and 7 depicting a phone, 1B55, recovered from Shelton's bedroom; photograph 8 depicting the boot from which multiple cell phones, including 1B36, were recovered from the first-floor living room; photographs 9 and 10 depicting a backpack, laptop and cell phone (1B45 and 1B46) recovered from the first-floor living room; photographs 12 and 13 depicting the firearm recovered from the first-floor living room). Thus, each of the devices the government intends to rely on at trial (1B32, 1B36, 1B45, 1B46, 1B51 and 1B55) came from Shelton's person or spaces closely tied to Shelton himself.  Moreover, Shelton has not identified any document (including the $5000 in cash that his grandmother identified as given to him in the days following Sylvester Zottola's murder) within the subset that the government intends to use at trial that falls outside the scope of the items specified for seizure in the October Premises Warrant.[55]

Accordingly, Shelton's motion seeking suppression of evidence based on any overbreadth of the October Premises Warrant fails as a matter of law and should be denied without a hearing.

---

[55]     Although Shelton asserts in a legal brief—with no supporting documentation or accompanying affidavit—that "of the forensic extractions that were produced to defense counsel, it is immediately apparent that some of those phones belonged to and were used by Mr. Shelton's minor son, and his mother," Shelton's Electronic Devices Mot., ECF No. 324, at 17—he does not identify whether any of this purportedly irrelevant materials is contained within the subset of items from the six devices that the government has informed him it may use at trial.

4.     The October Premises Warrant Was Sufficiently Particular and Issued on Probable Cause

Shelton next argues that the October Premises Warrant was insufficiently particular because the specified items to be seized are unsupported by probable cause and lack particularity. Shelton's Premises Mot., ECF No. 325, at 7-16. Shelton also asserts that the October Affidavit failed to provide sufficient probable cause authorizing law enforcement agents to seize certain electronic evidence, including the SIM Card, the Laptop and geolocation data. The Court should reject these arguments.

a.     Particularity of Categories of Items to Be Seized

As an initial matter, Shelton wholly fails to argue how the enumerated list of 13 categories of evidence, fruits and instrumentalities identified in Attachment B-1 to the October Premises Warrant lacks particularity. Nor could he. The Second Circuit has made clear that "a warrant satisfies the particularity requirement if it is "sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." United States v. Shi Yan Liu, 239 F.3d 138, 140 (2d Cir. 2000) (citation and quotation marks omitted); accord United States v. Folks, No. 20-3267-CR, 2021 WL 5987009, at *1 (2d Cir. Dec. 17, 2021). "In upholding broadly worded categories of items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items." United States v. Riley, 906 F.2d 841, 844 (2d Cir. 1990). "Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." Id. at 845. Here, the warrant specifically identified the items to be seized by reference to the Subject Offenses, and included an illustrative list. Nothing more is required under the law, and

144

"courts in this Circuit have routinely upheld warrants that define the items to be seized by reference to particular offenses and the use of an illustrative list." Messalas, 2020 WL 4003604, at *5 (internal quotation marks omitted) (collecting cases). Ignoring this body of law, Shelton instead asserts that each specific category enumerated in the October Premises Warrant violates the particularity requirement or otherwise lacks probable cause.

First, Shelton asserts that the use of "or other item" in Attachment B-1 of the October Premises Warrant renders invalid for lack of particularity the warrant's authorizing agents to search and seize "any writings, documents, records or other item, indicating a connection between" Shelton and Sylvester and Salvatore Zottola. Shelton's Premises Mot., ECF No. 325, at 7-8. But "a warrant need not set out every single item to be seized." See Riley, 906 F.2d at 844-45; Lustyik, 57 F. Supp. 3d at 228. It is enough if the warrant "permit[s] the rational exercise of judgment by the executing officers in selecting what items to seize." Liu, 239 F.3d at 140. Here, the use of the phrase "other item," included in a list of "any writings, documents, [or] records," see Oct. Premises Warrant, Attachment B-1(A), is plainly sufficient to "permit[] the rational exercise of judgment by the executing officers in selecting what items to seize," Liu, 239 F.3d at 140, because officers were limited to seizing items "indicating a connection between" Shelton and the victims of his crimes. See, e.g., Riley, 906 F.2d at 843-45 (upholding warrant authorizing seizure of "records of the distribution of cocaine . . . including but not limited to, bank records, brokerage house records, business records, safety deposit box keys or records and other items that constituted evidence of the offenses of conspiracy to distribute controlled substances and distribution of the same") (emphasis added); United States v. Hernandez, No. 09-CR-625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) (rejecting overbreadth and particularity challenge to

warrant authorizing search and seizure of "[e]vidence of crimes; contraband, fruits of crimes, or other items illegally possessed" (internal quotation marks omitted) (emphasis added)).

Second, Shelton asserts that law enforcement agents lacked probable cause to seize "any keys or security codes suspected of being connected to residences and/or locations associated with Victim-1 and/or Victim-2." Shelton's Premises Mot., ECF No. 325, at 8; Oct. Premises Warrant, Attachment B-1(B). In asserting that the October Affidavit provides no "indication as to what if any relevance those items would have to the subject offenses," Shelton's Premises Mot., ECF No. 325, at 8, Shelton ignores the affidavit's description of three men entering and leaving Sylvester Zottola's residence in December 2017 before and after a brutal home invasion during which they slashed Zottola's throat, see Oct. Aff. ¶ 25; and that CS-2 had informed law enforcement that Shelton told CS-2 that Shelton and others had previously robbed and assaulted Zottola, id. ¶ 36. Law enforcement officers thus clearly had probable cause to seize items indicating access to the victims' residences and locations where they would be associated. Moreover, in light of the sheer number of attacks on the victims over the course of months, law enforcement agents would have probable cause to seize items in Shelton's possession that provided him with access to the victims' residences or other locations associated with them, including keys or security codes, in any event.

Shelton's assertion that the word "key" and "code" are insufficiently particular in that it would permit the seizure of anything "containing numbers or letters or words" is absurd. Shelton's Premises Mot., ECF No. 325, at 8. "[T]he Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." Riley, 906 F.2d at 843.

146

Third, Shelton asserts that the October Premises Warrant's authorization for law enforcement officers to seize "any evidence of association and/or communication with co-conspirators in furtherance of the Subject Offenses," Oct. Premises Warrant, Attachment B-1(C), is "both overbroad and insufficiently particular."  Shelton's Premises Mot., ECF No. 325, at 8. The argument is meritless, as courts routinely uphold references to co-conspirators.  See, e.g., United States v Almaleh, No. 17-CR-25 (ER), 2022 WL 602069, at *15-16 (S.D.N.Y. Feb. 28, 2022) (rejecting particularity challenge to warrant authorizing "[e]vidence concerning identities and locations of co-conspirators in the Subject Offenses, including communications with co-conspirators" because those records would necessarily "relate to defendants' relationship with co-conspirators").  Although the affidavit was not able to specify each of Shelton's co-conspirators by name, that is not the standard, and Shelton cites no case supporting any such requirement. Rather, courts have found that even where "some of the categories" of illustrative items "are somewhat vague, given the complexity of the alleged scheme and the numerous documents involved, the lists of items are described with as much particularly as circumstances reasonably allowed."  Levy, 2013 WL 664712, at *9.  Here, as in Levy, "the complexity and scope of [Shelton's] alleged crimes justified the broad nature of the warrants at issue."  United States v. Jacobson, 4 F. Supp. 3d 515, 525-26 (E.D.N.Y. 2014).  Shelton worked with numerous co-conspirators over months, spanning numerous violent acts.  Neither probable cause nor particularity require the government to identify each co-conspirator by name to search for Shelton's communications with others about the murder-for-hire conspiracy.

Fourth, Shelton quibbles with the government's use of the term "enrich" in the October Premises Warrant's authorization for law enforcement agents' ability to seize "any evidence that [Shelton] and/or co-conspirators were enriched by their participation in the Subject

Offenses, including banking documents."  Shelton's Premises Mot., ECF No. 325, at 9 (citing Oct. Premises Warrant, Attachment B-1(D)).  Shelton apparently misunderstands the Subject Offenses, which include murder-for-hire—a statute that requires the government to prove an agreement to commit murder "as consideration for the receipt of, or as consideration for a promise or agreement to pay, <u>anything of pecuniary value</u>."  18 U.S.C. § 1958(a) (emphasis added).  It does not require cash only, as Shelton seems to argue.  <u>See</u> Shelton's Premises Mot., ECF No. 325, at 9 (conceding that the government had probable cause to seize at least cash).  Evidence of enrichment—including evidence from banking documents that might show, for example, abnormal cash flow—is plainly relevant to the crimes for which a magistrate judge found there to be probable cause to search for evidence of.  <u>Cf.</u> <u>Folks</u>, 2021 WL 5987009, at *1-2 (upholding language in search warrant authorizing seizure of "any and all items that could be evidence of violations of drug trafficking, including U.S. currency, foreign currency, jewelry, bank books, bank statements, receipts, warranties, electronics, financial and negotiable instruments, checks, and money orders, records of wire transfers, tax records")

   <u>Fifth</u>, incredibly, Shelton contends there was no probable cause to search for "any firearms and ammunition," as enumerated in Attachment B-1(E) of the October Premises Warrant, despite that the October Affidavit details no fewer than six incidents involving firearms used against Sylvester and/or Salvatore Zottola, including an attempted murder and a murder, ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ Oct. Aff. ¶¶ 24-29,

33.  Shelton's arguments to the contrary are frivolous.[56]  See, e.g., United States v. Alexander, 92-CR-220 (SWK), 1993 WL 97407, at *7 (S.D.N.Y. Apr. 1, 1993) (upholding warrant authorizing search and seizure of "weapons and ammunition" where a defendant's co-conspirators were associated with guns and weapons are tools of the narcotics trade).

Sixth, Shelton renews his arguments made in connection with each of the rest of the warrants he is challenging, specifically, that the October Premises Warrant lacks probable cause to support the seizure of evidence indicating his whereabouts during the time frame from November 2017 through October 2018.  Shelton's Premises Mot., ECF No. 325, at 11.  As the government noted in response to similar arguments challenging related search warrant affidavits, see supra in Section XI.B (Shelton's Instagram Warrants) and XI.C (Shelton's Historical Cell Site Information), and will not repeat at length again here, the October Affidavit details numerous acts of violence during this time period as well as close coordination among multiple co-conspirators over months.  The Court should reject Shelton's attempt to deflect the Court's attention from the facts set forth in the October Affidavit providing probable cause by speculatively referencing other documents.  Id. at 11 (citing time period charged in original indictment but simultaneously acknowledging that the government had probable cause predating that time period).

Seventh, Shelton argues that the October Premises Warrant unconstitutionally permitted the seizure of "items demonstrating membership in a gang or other criminal organization," including "clothing . . . and gang paraphernalia."  Shelton's Premises Mot., ECF No. 325, at 13 (citing Oct. Premises Warrant, Attachment B-1(H)).  Shelton once again provides

---

[56]    Particularly egregious is Shelton's argument as to staleness, given that he had just orchestrated the murder of Sylvester Zottola, by gunshots, six days prior to law enforcement agent's obtaining the October Premises Warrant.

his selective take on the facts set forth in the October Affidavit, ignoring that ████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[57]  See Oct. Aff. ¶¶ 37, 47.

Given these facts and the highly coordinated nature of the multiple attacks on Sylvester and

Salvatore Zottola, the Subject Offenses included violations of 18 U.S.C. § 1959, namely murder

in-aid-of racketeering and conspiracy to commit the same.  See Oct. Premises Warrant, Attachment

B-1.  Thus, items demonstrating Shelton's membership in a gang in which other co-conspirators

were also members is plainly supported by probable cause.  Shelton's argument that the language

was overbroad in that it permitted the seizure of his grandmother's clothing is pure hyperbole, as

agents are permitted some discretion in identifying clothing "demonstrating membership in a

gang."  And Shelton's assertion that the October Premises Warrant is overbroad because it would

permit the seizure of decades-old clothing is absurd.  Of course agents would have no means of

identifying the age of clothing in the premises.  That does not negate probable cause.

Eighth, Shelton asserts that the October Premises Warrant provides no probable

cause for the seizure of "any license plates, vehicle registration paperwork, and/or vehicle purchase

records," as outlined in Attachment B-1(I) of the warrant.  Shelton's Premises Mot., ECF No. 325,

at 14-15.  Like Shelton's arguments about the seizure of firearms, Shelton's assertions about these

vehicular records are frivolous in light of the October Affidavit's detailing of the use of cars during

numerous of the acts of violence in this case, that Shelton purchased a car in the days after the

---

[57]    The name of one of these individuals is redacted in the search warrant for that individual's safety.  The defendants have not requested an unredacted copy of the search warrant. Nonetheless, the government can provide an unredacted copy for the Court's in camera review should the Court deem it necessary for the Court's probable cause analysis.

October 4 murder, that ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████ in furtherance of the Subject Offenses.  See Oct. Aff. ¶¶ 24 (particularly describing a

van), 26 (particularly describing fleeing in a vehicle with a stolen license plate), 27 (particularly

describing a Honda); 28 (particularly describing a Nissan), 29, 31, 34, 37 (particularly describing

"Shelton's Vehicle"), 38-45 (particularly describing a car swap of two Nissans and the Nissan and

Shelton's Vehicle driving from New Jersey toward the scene of Salvatore Zottola's attempted

murder).[58]   In any event, as to Shelton's argument regarding the government needing to specify

the number of the stolen license plate referenced in the October Premises Warrant, the government

did not seize any such license plate from Shelton's Residence and, thus, the point is moot.

Finally, Shelton asserts that the October Premises Warrant's authorization for law

enforcement agents to seize "any other evidence, fruits, and instrumentalities of the Subject

Offenses, as set forth in the affidavit" is insufficiently particular because it references criminal

statutes and criminal activity broadly.  See Shelton's Premises Mot., ECF No. 325, at 15-16.

Shelton, again, simply ignores the law.  As stated above, the particularity requirement dictates that

a warrant clearly state the goals of the search it authorizes.  Attachment B sufficiently limited the

search to the parameters of the enumerated crimes by authorizing a search for evidence related to

the Subject Offenses for which a magistrate judge found probable cause and set forth a list of types

of evidence the law enforcement agents could seize.  In general, warrants that limit a search to

---

[58]     The government does not seek to introduce at trial evidence "indicating a connection between [Shelton] and La Cosa Nostra and/or Albanian organized crime groups" recovered from the October Premises Warrant except perhaps that which incidentally pertains to the Zottolas, who themselves had some connection to La Cosa Nostra, and, thus, the government does not address Shelton's arguments regarding the October Premises Warrant's authorization for the government to search for those items.  See Shelton's Premises Mot., ECF No. 325, at 11.

evidence relating to a particular crime, and which provide a list of examples as a means of limiting the items to be seized, are upheld when confronted with a particularity challenge. See, e.g., Riley, 906 F.2d at 844 ("In upholding broadly worded categories of items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items."); Lustyik, 57 F. Supp. 3d at 227 ("The Warrants at issue here meet that standard. Although each Warrant broadly describes the items to be seized as 'evidence, fruits, or instrumentalities' of specified federal crimes, each also sets forth an illustrative list of items to be seized. The inclusion of an illustrative list of seizable items brings the Warrants within the Fourth Amendment's particularity parameters."); Jacobson, 4 F. Supp. 3d at 524 ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants."); United States v. D'Amico, 734 F. Supp. 2d 321, 363 (S.D.N.Y. 2010) ("Moreover, Attachment A provides an exemplary list of records and other items falling within the scope of the Warrant, thereby enabling the executing agents to identify with reasonable certainty what they were authorized to seize."). Thus, because the October Premises Warrant limited the permissible search to evidence relating the Subject Offenses and provided an illustrative list of the types of evidence such a search might uncover, it is sufficiently particularized.

Rather, the incorporation of this affidavit merely reinforces the particularity of the other categories. Insofar as the October Premises Warrant lacked particularity, which it did not, any such lack of particularity may be "remed[ied] . . . when [an affidavit] is incorporated by reference in the warrant itself and attached to it," United States v. Purcell, 967 F.3d 159, 179 (2d Cir. 2020), as is the case here.[59]

---

[59]

In sum, Shelton's arguments that the October Premises Warrant lacked probable cause and particularity as to the categories of items for which the warrant authorized seizure are grounded in either mischaracterizations or simply failing to acknowledge relevant portions of the October Affidavit.  Although Shelton finds fault with each of the categories of items to be seized specified in the October Premises Warrant, he ignores that the warrant need only "specify the items to be seized by their relation to the designated crimes."  Galpin, 720 F.3d at 445-46.

           b.      There was Probable Cause for the Warrant's Seizure of Non-Cell Phone Electronic Devices

Shelton asserts that the October Affidavit failed to provide probable cause for agents to seize non-cell phone electronic devices, including the SIM Card, the Laptop and geolocation data.[60]

First, Shelton asserts there was no probable cause to seize the SIM Card from Shelton's Residence during the execution of the October Premises Warrant.[61]  Shelton renews his general arguments about the seizure of cellular telephones from Shelton's Premises, which the government has already addressed above.  See Shelton Devices Mot., ECF No. 324, at 29.  Insofar as Shelton claims that because the October Premises Warrant did not specifically state the words "SIM card," law enforcement agents were not entitled to seize it, Shelton is mistaken.  The SIM

_____

███████████████████████████████████████████████████.  See Shelton's Premises Mot., ECF No. 325, at 15.

[60]    Shelton raised related arguments regarding law enforcement's seizure of two SIM cards from Shelton's Vehicle, as well as the seizure of "tablets, USB drives, [a] camera memory card and [a] GPS device."  Shelton's Electronic Devices Mot., ECF No. 324, at 29, 31-32.  Although the government disagrees with Shelton's analysis of the facts and law in those portions of his brief, as the government already informed Shelton, the government does not seek to introduce data from those devices at trial, and thus his motion to suppress that data is moot.

[61]    The SIM Card was searched pursuant to a separate warrant, discussed infra at pp. 182 n.67.

Card is compatible with cellular telephones and is capable of storing electronic information.  The October Premises Warrant authorized law enforcement to search all Internet-capable devices, including cell phones and, with respect to cell phones, "[e]vidence of the attachment to the cellular telephone of other storage devices or similar containers for electronic evidence."  Oct. Premises Warrant, Attachment B-2(4).  Moreover, the October Premises Warrant defined "records" and "information" as including "all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data)."  Id. at Attachment B; cf. Folks, 2021 WL 5987009, at *2 (holding that "electronics" encompassed computers and tablets).  Nonetheless, in an abundance of caution, law enforcement in fact sought a second search warrant—the same day as the execution of the October Premises Warrant—to search the SIM Card, which had been recovered from Shelton's wallet.  Shelton cannot and does not credibly argue that this process violates the Fourth Amendment or warrants suppression.

As to the merits of the October SIM Card Warrant, Shelton asserts that the "warrant seeks even broader categories of information than the" October Premises Warrant, taking issue with the October SIM Card Warrant's illustrative list of information related to the Subject Offenses.  See Shelton Devices Mot., ECF No. 324, at 34.  But the items on the illustrative list is supportable for the same reasons the items in the October Premises Warrant were supported by probable cause (and notably, the affidavit supporting the October SIM Card Warrant incorporates the October Affidavit supporting the October Premises Warrant by reference), and each of those items are limited by reference to the Subject Offenses, as already analyzed herein.  See Ex. B to Shelton Devices Mot., ECF No. 324, at Attachment B.  In any event, law enforcement agents were only able to recover MSISDN information from the SIM Card (displaying a cell phone number

associated with the SIM Card), and thus, Shelton's arguments as to the broader scope of the October SIM Card Warrant's authorization are moot.

Second, Shelton argues the October Affidavit failed to set forth probable cause to seize Shelton's Laptop.  In addition to this claim failing for Shelton's lack of standing, discussed above, Shelton's assertion as to probable cause, once again, ignores the extensive use of electronics among multiple co-conspirators to commit the Subject Offenses, including the October Affidavit's description of the use of a GPS device to track and kill Sylvester Zottola, which location information is accessible through Internet-capable devices, such as computers, Oct. Aff. ¶ 32; and Shelton's use of Instagram to communicate in furtherance of the Subject Offenses, which is a social media platform accessible through Internet-capable devices, such as computers, id. ¶ 35. These facts provided sufficient probable cause for Judge Reyes to authorize the search of the Laptop recovered from Shelton's Premises.  Shelton's argument that the government needed to search the Laptop in a particular way fails for the same reasons his same arguments about a search protocol for the cell phones fail.  See supra pp. 138-39.

Third, Shelton argues that the October Premises Warrant "was invalid for the search and seizure of geolocation data."  Shelton Devices Mot., ECF No. 324, at 33. In making the argument, Shelton cites Carpenter, but that case upholds the propriety of what the government did here: obtain a warrant issued upon probable cause prior to obtaining location information, which, for all of the reasons noted above in connection with the cell-site warrants, was supportable in this case.  138 S. Ct. at 2220.  "Moreover, [g]eographic location and origination data associated with all of the" evidence of the Subject Offenses recovered from the devices "would be essential to establishing venue and jurisdiction in this Court for any potential charges," and can be upheld on that basis alone.  Chandler, 2021 U.S. 217265, at *15.

155

5.      The October Premises Warrant Did Not Omit Material Information Nor
        Was it Misleading

Shelton next asserts that the October Affidavit contains three instances of

misleading information in its (1) discussion of the activities of Albanian and Italian organized

crime; (2) ███████████████████████████████████████████ and (3)

inclusion of two purportedly "contradictory statements."  Shelton's Premises Mot., ECF No. 325,

at 17-19. In Shelton's Electronic Devices Motion, Shelton also argues that the October Affidavit

is misleading because it did not include that Shelton communicated with CS-2 by cell phone and

Instagram and that the Affidavit ███████████████████████████████

███████████████████   Shelton's Electronic Devices Mot., ECF No. 324, at 22.  As set

forth below, Shelton's Franks arguments are deficient on their face, he identifies no law

enforcement wrongdoing and he fails to identify any material misstatement or omission.  His

motion should therefore be denied without a hearing.

As to Shelton's first argument regarding the inclusion of background information

about organized crime, the argument fails because Shelton has wholly failed to demonstrate how

such information was either inaccurate or material or has any bearing on the probable cause

showing as to Shelton.  Far from being inaccurate, the October Affidavit sets forth accurate

information about Italian and Albanian organized crime which, at the time the affidavit was sworn

to, was an investigative lead that law enforcement was pursuing as an explanation for the ongoing

violent acts against two of the Zottolas.  Although, ultimately, no credible evidence developed

supporting the involvement of Albanian and Italian organized crime in the violent attacks against

the victims—instead, Zottola was found, with Shelton and others, to have orchestrated those

crimes—that does not render untrue or misleading those statements in the affidavit.  Moreover,

though this information was neither a misstatement nor an omission, Shelton has failed in any

event to demonstrate that the information was "necessary to the issuing judge's probable cause determination." Canfield, 212 F.3d at 718. Thus, his motion fails on that basis, too.

Shelton next argues that the October Affidavit's failure to include █████████ ████████████████████████████████████████████████ in the affidavit somehow renders the affidavit materially misleading. See Shelton's Premises Mot., ECF No. 325, at 18. But in doing so, Shelton assumes that only one gun was used in the multiple attempts on the lives of the victims. That assumption is completely unsupported and entirely speculative. As detailed at length above, probable cause existed to search Shelton's residence entirely separately from ███████ ████████████████████. Indeed, that Sylvester Zottola was shot and killed by gunfire on October 4, ███████████████ demonstrates the obvious invalidity of Shelton's argument.

Shelton also asserts that the "affidavit relies on contradictory statements to provide probable cause for the items authorized to be seized." Shelton's Premises Mot., ECF No. 325, at 18. But the purportedly "contradictory" statements Shelton takes issue with are that (1) ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████." Id. There is nothing, in fact, contradictory about these statements, given that both support some type of business dealings between the two for which there would be probable cause to search. In any event, Shelton does not explain how any contradiction would be material. Accordingly, Shelton's assertion fails.

Next, Shelton argues that the October Affidavit is materially misleading in indicating that CS-2 stated that CS-2 and Shelton "communicated in furtherance of the Subject Offenses via cellular telephones and Instagram," because (1) in the Instagram Warrants, the affidavits underlying those indicated only that CS-2 spoke with Shelton via Instagram, and not by

phone, which Shelton characterizes as a "contradiction"; (2) the FBI Special Agent "obscured the fact that ██████████████████████████████████████████████ and (3) the October Affidavit fails to "specify what type of cell phone 'contact' or 'communications' these were."  Shelton's Electronic Devices Mot., ECF No. 324, at 22.  As to the first argument, Shelton misunderstands the word contradiction, as the inclusion of CS-2's communications via Instagram with Shelton for the Instagram Affidavits were plainly a matter of relevance, not contradiction.  As to the second argument, the government has already addressed this identical argument above, as Shelton also made it in connection with respect to the Instagram Affidavits.  See supra Section XI.B (Shelton's Instagram Warrants).  As to his third argument, it falls far short of the Franks standard.  As an initial matter, the alleged omission is premised on the assumption that Shelton used only one phone for all communications and thus law enforcement's having reviewed records from one cell phone, and thus being able to identify types of communications from that phone, would govern for all phones Shelton used.  But that assumption is dispelled by the October Affidavit itself, which established Shelton's use of multiple devices.  Moreover, the purported omission is immaterial, because the October Affidavit establishes many different ways that Shelton's phones probably contained evidence of the Subject Crimes, which the government has detailed exhaustively herein.  See supra, e.g., at pp. 154-55.

In any event, even if any of the purported omissions or misstatements identified by Shelton were material, which they are not, Shelton has made "no showing—much less a substantial preliminary showing—that [law enforcement] intentionally misrepresented the facts or entertained serious doubts as to the truth of [their] allegations."  United States v. Ray, 541 F. Supp. 3d 355, 387 (S.D.N.Y. 2021) (internal quotation marks omitted).

Indeed, with each of these arguments, Shelton makes no argument whatsoever as to intentionality and recklessness, as opposed to inadvertence. Nor could he, given that none of the purported deficiencies he relies on are material misstatements or omissions and there is no indicia of deliberate misleading or reckless false information.

E.     The October Vehicle Warrant

Shelton argues that Judge Reyes authorized the October Vehicle Warrant without probable cause. Shelton's Premises Mot., ECF No. 325, at 21-22. But as detailed above, the October Affidavit detailed extensive evidence regarding the conspiracy's use of vehicles—often unable to be identified—in furtherance of the Subject Offenses. See Oct. Aff., ¶¶ 24, 26-29. Moreover, ██████████████████████████████████████████████████ ████████████████████████████████████████████ and the affidavit sets forth specific use of that car in connection with the Subject Offenses, specifically, with the attempted murder of Salvatore Zottola on July 11, 2018. Id. ¶¶ 37, 38-45. The October Affidavit also sets forth that "[b]ased on witness interviews, LPR records and recent surveillance conducted by law enforcement," Shelton consistently drove Shelton's Vehicle from March 2018 through the present—spanning a substantial portion of the conspiracy. Id. ¶ 48. The October Affidavit did not need to specify the precise evidence observed inside Shelton's Vehicle to provide probable cause to search it, as Shelton seems to assume. It need only provide "such facts as make wrongdoing or discovery of evidence thereof probable." Walczyk, 496 F.3d at 157. Moreover, the vehicle is also clearly an instrumentality of the crime, and therefore evidence of the crime, as it was used in the commission of the Subject Offenses.

Moreover, Shelton was observed in Shelton's Vehicle on October 4, 2018, the day of Sylvester Zottola's murder, with an electronic device, which the October Affidavit describes were used in furtherance of the Subject Offenses—thus rendering insupportable Shelton's claims

about ████████████████████████████████████████████████████████

████████████████████████████████████████   Id. ¶ 30; <u>see also</u> <u>United States v.</u>

<u>Wagner</u>, 989 F.2d 69, 75 (2d Cir. 1993) ("Fact of past criminal activity that by themselves are too

stale can be sufficient if the affidavit also established a pattern of continuing criminal activity so

there is reason to believe that the cited activity was probably not a one-time occurrence.").

      Finally, the government has already detailed all of the ways the illustrative list of

items to be seized, cabined by their reference to the Subject Offenses, meets the Fourth

Amendment's particularity requirements.  Shelton's renewed argument as to the October Vehicle

Warrant lacks any factual or legal citations to the contrary.  <u>See</u> Shelton's Premises Mot., ECF No.

325, at 22.

    F.   <u>The December Premises Warrant</u>

      Shelton's main challenge to the December Premises Warrant is that it was based on

the October Premises Warrant, which he asserts was "invalid."  Shelton's Premises Mot., ECF No.

325, at 22.  Because, as described above, there is no basis for wholesale invalidation of the October

Premises Warrant or suppression of the evidence from it, Shelton's claims plainly fail.

      Shelton's remaining challenge to the probable cause supporting the December

Premises Warrant is that a photograph relevant to the probable cause showing was dated October

5, 2018—only five days prior to the execution of the October Premises Warrant but approximately

two months prior to the execution of the December Premises Warrant.  <u>Id.</u> at 23.  Shelton thus

asserts the facts supporting probable cause were stale.  <u>Id.</u>  However, Shelton ignores that the

December Affidavit makes clear that Shelton had been in custody since the execution of the

October Premises Warrant.  Dec. Aff. ¶ 4.  It was thus reasonable for Judge Gold to conclude that

Shelton's effects would not have been disposed of during this two-month period and there was

probable cause for a second search based on the newly-discovered information set forth in the December Affidavit.

Finally, Shelton asserts that the six water bottles seized during the execution of the December Premises Warrant fall outside the scope of the warrant, which authorized law enforcement officers to seize "[b]oxes of water," as depicted in a photograph included in Attachment B to the December Premises Warrant, which Shelton asserts does not include water bottles. Shelton's Premises Mot., ECF No. 325, at 23. Although the government disputes Shelton's conclusion that the warrant authorized the bottles of water depicted in the photograph in Attachment B only if they were inside a box, the water bottles were in any event seized in plain view. Specifically, six clear water bottles with black lids were visible in the photograph sitting next to stacks of cash inside Shelton's residence, as set forth in the December Premises Warrant. In executing the December Premises Warrant, six clear water bottles with black lids were in plain view. A comparison of the water bottles in the photograph in the December Premises Warrant to the water bottles seized from Shelton's Premises shows they appear identical. Compare Shelton's Premises Mot., ECF No. 325, Ex. B, Attachment B; with Shelton's Premises Mot., ECF No. 325, Ex. I. See, e.g., United States v. Babilonia, 854 F.3d 163, 179-80 (2d Cir. 2017) ("Under the plain view doctrine, a law enforcement officer may seize evidence without a warrant if (1) the officer is lawfully in a position from which the officer views the object; (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object.").[62]

---

[62]    In any event, Shelton lacks standing to challenge the evidence seized upon the execution of the December Premises Warrant, because neither Shelton nor his wife continued to live there. Specifically, following Shelton's arrest in October 2018, Shelton's grandmother indicated that they were no longer permitted to reside at her residence.

G.     The July SIM Card Search Was Not Rendered Unreasonable by the Passage of Time

Shelton next contends that the passage of time between the October 2018 seizure of the SIM Card and the June 2019 obtaining of a second search warrant to search it (the July SIM Card Warrant) renders the search unreasonable under the Fourth Amendment.  See Shelton's Electronic Devices Mot., ECF No. 324, at 35.   In determining the reasonableness of the government's delay in seeking a search warrant after a valid seizure, four facts are "generally relevant": "(1) the length of the delay, (2) the importance of the seized property to the defendant, (3) whether the defendant had a reduced property interest in the seized item, and (4) the strength of the state's justification for the delay."  United States v. Smith, 967 F.3d 198, 206 (2d Cir. 2020).

The time elapsed in this case did not render the search unreasonable.  First, the government sought a warrant to search the SIM Card the very day it was seized—the October SIM Card Warrant.  Thus, the government acted extremely promptly in providing its probable cause analysis to a magistrate judge and having that magistrate judge, in his independent review, issue a warrant.  Due to an oversight, however, there was delay in the government's execution of the October SIM Card Warrant and therefore the government obtained a second search warrant.  In light of the number of devices and fast-moving pace of the case, detailed infra in Section IX.J, and given that the government had already obtained a warrant to search the SIM Card, the first factor (length of delay), weighs in favor of the government.  In urging otherwise, Shelton cites to that portion of Smith that reasoned that "if the police have probable cause to seize an item in the first place, there is little reason to suppose why they cannot promptly articulate that probable cause in the form of an application to a judge for a search warrant."  Shelton's Electronic Devices Mot., ECF No. 324, at 35 (citing Smith, 967 F.3d at 206-07).  But this is inapposite here, where the government did in fact obtain a search warrant—and on the same day it seized the SIM Card.

Shelton does not even address the other three <u>Smith</u> factors. "As to the second factor (importance of the seized property to the defendant), our starting point is to consider the nature of the property seized." Here, the SIM Card had little data on it and Shelton makes no argument that it was important to him. Thus, this factor weighs in the government's favor. As to whether Shelton had a reduced property interest in the SIM Card, <u>Smith</u> determined that "to the extent that [the defendant's] possessory interest was offset by the police's probable cause to seize the tablet, the police's interest was delimited by the obligation to seek a search warrant without unreasonable delay." <u>Id.</u> at 209. Here, the government was in possession of the SIM Card pursuant to a search warrant and promptly obtained a search warrant to search the SIM Card. Thus, the defendant's possessory interest was minimal, and this factor too weighs in favor of the government. Finally, as to the justification for the delay, as detailed at length below in response to the defendant's arguments pursuant to Rule 41 of the Federal Rules of Criminal Procedure, this case involves large numbers of devices in a fast-moving investigation. Indeed, between Shelton's arrest and law enforcement's obtaining the October SIM Card Warrant in 2018 and law enforcement's obtaining the July SIM Card Warrant in 2020, law enforcement agents on this case had arrested nine additional individuals and seized more than 100 electronic devices. Their oversight in failing to execute the October SIM Card Warrant was in the context of a large, complex and active investigation.

Accordingly, application of the exclusionary rule is inappropriate and unwarranted on these facts.

H.    The Zottola Premises and Device Warrants

Zottola moves to suppress all evidence obtained from the execution of two warrants authorizing the search of his residence and electronic devices (issued on June 17, 2019) and two cell phones seized pursuant to his arrest (issued on June 18, 2019) (collectively, the "Zottola

Premises and Devices Warrants"). This motion should be denied. The Zottola Premises and Devices Warrants were issued on probable cause and were tailored and particularized.

1. The Zottola Premises and Devices Warrants Were Supported by Probable Cause

The affidavits for the Zottola Premises and Devices Warrants (the "Zottola Premises and Devices Affidavits") set forth probable cause to believe Zottola lived at the premise, had traveled to and from the premises during the murder-for-hire scheme, stored items relevant to the scheme at the residence and used electronic devices in furtherance of the scheme. To be sure, even Zottola concedes that the Zottola Premises and Devices Affidavits provided a sufficient basis to seize items from the residence and devices, including Zottola's correspondence with Shelton, his correspondence with other co-conspirators, and certain family real estate records. Zottola Omnibus Mot., ECF 334 at 36. However, the Affidavits established a basis for the search and seizure of far more than communications and business records from Zottola, who had already been charged by Indictment with the murder-for-hire conspiracy. The Zottola Premises and Devices Affidavits illustrated Zottola's role as the architect of the murder-for-hire scheme. They included numerous examples of coded text message conversations between Zottola and Shelton concerning the murders of Zottola's father and brother. For example, on November 26, 2017, after his father escaped a gunman who exited a dark van, Zottola engaged in the following coded text message communication with Shelton:

|  |  |
|---|---|
| ZOTTOLA: | How are we looking with the filming (3:56 PM) |
| ZOTTOLA: | It has gotten real cold over here I hope you can get the actor [i.e., Victim-1] to work (3:57 PM) |
| SHELTON: | I just hear the costar just got into it with the director about 15 minute ago and they had to call security (3:59 PM) |
| ZOTTOLA: | Whr (4:00 PM) |
| ZOTTOLA: | What (4:00 PM) |
| ZOTTOLA: | Nothing said (4:01 PM) |
| ZOTTOLA: | Told you he is an ass (4:01 PM) |

| | |
|---|---|
| SHELTON: | The star stormed off set and I think it spooked him (4:01 PM) |
| SHELTON: | You should see it security checking everyone like they in the airport (4:02 PM) |
| ZOTTOLA: | That is why we need to get the final scene before (4:03 PM) |
| SHELTON: | The star doesn't come back (4:03 PM) |

Zottola Omnibus Mot., ECF 334, Ex. H ¶¶ 30-31.  On March 11, 2018, Zottola directed Shelton

to kill his brother in addition to his father:

| | |
|---|---|
| ZOTTOLA: | This week We have to get the captain [i.e., Victim-1]. We is taking all my shrimp (3:14 PM) |
| ZOTTOLA: | Can we get a double header at all. My business is all messed up by both of them [i.e., Victim-1 and Victim-2] especially the MF captain the worst. Everyday it's gets harder for me with me. (4:21 PM) |
| SHELTON: | Where? (4:25 PM) |
| SHELTON: | My people go to the boat house4 for weeks and its virtually impossible (4:25 PM) |
| ZOTTOLA: | Warehouse is good tomorrow but number 1 spot is only good for that 15 min of fame. I don't even know (4:26 PM) |
| SHELTON: | They wait in the warehouse he never shows (4:26 PM) |
| ZOTTOLA: | You are working hard for me. Trust me I know. And I thank you. Whatever we can do (4:27 PM) |
| SHELTON: | This is frustrating and bad for you because of it I've lost 3 people from the first time for having equipment with no permits they still on the island (4:29 PM) |
| SHELTON: | The rest have started to lose faith based on inaccurate information (4:30 PM) |
| ZOTTOLA: | Holy sht I didn't know that. My apologies for that. If I can help I will (4:30 PM) |

Id. ¶ 32.  The Affidavits also included conversations between Zottola and Shelton in the hours

before they successfully killed Sylvester Zottola discussing payment as "cases of water" (Zottola:

"I have the water order I just put in. I am getting you 10 cases of the essential water." (10:35 a.m.)).

Shelton indicated there would be another attempt on Sylvester Zottola's life that day (Shelton:

"I'm banking on my players to land a big contract today so the signing bonus would get me all the

way straight (10:47 AM)").  And then, six minutes after the murder, Shelton told Zottola that his

father was successfully killed (Shelton: "Can we party today or tomorrow (4:51 PM)").  Zottola then confirmed Shelton would be paid shortly (Zottola: "I have the cases of water in a day or so (4:52 PM)").  Zottola Omnibus Mot., ECF 334, Ex. H ¶¶ 30-39.

In addition to these communications, the Zottola Premises and Devices Affidavits also included numerous facts about the plots to kill Sylvester Zottola and Salvatore Zottola, including the details of the attacks on November 26, 2017, December 27, 2017, April 16, 2018 and June 12, 2018; the vehicles and weapons used in those attacks; a tracking device recovered from Sylvester Zottola's vehicle in the days after his death; and the monitoring of Sylvester Zottola through his own security system.  Id. ¶¶ 16-29, 39, 82-83.

The Zottola Premises and Devices Affidavits also included numerous facts connecting the crime to the Zottola family's real estate business.  Id. ¶¶ 77-81.  As set forth in the Affidavits, Zottola told Shelton that his father and brother had "messed up" his business.  Zottola thereafter established a second company.  Id. ¶ 79-80.  ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ .

Zottola claims the Affidavits did not set forth probable cause to seize "the entirety of his electronic devices."  Zottola Omnibus Mem., ECF 335 at 35.  The magistrate judge correctly concluded differently, finding that based on the information set forth in the affidavit, including numerous coded text messages conversations with Shelton and Zottola's control over his father's security system, which could be operated from an electronic device, there was probable cause to

believe the electronic devices contained evidence of the murder-for-hire conspiracy.  Nor is such authorization rare when supported by probable cause, as also detailed above in connection with Shelton's devices.  See, e.g., Purcell, 967 F.3d at 181 n.9 (characterizing as "familiar" warrants that permit law enforcement agents to seize "all computers, hard drives and other storage devices" where probable cause is demonstrated that "various electronic devices to be found at a suspect's residence" contain evidence of crime "which thereafter are examined to identify any contraband images or other relevant evidence that they might contain").  Zottola seems to suggest that agents should have gathered the nearly 20 electronic devices, reviewed them manually on site, and only seized the electronic devices in which they were immediately able ascertain contained additional evidence of the crimes.  That is not the process envisioned under Rule 41 of the Federal Rules of Criminal Procedure, which permits "a later review of the media or information."  Fed. R. Crim. P. 41(e).  Moreover, that process would frustrate law enforcement's judicially-authorized efforts to conduct an investigation in compliance with the Fourth Amendment or invite an even greater intrusion of privacy.  See United States v. Ray, 541 F. Supp. 3d 355, 393 (S.D.N.Y. 2021).  "It would either preclude the agents from seizing the media at all or, more likely, require them to remain at the premises being searched while they methodically reviewed each of the items of electronic media, effecting an even greater intrusion on the occupant's privacy."  Id.

Zottola also claims that the Zottola Premises and Devices Affidavits did not set forth sufficient probable cause to seize "every record" in his home office.  Zottola Omnibus Mem., ECF 335 at 35.  First, as explained below, the Zottola Premises and Devices Warrants did not purport to authorize the seizure of "every record" in his home office.  Second, to the extent that agents seized some records that were later deemed non-responsive to the warrant, courts routinely uphold warrants that permit agents to seize records and later review them for responsiveness.  The

Second Circuit in <u>Riley</u> acknowledged this necessary latitude.  906 F.2d at 844–45 ("But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'").  This is particularly appropriate here because, as shown in the Zottola Premises and Devices Affidavits, Zottola has demonstrated that he feared detection by law enforcement and so he communicated in coded language to conceal the true meaning of his directives concerning the murder of his father and brother.  Accordingly, Zottola's arguments concerning a lack of probable cause should be rejected.

   2.   <u>The Zottola Premises and Devices Warrants Were Sufficiently Tailored</u>

Zottola next claims the Zottola Premises and Devices Warrants were overbroad because they permitted the seizure of "virtually anything," such all communications, all real estate records, all location information, and all vehicle information.  Zottola Omnibus Mem., ECF 335 at 36.  These assertions mischaracterize the language of the Warrants.  Furthermore, as explained above, it also ignores the latitude given to agents in conducting the search and their ability to subject the seized items to a later review for responsiveness.

It is axiomatic that "a search warrant does not necessarily lack particularity simply because it is broad."  <u>Ulbricht</u>, 858 F.3d at 100.  Here, over the course of many months, Zottola carried out a plot to kill his father and brother, which resulted in several unsuccessful violent attacks that included different individuals, vehicles, weapons, tracking devices and security precautions before his father was ultimately murdered.  During this time, Zottola told others that his father and brother had "messed up" his business, he established his own company independent of the family business and moved family business records to his home office.  Zottola Omnibus Mot., ECF 334, Ex. H ¶¶ 77-81.  Accordingly, given the length and breadth of this scheme, the nature of the crimes "require[d] a broad search," <u>United States v. Cioffi</u>, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009).   The  magistrate  judge  authorized  a  search  for  evidence,  fruits  and

instrumentalities of the Subject Offenses in the Zottola Premises and Devices Warrants, namely

20 categories of items:

> (A) any writings, documents, records or other item, indicating a connection between Anthony Zottola ("ZOTTOLA") and Bushawn Shelton, or others connected to the Subject Offenses; (B) any keys or security codes suspected of being connected to residences and/or locations associated with Victim-1 and/or Victim-2; (C) any evidence of association and/or communication with co-conspirators in furtherance of the Subject Offenses, including photographs; (D) any evidence that ZOTTOLA and/or co-conspirators were enriched by their participation in the Subject Offenses, including banking documents; (E) any firearms and ammunition; (F) any writings, documents, records or other evidence indicating the whereabouts of ZOTTOLA on or about and between November 2017 and October 4, 2018; (G) any license plates, vehicle registration paperwork, and/or vehicle purchase records; (H) any cellular telephones; (I) any Internet-capable devices, including iPads, tablets and computers; (K) any tracking devices or records related to tracking devices; (L) any paperwork connecting ZOTTOLA to ▓▓▓▓▓▓, Brooklyn, New York; (M) any paperwork related to the potential sale of properties; (N) any keys to properties; (O) any documents, records or other materials related to video surveillance equipment at other properties; (P) any records related to the Zottola family's assets, including its real estate and real estate ventures; (Q) any cash; (R) any bright colored jackets; (S) any business records and ledgers pertaining to ASZ Maintenance and A&S Maintenance; (T) any essentia water bottles.

Zottola Omnibus Mot., ECF 334, Ex. I, Attachment B-1.

Zottola's depiction of these items as records without limitation is simply not accurate. For example, Zottola claims law enforcement were permitted to seize "[a]ny writings, documents, records or other item[s], indicating a connection between Anthony Zottola ('ZOTTOLA') and Bushawn Shelton, or others." Zottola Omnibus Mem., ECF 335 at 35. Zottola, however, omits a key phrase: "(A) any writings, documents, records or other item, indicating a connection between Anthony Zottola ("ZOTTOLA") and Bushawn Shelton, or others <u>connected to the Subject Offenses</u>." Zottola Omnibus Mot., ECF 334, Ex. I, Attachment B-1. The warrant

did not authorize all communications in any timeframe; it authorized the seizure of communications with those who ultimately agreed or assisted in the murder plot.

Next, Zottola claims the warrant authorized "all documents reflecting Mr. Zottola's whereabouts for an entire year."  Zottola Omnibus Mem., ECF 335 at 35.  The Warrants authorized the seizure of "any writings, documents, records or other evidence indicating the whereabouts of ZOTTOLA on or about and between November 2017 and October 4, 2018," the time period in which numerous crimes of violence were perpetrated against his father and brother.  Indeed, given the references to meetings between Zottola and Shelton in text messages, the Affidavits provided probable cause to believe records of Zottola's whereabouts would prove (or disprove) whether those meetings occurred.  Additionally, like every item listed in Attachment B, documents concerning Zottola's location in that time period could only be seized should his location <u>relate to the crimes at issue</u>.

Zottola argues the warrant authorized the seizure of "all vehicle records."  Zottola Omnibus Mem., ECF 335 at 35, 37.  It did not.  The Affidavits included detailed descriptions in the affidavit about the vehicles used to carry out certain attacks:  the dark van used on November 26, 2017 to attack Sylvester Zottola, the vehicle with stolen license plates which was used in the attempted shooting of Salvatore Zottola, the dark-colored Honda which was used in the attempted shooting of Sylvester Zottola, and the red Nissan Altima which was used in the successful shooting of Salvatore Zottola.  Accordingly, the warrant authorized the seizure of "(G) any license plates, vehicle registration paperwork, and/or vehicle purchase records."  This is a circumscribed category of records related to license plates or the purchase or registration of new vehicles, not, as Zottola claims, authorization to seize any record pertaining to any vehicle.

Zottola asserts the Warrants authorized the seizure of "all real estate records," but once again this misrepresents the approved language of the Warrants and ignores the underlying probable cause.  The magistrate judge authorized the seizure of records relating to Zottola's family assets, including the real estate business, business records pertaining to Zottola's entities ASZ Maintenance and A&S Maintenance, and records related to the property located at ▮▮▮▮▮ Street, Brooklyn, New York.  As set forth in the affidavit, Zottola's business dealings were connected to the scheme—Zottola expressed displeasure with his father over his handling of the family business, Zottola moved family business records to his home office, and he established his own business apart from the family business.  Zottola Omnibus Mot., ECF 334, Ex. H ¶¶ 77-81.  Accordingly, this was not some wholesale search of the family business—this was a tailored inspection of the business records in Zottola's possession at his home as related to his plot to kill other members of the family business.

Zottola also claims the Warrants permitted the seizure of "all call logs," "any evidence of where Zottola's electronic devices were used," and "all communications . . .without specificity as to what those communication entail."  Zottola Omnibus Mem., ECF 335, at 35-36.  As explained supra pp. 136, in response to Shelton's arguments concerning the same language, "with regard to any cellular telephones and Internet-capable devices," agents were permitted to search "names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails . . . instant messages, photographs, videos, Facebook posts, FaceTime logs, Google Voice calls, Internet activity . . . and other electronic media constituting evidence, fruits or instrumentalities" of the Subject Offenses (which were specifically enumerated in the attachment) and appropriate contextual information.

Zottola claims the overbreadth of this search can be seen from the selected examples he provides of some of the documents and communications seized from Zottola's premises and devices.  Zottola Omnibus Mot., ECF 334, Exs. L (devices) & M (premises).  However, "[t]he Fourth Amendment does not prohibit law enforcement from seizing, pursuant to a warrant, electronic devices that are likely to contain evidence of crime simply because that evidence is likely intermingled with other non-criminal and private information." Ray, 541 F. Supp. 3d at 394.  To be sure, given the difficulty in identifying whether a particular document or device contains relevant evidence at the time of the search, law enforcement agents routinely seize listed items and then subject those items to a more thorough review. See Ulbricht, 2014 WL 5090039, at *14 (noting warrants have long allowed reviewing an entire file cabinet to find files that serve as evidence of money laundering activity, which might be intermingled with files documenting lawful and irrelevant activity").  In any event, as discussed supra, pp. 142, the remedy for an overbroad warrant is not suppression of all evidence, but only the portion seized pursuant to the overbroad portion of the warrant.  See, e.g., George, 975 F.2d at 79.

Accordingly, Zottola's motion seeking suppression of evidence based on any overbreadth of the Zottola Premises and Devices Warrant fails as a matter of law and should be denied.

3.   The Zottola Premises and Devices Warrants Are Sufficiently Tailored

Zottola asserts that the Zottola Premises and Devices Warrants lack particularity because they allowed the government to seize information without regard to "individual, timeframe or subject matter."  Zottola Omnibus Mem., ECF 335 at 39.  As explained above, that is simply incorrect.  The Zottola Premises and Devices Warrants satisfy the Second Circuit's criteria by, among others thing, specifying the items to be seized as related to the Subject Offenses supported by probable cause.

172

As explained above, warrants satisfy the particularity requirement if they permit agents to rationally select which items to seize.  Liu, 239 F.3d at 140.  The Second Circuit in Riley noted even "broadly worded categories of items" would be upheld when the language of a warrant "is construed in light of an illustrative list of seizable items."  906 F.2d at 844.  The Fourth Amendment is satisfied when a category is "adequately described, with the description delineated in part by an illustrative list of seizable items." Id. at 845.  Nothing more is required.  Despite this well-established law, Zottola argues the Warrants are invalid because they lack "relevant factual context," id.  Courts do not require a warrant to include "factual context";  they require warrants to include specific criminal offense supported by probable cause, probable cause to believe evidence will be found in the place to be searched, a description of the place to be searched, and a list of items to be seized in relation to the designated offenses.  Purcell, 967 F.3d at 178.  The Zottola Premises and Devices Warrants satisfy those requirements.

Zottola also claims the Warrants are deficient because certain enumerated items fail to include a date range, but courts have held temporal limitation for the data are not "an absolute necessity."  See Hernandez, 2010 WL 26544, at *11.  Even the authorities on which Zottola relies acknowledge that the inclusion of a date range is not a "universal requirement" for a valid warrant, Wey, 256 F. Supp. 3d 355 at 381, but rather a limitation that should be included "when possible," Levy, 2013 WL 664712, at *11 n.7.  Courts in this Circuit have reasoned that the absence of a time frame does not render warrants unconstitutionally general where, as here, the crimes under investigation were complex and concerned a long period of time, and not simply one or two dates of criminal activity." United States v. Elkorany, No. 20-CR-437 (NRB), 2021 WL 3668086, at *4 (S.D.N.Y. Aug. 17, 2021) (internal quotation marks omitted); United States v. Hadden, No. 20 CR. 468 (RMB), 2022 WL 1409600, at *3 (S.D.N.Y. May 4, 2022); Jacobson, 4 F. Supp. 3d at

526.  Here, in applying for the Zottola Warrant, the affiant set forth facts concerning dozens of

acts of violence and conversations about those violent events that occurred over a year long period.

United States v. Rosario, No. 19-CR-807 (LAP), 2021 WL 5647879, at *6 (S.D.N.Y. Dec. 1, 2021)

(rejecting, in dicta, argument that a warrant containing non-temporal items should be suppressed

for its overbreadth or lack of particularity).

      I.      <u>Law Enforcement Relied Upon Each of the Shelton and Zottola Warrants in Good Faith</u>

Finally, even if the Court found some defect in any warrant sought in the course of

this investigation (which it should not), the evidence from that warrant should not be suppressed,

because law enforcement agents clearly relied upon every warrant issued in this case in good

faith.[63]

The Fourth Amendment "contains no provision expressly precluding the use of

evidence obtained in violation" of its terms.  United States v. Leon, 468 U.S. 897, 906 (1984).  The

exclusionary rule developed as "a 'prudential' remedy, crafted by the Supreme Court," Raymonda,

780 F.3d at 117, and it is neither a "personal constitutional right" nor a means "to 'redress the

injury' occasioned by an unconstitutional search," Davis v. United States, 564 U.S. 229, 237

(2009).  Rather, "[t]he rule's sole purpose . . . is to deter future Fourth Amendment violations."

---

[63]      The government contends the good-faith exception applies to the 11 search warrants Shelton and Zottola move to suppress, specifically: (1) three social media search warrants challenged by Shelton, namely, the MMBCertified Instagram Warrant, the KINGSHELZ Instagram Warrant and the Joint Instagram Warrant; (2) three search warrants for information associated with cellular devices belonging to Shelton or Zottola, namely, the 4515 Historical Cell-Site Warrant, the 3484 Historical Cell-Site Warrant and the October Verizon Warrant; (3) three premises warrants for Shelton's and Zottola's residences, namely, the October Premises Warrant, the December Premises Warrant and the June Premises Warrant; and (4) two SIM card search warrants for a SIM card belonging to Shelton, namely, the October and July SIM Card Warrants.

Id.  Accordingly, "the exclusionary rule is designed to deter <u>police</u> misconduct," not mistakes by judges and magistrates.  <u>Leon</u>, 468 U.S. at 916.

      Given this reasoning, suppression will rarely be the appropriate remedy even when probable cause is lacking or a warrant is overbroad.  As the Supreme Court has explained, suppression is the Court's "last resort, not [its] first impulse."  <u>Michigan</u>, 547 U.S. at 591.  Suppression is an appropriate remedy only where it deters "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." <u>Herring v. United States</u>, 555 U.S. 135, 144 (2009).  The Supreme Court has explained that where law enforcement has obtained a warrant, suppression will be "an appropriate remedy" only where (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) "the issuing magistrate wholly abandoned his judicial role," such that "no reasonably well trained officer should rely on the warrant;" (3) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "facially deficient" in that it "fail[s] to particularize the place to be searched or the things to be seized . . . that the executing officers cannot reasonably presume it to be valid." <u>Leon</u>, 468 U.S. at 923; <u>Clark</u>, 638 F.3d at 99 (holding that warrant lacked probable cause to believe evidence of criminal conduct would be found throughout the premises searched, but citing <u>Leon</u>, applying good faith exception and reversing district court's grant of suppression motion).

      Although the government has the burden of showing the objective reasonableness of the officers' good faith reliance on an invalidated warrant, in assessing whether the government has carried its burden, courts must be "mindful that in Leon, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection." <u>Clark</u>,

638 F.3d at 100.  "Evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."  Illinois v. Krull, 480 U.S. 340, 348–49 (1987) (internal quotation marks omitted).

It was manifestly reasonable for law enforcement agents to seek the warrants searching social media accounts, cell phone location information, two premises, a vehicle and a SIM card, on the facts uncovered during the course of this investigation.  It was also reasonable that once obtained, the agents relied upon them.  First, there is no credible basis for any allegation that law enforcement acted in bad faith in seeking or relying upon the warrants, or that law enforcement knew or should have known of some legal infirmity—none have been clearly alleged by the defendants.  Second, it is utterly implausible to claim that the issuing magistrate wholly abandoned his or her judicial role when four different magistrate judges—three from the Eastern District of New York and one from the Southern District of New York—issued 11 warrants over the course of 10 months.  A comparison of the affidavits submitted between September 2018 and June 2019 shows they included much of the same underlying information concerning the violent attacks on Sylvester Zottola and Salvatore Zottola, Shelton's role, and ultimately, Zottola's key presence in the conspiracy.  Given the judges' repeated authorization to conduct searches, no reasonable officer would question his or her reliance on the warrant.  Third, for all the reasons stated above (reasons which the government will not repeat), the affidavits included sufficient probable cause and were not lacking in particularity.  Even if this Court finds defects in those warrants, they were not so lacking in indicia of probable cause or so facially deficient as to the place to be searched and the things to be seized, that officers could not presume the warrant to be valid.

J.     The Execution of the Shelton and Zottola Premises Warrants Was Reasonable

In addition to challenging the probable cause, breadth and particularity of the warrants, Shelton and Zottola also challenge law enforcement's execution of the warrants in this case claiming, in essence, that agents seized too much evidence and conducted untimely and continuous searches of the electronic devices seized pursuant to the warrants.  Zottola Omnibus Mot., ECF 335 at 21-31; see generally Shelton Brady Mot. (filed under seal) & Shelton's Electronic Devices Mot., ECF 324.   These motions should be denied.  The government's review of the devices seized in this case, particularly given the circumstances of this wide-ranging investigation and the number of electronic devices, was reasonable.

1.     Legal Standard

Rule 41 of the Federal Rules of Criminal Procedure provides that, absent any limitation in the warrant itself, the government may seize "electronic storage media or . . . electronically stored information" for "a later review of the media or information consistent with the warrant." Fed. R. Crim. P. 41(e)(2)(B).  Rule 41 also explicitly authorizes the government to retain a copy of electronic media seized pursuant to a warrant.  See Fed. R. Crim. P. 41(f)(1)(B) ("The officer may retain a copy of the electronically stored information that was seized or copied."); Folks, 2021 WL 5987009, at *2  (copying of devices was reasonable); United States v. Mendlowitz, No. 17-CR-248 (VSB), 2019 WL 1017533, at *12 (S.D.N.Y. Mar. 2, 2019) (collecting cases and finding that the retention of electronic devices was reasonable).

As explained at length above, due to the challenges inherent with identifying and accessing devices during the execution of a search, courts routinely permit law enforcement agents to seize all electronic devices within a subject premises for imaging and review.  See, e.g., Purcell, 967 F.3d at 181 n.9; see also Ray, 541 F. Supp. 3d at 394.  This procedure is not grounds for the extraordinary remedy of suppression.  United States v. Chow, No. 01-CR-291 (FB), 2001 WL

1347236, at *2, 4 (E.D.N.Y. Nov. 2, 2001) (denying motion to dismiss where warrant authorized search and seizure, among other things, "all . . . telephones and telephonic devices" at three locations); United States v. Lloyd, No. 98-CR-529 (ILG), 1998 WL 846822, at *3-4 (E.D.N.Y. Oct. 5, 1998) (denying motion to dismiss where defendant challenged "warrant's authorization to seize 'all computer equipment, including hard drives, modems, floppy diskettes, and all peripheral devices'").

Once devices have been seized, the Fourth Amendment requires the government to review these devices within a "reasonable period of time." United States v. Metter, 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012); United States v. Alston, No. 15 CR. 435 (CM), 2016 WL 2609521, at *3 (S.D.N.Y. Apr. 29, 2016) (same); see also United States v. Knights, 534 U.S. 112, 118 (2001) ("The touchstone of the Fourth Amendment is reasonableness."). Although the government's execution of a valid search warrant is subject to reasonableness review, "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness." Ganias, 824 F.3d at 209 (quoting Leon, 468 U.S. at 922).

There is "no established upper limit as to when the government must review seized electronic data to determine whether evidence falls within the scope of a warrant." Wey, 256 F. Supp. 3d at 383 (citation omitted). Rather, numerous courts have held that "a delay of several months or even years between the seizure of electronic evidence and the completion of the government's review of it is reasonable." United States v. Jarman, 847 F.3d 259, 267 (5th Cir. 2017) (citation and alterations omitted); see also Almaleh, 2022 WL 602069, at *19-20 (noting numerous cases hold that a delay of several months or even years between the seizure of electronic evidence and the completion of the government's review of it is reasonable); United States v. Nejad, 436 F. Supp. 3d 707, 735 (S.D.N.Y. 2020) (finding a review process of approximately three

years reasonable); <u>United States v. Sosa</u>, 379 F. Supp. 3d 217, 222 (S.D.N.Y. 2019) (holding that searches of two cellphones that took ten months and fifteen months, respectively, to complete was not unreasonable, where searches were "completed nearly three months prior to defendant's scheduled trial"); <u>Mendlowitz</u>, 2019 WL 1017533, at *12 (collecting cases and finding a review process of 18 months reasonable).

A case-specific analysis is required, because "computer searches are not, and cannot be subject to any rigid time limit because they may involve much more information than an ordinary search, more preparation and a greater degree of care in their execution." <u>United States v. Triumph Capital Grp.</u>, 211 F.R.D. 31, 66 (D. Conn. 2002). "[T]he practical reality is that there is no basis for a 'one size fits all' presumptive period" for the duration of review, because "[a] substantial amount of time can be involved in the forensic imaging and review of information ... due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs." Fed. R. Crim. P. 41(e)(2)(B) advisory committee's notes to the 2009 Amendments.

2.    <u>Analysis</u>

Here, the agents properly executed the warrants, reviewed the evidence over a reasonable period of time, and in rolling productions, the government provided defense counsel with the full electronic devices as well as certain specified materials it intends to use at trial more than four months in advance of jury selection. In the course of this investigation, more than 100 electronic devices were seized in more than a dozen judicially-authorized searches, which devices were believed to contain information within the scope of the warrant. Approximately 66 of those devices were submitted to the FBI to be imaged. Of those, approximately 55 devices were able to be imaged by the FBI and reviewed by agents for evidence authorized by the respective warrants. Those approximately 55 devices, which included cell phones, computers, iPads, laptops and other

electronic devices, account for more than 3 terabytes, or 3,000 gigabytes, of data.[64] Once imaged, each device was reviewed for evidence (as specified the respective warrants) against nearly a dozen defendants charged for a plot that lasted more than a year and featured multiple instances of violence or attempted violence.   The government intends to offer records at trial from approximately 30 of those devices (as detailed above) that comprise approximately less than 20 gigabytes of data.  As law enforcement agents reviewed this data, the government produced full extractions to the defendants of their own devices as well as the devices of others to enable the defendants to engage in their own review and prepare for any suppression motion.  Despite the amount of data spread across dozens of devices, Shelton and Zottola claim law enforcement's review was unreasonable.  Should the Court accept their claims, this would set an untenable standard for investigation in the digital age.  Shelton's and Zottola's motions for suppression on this ground should be denied.

First, Zottola and Shelton argue that the government exceeded the scope of the warrants in seizing the electronic devices as permitted in the warrants.  Zottola Omnibus Mot., ECF 335 at 24 & Exhibit L; Shelton's Electronic Devices Mot., ECF 324 at 37.  Consistent with Rule 41, the search warrant authorized law enforcement agents to seize computers and other electronic devices that might contain evidence falling in the enumerated categories and bearing on the Subject Offenses.  See Ray, 541 F. Supp. 3d at 394 (rejecting argument that because the

---

[64]     To put this number into context, an oft-cited study produced by faculty and students at the School of Information Management and Systems at the University of California at Berkeley ("How Much Information? 2003") explains 1 terabyte equals 50,000 trees made into paper and printed; 2 terabytes equals an academic research library and 10 terabytes equals the print collections of the U.S. Library of Congress.  See Peter Lyman and Hal R. Varian, "How Much Information," 2003. University of California at Berkeley, available at https://groups.ischool.berkeley.edu/archive/how-much-info-2003/execsum.htm#summary (last accessed May 27, 2022).

evidence is "likely intermingled with other non-criminal and private information" it should not be subject to seizure).  Law enforcement agents could not possibly have known merely from looking at a particular device whether or not it contained evidence responsive to the warrants until those devices had been reviewed off-site.  See Purcell, 967 F.3d at 181 n.9.  The defendants' argument ignores the reasonable steps that the government took to address the defendants' concern that law enforcement agents may have seized devices used by other family members.  Specifically, in Zottola's case, he requested the return of three devices, two iPhones and an iPad, which he said were used exclusively by other family members.  As a courtesy, the government asked law enforcement agents to prioritize their review of those devices to confirm Zottola's representations were accurate.  Two of those devices were then returned to Zottola's attorney on October 17, 2019.[65]

Second, Zottola and Shelton claim the government's searches of the seized devices were untimely, and therefore, unreasonable under the Fourth Amendment.  Zottola Omnibus Mot., ECF 335 at 25, 29; Shelton's Electronic Devices Mot., ECF 324 at 36-37.  Here, the review period began shortly after the devices were seized and imaged.[66]  The government produced full extractions of the majority of seized devices several months after their seizure—as detailed above, Zottola received the majority of the extraction reports of the devices seized from his residence and person by November 2019, and Shelton received the extraction reports of the devices seized from his premises on a rolling basis through October 2020.  Moreover, the complaints by the defendants

---

[65]     Zottola used the third device, purportedly belonging to his son, to store a contact number used by Shelton.

[66]     The Shelton SIM Card was not immediately imaged in October 2018, and the government obtained a subsequent warrant in July 2020, in an abundance of caution, to conduct the search of the Shelton SIM Card.

regarding the pace of the discovery are disingenuous, as already detailed at length above. With the exception of several devices seized from Zottola,[67] the defendants in the case largely received the devices the government intends to rely on at trial by February 2021—nearly a year and a half before trial was scheduled to begin. In addition, all the devices have been and remain available for review by the defendants upon request.[68]

In <u>Almaleh</u>, a district court faced with a similar suppression motion claiming an unreasonable search rejected the defendants' argument. <u>See</u> 2022 WL 602069, at *19. There, law enforcement agents reviewed 22 devices (less than half the devices reviewed in this case) and the government finished producing forensic copies of those devices approximately 20 months after they were seized. <u>Id.</u> In light of the number of devices and the volume of data at issue, the court found the review period was "appropriate and comported with the warrant." <u>Id.</u>

Here, in addition to producing full forensic copies of the devices, the government has made apparent throughout the course of this case that it had seized relevant messages pursuant to the warrants and cited those messages as evidence against the defendants warranting their

---

[67] As explained, <u>supra</u> in Section VII, while some devices seized from Zottola had not been previously disclosed to Shelton and other defendants, the government simultaneously produced fewer than 400 pages of records from those devices which it intends to rely on at trial.

[68] Moreover, insofar as Shelton complains that for the devices for which he has not received a forensic extraction, the government must inform him "whether it has attempted to obtain a forensic extraction for the device, or otherwise searched or attempted to search the device," the government has provided a chart of the devices, whether they were submitted for forensic review and imaged and whether the government intends to rely on them at trial. As to Shelton's request for "details as to how the examinations of each device were conducted, including any and all methods or tools used to attempt to extract data or otherwise view the contents of the devices," Shelton has cited no section of Rule 16 or identified any other obligation on the part of the government to do so. Shelton's Electronic Devices Mot., ECF No. 324, at 10. Moreover, although Shelton complains that he was not informed of the dates of forensic extractions of the various devices, he has simply failed to review the discovery provided to him, which indicates, in the extraction reports of the devices, the date of the forensic examination.

continued pretrial detention.  For example, messages from certain devices formed the centerpiece of the government's June 2019 detention letter for the defendants charged in the S-2 Indictment, including Zottola and Lopez, as well as numerous other motions in response to requests for pretrial release throughout 2020.  See, e.g., ECF No. 100 (S-2 detention letter); ECF No. 192 (response to request for bond by Shelton, and detailing evidence recovered from Shelton's devices); ECF No. 200 (response to request for bond by Snipe, and detailing evidence recovered from certain devices).

Zottola's claim that the agents only conducted searches in accordance with the warrants in April 2022 is simply absurd.  Zottola Omnibus Mem., ECF 335 at 29.  The review of 55 electronic devices for information over an approximately year-long period concerning communications among numerous co-defendants and co-conspirators about multiple instances of violence or attempted violence is an undertaking that cannot be accomplished in a single month. In support, Zottola points to the date of the extraction reports that the government provided in its April pretrial disclosure.[69]  That date, however, captures when government asked law enforcement agents to provide the reports for their disclosure; it has no bearing as to when the review of these devices occurred.  The timeliness of the search process was eminently reasonable in light of the circumstances of this investigation which required the imaging and attempted review of more than 100 electronic devices.  Metter, 860 F. Supp. 2d at 212 (noting the analysis requires a careful case-by-case factual analysis "because what may be appropriate under one set of facts and circumstances may not be so under another.").

Third, Zottola argues the government conducted "continuous searches" of the electronic devices and by doing so, "seized" the entire contents of the devices in disregard of the

---

[69]   This date is different than the date of the initial extraction reports for the full phone downloads provided to the defendants in discovery, because this date simply represents the date the pretrial disclosure reports were prepared.

warrant.  Zottola Omnibus Mem., ECF 335 at 29-30; see also Shelton's Electronic Devices Mot., ECF 324 at 37.  As a preliminary matter, Rule 41 explicitly contemplates an ongoing review of electronic evidence, and neither Zottola nor Shelton's motions raise anything to suggest that the searches in this case were unreasonable.  Courts have sanctioned review periods that have lasted years for far fewer devices.  See Jarman, 847 F.3d at 267 (review period of 23 months was reasonable for hard drive, desktop and laptop); Sosa, 379 F. Supp. 3d at 222 (review period of two cell phones that took ten months and fifteen months was not unreasonable); Nejad, 436 F. Supp. at 735 (review period of three years for 1 million documents was reasonable); Mendlowitz, 2019 WL 1017533, at *4, 12 (finding one-and-a-half-year review period was reasonable for three servers and three desktop computers).  As the advisory committee notes to Rule 41 recognize, "this is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs."  Nejad, 436 F. Supp. 3d at 735 (quoting Fed. R. Crim. P. Rule 41, advisory committee notes).

        In addition, the government's production of eight of the devices seized from Zottola to his remaining co-defendants does not indicate the government improperly seized the whole of every device.  Zottola Omnibus Mem., ECF 335 at 29; Shelton's Electronic Devices Mot., ECF 324 at 38.  In light of the upcoming trial schedule, Zottola's receipt of his co-defendants' complete devices, and the ongoing requests for Brady and Giglio evidence, the government did not believe it was prudent to withhold production of the full forensic extractions.  This production was a good faith effort to provide the defendants with potentially relevant documents in a timely fashion.  If the government had taken the opposite approach, Zottola likely would have complained that the government had failed to timely provide the full forensic extractions for his review.  The government marked these devices as protected materials pursuant to the protective order in this

case, and at the same time, identified and produced the much smaller universe of documents from these devices that the government intends to rely on at trial.

Finally, even if the Court determines that the searches were not completed within a reasonable amount of time, "suppression would not be the appropriate remedy because there was no prejudice to the defendant by the delay, and there is no evidence of any intentional and deliberate disregard of any provision of Rule 41." Alston, 2016 WL 2609521, at *4 (citing United States v. Pangburn, 983 F.2d 449, 455 (2d Cir. 1993), and United States v. Burke, 517 F.2d 377, 386 (2d Cir. 1975)).  The Second Circuit has held that courts "must be 'wary in extending the exclusionary rule in search and seizure cases to violations' of Rule 41 alone." United States v. Turner, 558 F.2d 46, 52 (2d Cir. 1977) (quoting Burke, 517 F.2d at 386); see also Jacobson, 4 F. Supp. 3d at 523.  In Burke, the Second Circuit held that "violations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule."  517 F.2d at 386-87; see also Pangburn, 983 F.2d at 455.  The Court should find no basis for concluding that FBI agents "flagrantly disregard[ed]" the warrants here.  See, e.g., Liu, 239 F.3d at 140.

IX.    Use of a Jury Questionnaire

Lastly, Zottola, joined by certain of his remaining co-defendants, requests that jurors in this case be provided with a written questionnaire as part of the voir dire process.  See Zottola's Omnibus Mot., ECF No. 334, at 66-69.  The government defers to the Court's practice but does not oppose the use of questionnaire as a general matter in this case.  The government may object to certain of the defendant's proposed questions but proposes that the parties attempt to reach agreement as to the proposed voir dire by a date set by the Court in advance of jury selection,

or notify the Court of any disagreement by that date, should the Court grant the questionnaire request.[70]

### CONCLUSION

For the reasons set forth above, the government respectfully submits that the defendants' motions are without merit and should be denied except as otherwise stated herein.

Dated:      Brooklyn, New York
            June 1, 2022

                                        Respectfully submitted,

                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Kayla Bensing
Devon Lash
Emily Dean
Assistant United States Attorneys
        (Of Counsel)

---

[70]     The government also anticipates seeking an anonymous and partially sequestered jury in this case by separate motion.

186